OMB No. 1115-0

## PART D.    YOUR SIGNATURE

*After reading the information regarding penalties in the instructions, complete and sign below. If someone helped you prepare must complete Part E.*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546, provides in part: "Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or knowingly presents any such application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned not more than five years, or both." I authorize the release of any information from my record which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.



*WARNING:* Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an Asylum Officer or an Immigration Judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. See 208(d)(6) of the Act and 8 CFR 208.20.

| Print Complete Name | Write your name in your native alphabet |
|---|---|
| Lorena Demirai | |

Did your spouse, parent, or child(ren) assist you in completing this application?   [X] No   [ ] Yes  *(If "Yes" list the name and relationship.)*

| *(Name)* | *(Relationship)* | *(Name)* | *(Relationship)* |
|---|---|---|---|

Did someone other than your spouse, parent, or child(ren) prepare this application?   [ ] No   [ ] Yes  *(If "Yes," complete Part E)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?   [X] No   [ ] Yes

Signature of Applicant *(The person in Part A. I.)*

[ *Lorena Demirie* ]

Sign your name so it all appears within the brackets

Date (Mo/Day/Yr): 4/14/04

## PART E.    DECLARATION OF PERSON PREPARING FORM IF OTHER THAN APPLICANT, SPOUSE, PARENT OR CHILD

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324(c).

| Signature of Preparer | Print Complete Name | Yvette Mastin |
|---|---|---|
| Daytime Telephone Number ( ) | Address of Preparer: Street Number and Name 2323 S. Voss | |
| Apt No 400 | City Houston | State TX | ZIP Code 77057 |

## PART F.    TO BE COMPLETED AT INTERVIEW OR HEARING

*You will be asked to complete this Part when you appear before an Asylum Officer of the Immigration and Naturalization Service (INS), or an Immigration Judge of the Executive Office for Immigration Review (EOIR) for examination.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are all true, to the best of my knowledge taking into account correction(s) numbered _____ to _____ that were made by me or at my request.

Signed and sworn to before me by the above named applicant on

_____     _____
Signature of Applicant                               Date (Mo/Day/Yr)

_____     _____
Write Your Name in Your Native Alphabet          Signature of Asylum Officer or Immigration Judge

28

ADDITIONAL INFORMATION ABOUT YOUR CLAIM TO ASYLUM.

| A # (if available) None | Date |
|---|---|
| Applicant's Name Lorena Demiraj | Applicant's Signature |

*Use this as a continuation page for any information requested. Please copy and complete as needed.*

PART __B__

QUESTION __1A__

were scared and we asked these people where we were going. They told us to shut up because if we talked they were going to kill us. I was scared to death. We stayed for 45 minutes in the train station waiting for the train at 2:05 a.m. We got in the train. myself, my sister and these four persons. They put us in a room and we stayed there for six hours. When we arrived in Napoli they took us and put us in another train. We stayed again in a room for about 7 hours. We went to another cityy called Genova. These people took us to another house in Genova. It was 3.30 pm on April 16, 2003. They brought us some spaghetti. While we were there a man dressed up in black jeans and a black leather jacket came to talk to us. He had a plastic bag in his hand and told us that he had clothes for us and ordered us to put them on. We put them on. He left and came back later that night. He told us we looked pretty in our new clothes. He said we had to get ready because we were going out and started to laugh. We asked him where we were going. He told us that we were going to work as prostitutes for him. We started to cry. We told him that we were not prostitutes. He got mad and started beating us. We kept telling him we would not do that because we were not prostitutes and that we would not go. He beat us with his belt. We asked him why are youing this to us. He said this was payback to your uncle Edmund for when I was in the United States. Then we understood who he was. He was the same person that shot our Uncle. Edmund Demiraj only a few days earlier. Again we told him we were not going to do that job. Then he called on his mobile phoneand after that came three more men. They tied us up - back to back. and put tape in our mouths and started beating us. They told us if we don't obeythey will kill us and our family in Albania. After that they went out and left us tied up in the middle of the room with no food or water. Several times one of them would come in and ask us if we were going to work. We still said no. They stayed like that for two days. We both had pain all over, felt sick and nauseated. They didn't untie us to go to the bathroom and we had both urinated on ourselves. It was really a horrible experience. At some point I signaled to Sefide that we should say yes. I figured we'd have a better chance at escaping. We did say yes and they released us we were able to shower, eat and drink and change our clothes. We put the make-up on as we were told and then they took us out. The same man was there who shot our Uncle Edmund. He gave us some condoms and told us how to use them for sex. They put us in a dark street. They separated us and put us in different places on the same street. They told us if we leave their going to kills us and our families in Albania. Then they left us and we were alone and scared. We tried to get closer together on the street but someone came and wouldn't let us. It started to rain. They came to get us and they took us to a place caqlled "Piazza ferrari." When we arrived we took a taxi and told the driver that we wanted to go to the train station in Genova. When we arrived at the station we told the driver we didn't have any money and tried to tell him our situation. He felt sorry for us and gave us 30 euros each. We bought tickets to go to Roma because it the first place to go quickly. The train was leaving in 20 minutes. We waited in the bathroom for the train. When we heard the annolucement to leave we left the bathroom and boarded the train. I was the morning of April 20, 2003. After many hours the train arrived in Roma. As soon as we arrived we called our family in Albania. We told our grandparents what had happened. Our father is somewhere in Greece and our mother is deceased. So we were living with our grandparents before we were kidnapped. We told our grandparents that the man who shot our uncle ed mund had had us kidnapped. My grandfather was afriad we would be harmed if we returned to Albania because the government officials had done nothing to help Edmund when he reported the shooting to government officials. They had ignored him and told him it was his problem from the United States. MY grandfather told us to wait at the station he had a friend in Italy that would come and get us. After about an hour a tall man came and took us in his car, a fiat tipo. and he told us that we were going to his house in "Peruxhia." When we arrived at his house he told us to call out family in Albania. When we talked to our grandfather he told us that this man was going to help us get to the United States where we would be safe with our other relatives. We told him that we really wanted to come home to Albania but he told us that it was too dangerous to come back to Albania. HE told us that that man would kidnap us again because of the feud between him and Edmund. We stayed in that house for fice days. On April 26, 2003 we left Italy and went to France by train. Someone else went with us. We arrived in France and stayed at a hotel calle "Champayner." The next day at 10:45 a.m. we took a plave from France to Mexico. We went to Mexico with this person. When we arrived in Mexico this person called somebody else with a white car. We got into it and went to the bus station. at the bus station a Mexican man told us to get on the bus after him. We did. We traveled all night on the bus and in the morning we were in Matamoros. When we arrived a woman was waiting for us with a truck. Ahe took us to a house. The house was very dirty and smelled bad. Late at night a man came and took us to pass the river. The river was deep so he had to help us get across. After we crossed the river we walked for about three hours. We stayed there for two days in a house that was next to a pizza place. After that we were separated and taken in different cars. When we went to the check point the driver talked to the officer and then he kept driving. From there we went to Houston. The driver took us to my sister-in-law's apartment on Nasa Road. We only had her address. The driver called on his mobile phone. We spoke to the the man who had brought us from France to Mexico. He told us that we would be safe now. Then we called our family in Albania. Grandpa told us he borrowed $30,000.00 to get us to the United States.

IMMIGRATION COURT
26 FEDERAL PLZ 12TH FL. Rm1237
NEW YORK, NY  10278

In the matter of

DEHTRAJ LOREDA                          Case No.: A73-317-799
    Respondent

                                        IN REMOVAL PROCEEDINGS

ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on _December 6, 2006_.
This memorandum is solely for the convenience of the parties. If the
proceedings should be appealed or reopened, the oral decision will become
the official opinion in the case.

[ ]  The respondent was ordered removed from the United States to
                                                    or in the alternative to

[ ]  Respondent's application for voluntary departure was denied and
     respondent was ordered removed to
     alternative to

[ ]  Respondent's application for voluntary departure was granted until
         upon posting a bond in the amount of $ _____
     with an alternate order of removal to

[X]  Respondent's application for asylum was (X)granted  ( )denied
     ( )withdrawn.

[ ]  Respondent's application for withholding of removal was ( )granted
     ( )denied  ( )withdrawn.

[ ]  Respondent's application for cancellation of removal under section
     240A(a) was ( )granted  ( )denied  ( )withdrawn.

[ ]  Respondent's application for cancellation of removal was ( ) granted
     under section 240A(b)(1)  ( ) granted under section 240A(b)(2)
     ( ) denied ( )withdrawn. If granted, it was ordered that the
     respondent be issued all appropriate documents necessary to give
     effect to this order

[ ]  Respondent's application for a waiver under section _____ of the INA was
     ( )granted ( )denied ( )withdrawn or ( )other.

[ ]  Respondent's application for adjustment of status under section _____
     of the INA was ( )granted ( )denied ( )withdrawn. If granted, it
     was ordered that respondent be issued all appropriate documents necessary
     to give effect to this order.

[ ]  Respondent's status was rescinded under section 246.

[ ]  Respondent is admitted to the United States as a _____ until _____.

[ ]  As a condition of admission, respondent is to post a $ _____ bond.

[ ]  Respondent knowingly filed a frivolous asylum application after proper
     notice.

[ ]  Respondent was advised of the limitation on discretionary relief for
     failure to appear as ordered in the Immigration Judge's oral decision.

[ ]  Proceedings were terminated.

[ ]  Other: _____

     Date: December 6, 2006
     Appeal: Waived/Reserved   Appeal Due By:

                                        PHILIP L. MORACE
                                        Immigration Judge

AU

30

ALIEN NUMBER: 98-317-799                    ALIEN NAME   EMIRAJ. LORENA

## CERTIFICATE OF SERVICE

THIS DOCUMENT WAS SERVED BY: MAIL (M)      PERSONAL SERVICE (P)
TO: [ ] ALIEN [ ] ALIEN c/o Custodial Officer  [ ] ALIEN'S ATT/REP  [ ] INS
DATE: _____  BY: COURT STAFF _____
     Attachments:  [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other

U.S. Department of Justice
Immigration and Naturalization Service

**Application for Asylum** d for Withholding of Remova

OMB No. 1115-0086

*Start Here - Please Type or Print.* USE BLACK INK. SEE THE SEPARATE INSTRUCTION PAMPHLET FOR INFORMATION ABOUT ELIGIBILITY AND HOW TO COMPLETE AND FILE THIS APPLICATION. (Note: There is NO filing fee for this application.)

*Please* check the box if you also want to apply for withholding of removal under the Convention Against Torture. [X]

## PART A. I.  INFORMATION ABOUT YOU

| | |
|---|---|
| 1. Alien Registration Number(s) (A#'s) (If any)  None | 2. Social Security No. (If any)  None |

| 3. Complete Last Name  Demiraj | 4 First Name  Sefide | 5. Middle Name  N/A |
|---|---|---|

6. What other names have you used? *(Include maiden name and aliases.)*
none

7. Residence in the U.S.

| C/O Edmund Demiraj | Telephone Number  832-251-3662 |
|---|---|
| Street Number and Name  535 Nassa Rd | Apt. No.  2008 |
| City  Webster | State  TX | ZIP Code  77598 |

8. Mailing Address in the U.S., if other than above
Yvette M. Mastin, Atty

| Street Number and Name  2323 South Voss Rd | Telephone Number  832-251-366 |
|---|---|
| | Apt. No.  400 |
| City  Houston | State  TX | ZIP Code  77057 |

| 9. Sex [ ] Male [X] Female | 10. Marital Status: [X] Single [ ] Married [ ] Divorced [ ] Widowed |
|---|---|

| 11. Date of Birth (Mo/Day/Yr)  03/31/1982 | 12. City and Country of Birth  Lushnie, Albania |
|---|---|

| 13. Present Nationality (Citizenship)  Albanian | 14. Nationality at Birth  Albanian | 15. Race, Ethnic or Tribal Group  white | 16. Religion  Muslim |
|---|---|---|---|

17.   Check the box, a through c that applies:   a. [X]   I have never been in immigration court proceedings.
b. [ ] I am now in immigration court proceedings.   c. [ ]  I am not now in immigration court proceedings, but I have been in the past.

18. Complete 18 a through c.
a  When did you last leave your country? (Mo/Day/Yr)  04/15/03   b. What is your current I-94 Number, if any?  none

c.  Please list each entry to the U.S. beginning with your most recent entry.
List date (Mo/Day/Yr), place, and your status for each entry. (Attach additional sheets as needed.)

| Date  04/30/2003 | Place  Brownsville, TX | Status  EWI | Date Status Expires  N/A |
|---|---|---|---|
| Date | Place | Status | |
| Date | Place | Status | |
| Date | Place | Status | |

| 19. What country issued your last passport or travel document? no passport issued | 20. Passport ≠ N/A  Travel Document ≠ N/A | 21. Expiration Date (Mo/Day/Yr) |
|---|---|---|

| 22  What is your native language?  Albanian | 23. Are you fluent in English? [ ] Yes [X] No | 24. What other languages do you speak fluently?  None |
|---|---|---|

| FOR EOIR USE ONLY | FOR INS USE ONLY |
|---|---|
| | Action:  Interview Date:  Decision:  __ Approval Date:  __ Denial Date:  __ Referral Date:  Asylum Officer ID≠ |

Form I-589 (Rev. 10.18/01)

OMB No 1115-0086

**PART A. II.   INFORMATION ABOUT YOUR SPOUSE AND CHILDREN**
**Your Spouse.**   ☒ I am not married. (Skip to *Your Children*, below)

| 1. Alien Registration Number (A#) *(If any)* NA | 2. Passport/ID Card No. *(If any)* NA | 3. Date of Birth *(Mo/Day/Yr)* NA | 4. Social Security No *(If any)* NA |
|---|---|---|---|
| 5. Complete Last Name NA | 6. First Name NA | 7 Middle Name NA | 8. Maiden Name NA |
| 9. Date of Marriage *(Mo/Day/Yr)* NA | 10. Place of Marriage NA | 11. City and Country of Birth NA | |

| 12. Nationality *(Citizenship)* NA | 13. Race, Ethnic or Tribal Group NA | 14. Sex NA ☐ Male ☐ Female |
|---|---|---|

| 15. Is this person in the U.S.? NA ☐ Yes *(Complete blocks 16 to 24.)* ☐ No *(Specify location)* |
|---|

| 16. Place of last entry in the U.S.? NA | 17. Date of last entry in the U.S. *(Mo/Day/Yr)* NA | 18. I-94 No. *(If any)* NA | 19. Status when last admitted *(Visa type, if any)* NA |
|---|---|---|---|
| 20. What is your spouse's current status? NA | 21. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* NA | 22. Is your spouse in immigration court proceedings? NA ☐ Yes ☐ No | 23. If previously in the U.S., date of previous arrival *(Mo/Day/Yr)* NA |

24.   If in the U.S., is your spouse to be included in this application? *(Check the appropriate box.)* NA

☐   Yes *(Attach one (1) photograph of your spouse in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐   No

**Your Children.**   Please list ALL of your children, regardless of age, location, or marital status.

☒ I do not have any children. (Skip to Part A. III., *Information about Your Background.)*
☐ I do have children. Total number of children _____

   *(Use Supplement A Form I-589 or attach additional pages and documentation if you have more than four (4) children.)*

| 1. Alien Registration Number (A#) *(If any)* NA | 2. Passport/ID Card No. *(If any)* NA | 3. Marital Status *(Married, Single, Divorced, Widowed)* NA | 4. Social Security No. *(If any)* NA |
|---|---|---|---|
| 5. Complete Last Name NA | 6. First Name NA | 7. Middle Name NA | 8. Date of Birth *(Mo/Day/Yr)* NA |
| 9. City and Country of Birth NA | 10. Nationality *(Citizenship)* NA | 11. Race, Ethnic or Tribal Group NA | 12. Sex ☐ Male ☐ Female NA |

| 13. Is this child in the U.S.? NA ☐ Yes *(Complete blocks 14 to 21.)* ☐ No *(Specify Location)* |
|---|

| 14. Place of last entry in the U.S.? NA | 15. Date of last entry in the U.S.? *(Mo/Day/Yr)* NA | 16. I-94 No. *(If any)* NA | 17. Status when last admitted *(Visa type, if any)* NA |
|---|---|---|---|
| 18 What is your child's current status? NA | 19 What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* NA | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No NA | |

21   If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐   Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐   No   NA

Form I-589 (Rev. 10.18/01)N Page 2

OMB No. 1115-0086

## PART A. II. INFORMATION ABOUT YOUR SPOUSE AND CHILDREN Continued

| 1. Alien Registration Number (A#) (If any) | 2. Passport/ID Card No. (If any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. Social Security No. (If any) |
|---|---|---|---|
| NA | NA | NA | NA |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (Mo/Day/Yr) |
|---|---|---|---|
| NA | NA | NA | |

| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic or Tribal Group | 12. Sex ☑ Male ☐ Female |
|---|---|---|---|
| NA | NA | NA | |

13. Is this child in the U.S.? ☐ Yes (Complete blocks 14 to 21) ☐ No (Specify Location)   N/A

| 14. Place of last entry in the U.S.? | 15 Date of last entry in the U.S.? (Mo/Day/Yr) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| NA | NA | NA | |

| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (Mo/Day/Yr) | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No |
|---|---|---|
| NA | NA | NA |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes (Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)
☐ No

| 1. Alien Registration Number (A#) (If any) | 2. Passport/ID Card No. (If any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. Social Security No. (If any) |
|---|---|---|---|
| NA | NA | N/A | NA |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (Mo/Day/Yr) |
|---|---|---|---|
| NA | | NA | |

| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |
|---|---|---|---|
| NA | NA | NA | |

13. Is this child in the U.S.? ☐ Yes (Complete blocks 14 to 21.) ☐ No (Specify Location)   NA

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? (Mo/Day/Yr) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| NA | NA | N/A | NA |

| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (Mo/Day/Yr) | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No |
|---|---|---|
| NA | NA | |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes (Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)
☐ No

| 1. Alien Registration Number (A#) (If any) | 2. Passport/ID Card No. (If any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. Social Security No. (If any) |
|---|---|---|---|
| NA | NA | N/A | NA |

| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (Mo/Day/Yr) |
|---|---|---|---|
| NA | NA | NA | NA |

| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |
|---|---|---|---|
| NA | | | |

13. Is this child in the U.S.? ☐ Yes (Complete blocks 14 to 21.) ☐ No (Specify Location)   NA

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? (Mo/Day/Yr) | 16. I-94 No. (If any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| NA | NA | NA | |

| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (Mo/Day/Yr) | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No |
|---|---|---|
| NA | NA | |

21. If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes (Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)
☐ No   NA

OMB No. 1115-0086

**PART A. III.   INFORMATION ABOUT YOUR BACKGROUND**

1 . Please list your last address where you lived before coming to the U.S. If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State, and Country.) (Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Number and Street (Provide if available) | City/Town | Department, Province or State | Country | Dates From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|---|---|
| Pallati 210 | Lushnie | Xberdet Meprevi | Albania | 03/1996 | 04/2003 |
| NA | NA | NA | NA | NA | NA |

2. Provide the following information about your residences during the last five years. List your present address first. *(Use Supplement Form B or additional sheets of paper if necessary)*

| Number and Street | City/Town | Department, Province or State | Country | Dates From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|---|---|
| 535  Nassa Rd | Webster | TX | USA | 01/2004 | Present |
| 535 W Nassa Rd 1 #2008 | Webster | TX | USA | 04/2004 | 04/2004 |
| 800 West Nasa Rd. 1 #260 | Webster | TX | USA | 04/2003 | 04/2004 |
| Pallati 210 | Lushnie | | Albania | 04/1996 | 04/2003 |
| NA | NA | NA | NA | NA | NA |

3. Provide the following information about your education, beginning with the most recent. *(Use Supplement B Form I-589 or additional sheets of paper if necessary)*

| Name of School | Type of School | Location (Address) | Attended From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|---|
| October Eighteen | high school | Lushnie, Albania | 09/1995 | 06/2000 |
| elementary school / middle school | elementary school / middle school | Pluk, Albania | 09/1987 | 06/1995 |
| NA | NA | NA | NA | NA |
| NA | NA | NA | NA | NA |

4. Provide the following information about your employment during the last five years. List your present employment first. *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|
| contract employment | odd jobs | 04/2003 | |
| none: | | 04/1999 | 04/2003 |
| NA | NA | NA | NA |
| NA | NA | NA | NA |
| NA | NA | NA | NA |

5. Provide the following information about your parents and siblings (brother and sisters) Check box if the person is deceased. *(Use Supplement B Form I-589 or additional sheets of paper if necessary)*

| Name | City Town and Country of Birth | | Current Location |
|---|---|---|---|
| *Mother* Qanie Demirai | Viora, Albania | [X] Deceased | |
| *Father* Ridvan Demirai | Korea, Albania | [ ] Deceased | Greece |
| *Siblings* Lorena  Demirai | Lushnie Albania | [ ] Deceased | Houston, TX  USA |
| N/A | NA | [ ] Deceased | N/A |

Form I-589 (Rev. 10/18/01)N Page 4

OMB No. 1115-0086

## PART B.   INFORMATION ABOUT YOUR APPLICATION

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in PART B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the Act or withholding of removal under the Convention Against Torture) you should provide a detailed and specific account of the basis of your claim to asylum or other protection. To the best of your ability, provide specific dates, places, and descriptions about each event or action described. You should attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim. If this documentation is unavailable or you are not providing this documentation with your application, please explain why in your responses to the following questions. Refer to Instructions, Part 1: Filing Instructions, Section II. "Basis of Eligibility," Parts A - D, Section V. "Completing the Form," Part B, and Section VII. "Additional Documents that You Should Submit" for more information on completing this section of the form.

1.  Why are you applying for asylum or withholding of removal under section 241(b)(3) of the Act, or for withholding of removal under the Convention Against Torture? Check the appropriate box (es) below and then provide detailed answers to questions A and B below:

     I am seeking asylum or withholding of removal based on

     ☐ Race
     ☐ Religion
     ☐ Nationality
     ☐ Political opinion
     ☒ Membership in a particular social group
     ☒ Torture Convention

    A. Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

     ☐ No  ☒ Yes  If your answer is "Yes," explain in detail:

      1) What happened;
      2) When the harm or mistreatment or threats occurred;
      3) Who caused the harm or mistreatment or threats; and
      4) Why you believe the harm or mistreatment or threats occurred.

    On April 15, 2003, a black mercedes with license plate VL pulled up in front of me and my sister Sefide. Three men wearing masks came out of the car and grabbed us. They pushed us into the car and blindfolded us. I tried to struggle but they threatened to kill us if we didn't settle down and be quiet. From the car they took us into a house with an iron window. In the room was only two beds and a table. We stayed there for a few hours and after that four people came and took us. I realized we were in Vlora, Albania because I saw the soccor stadium when werew taken outside. This time they separated us. Two persons came with me and two persons went with my sister. After 30 minutes we arrived at the Port of Vlora. They took us from the cars and put us into a boat. In theis boat were other people. After fours hours we were at Bari, Italy. It was dark and we

    B. Do you fear harm or mistreatment if you return to your home country? **See additional information in Supplement B to Form I-589**

     ☐ No  ☒ Yes  If your answer is "Yes," explain in detail:

      1) What harm or mistreatment you fear;
      2) Who you believe would harm or mistreat you; and
      3) Why you believe you would or could be harmed or mistreated.

    Yes, I am afraid that I will be kidnapped again by the man that shot my uncle Edmund Demiraj and that the Albanian government will not and cannot do anything to protect me.  Many girls are kidnapped in Albania and forced to work as prostitutes in Italy. This man is a known criminal and the Albanian government is not able to stop him and does not even try.

OMB No. 1115-0086

PART B.    INFORMATION ABOUT YOUR APPLICATION Continued

2.  Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States?

☐ No    ☒ Yes  If "Yes," explain the circumstances and reasons for the action.

Yes, members of our family have been imprisoned by the communist party members in Albania when the communists were in power in Albania.  Additionally members of the socialist party, the former communist party  have had members of my family attacked because of their association with the Democratic party in Albania.

3.  A.  Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No    ☒ Yes  If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

Yes, members of my family have belonged to the Democratic party in Albania.

B.  Do you or your family members continue to participate in any way in these organizations or groups?

☐ No    ☒ Yes If "Yes," describe for each person, your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

They do participate but no longer in Albania because their lives were threatened.

4.  Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No    ☒ Yes  If "Yes," explain why you are afraid and describe the nature of the torture you fear, by whom, and why it would be inflicted.

I am afraid that the peolpe who kidnapped me will torture me and kill me for escaping from them.

See additional information in Supplement B to Form I-589
Form I-589 (Rev. 10/18/01)N Page 6

OMB No. 1115-008

**PART C.   ADDITIONAL INFORMATION ABOUT YOUR APPLICATION**
*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.)*

1   Have you, your spouse, your child(ren), your parents, or your siblings ever applied to the United States Government for refugee status, asylum, or withholding of removal?   ☐ No  ☒ Yes

If "Yes" explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision. Please indicate whether or not you were included in a parent or spouse's application. If so, please include your parent or spouse's A- number in your response. If you have been denied asylum by an Immigration Judge or the Board of Immigration Appeals, please describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.
My sister Sefide Demiraj is applying for asylum at the same time that I am.  She has not received a decision in her case.

2.   A.  After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside in any other country before entering the United States?   ☐ No  ☒ Yes

B.  Have you, your spouse, your child(ren), or other family members such as your parents or siblings ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?   ☒ No  ☐ Yes

If "Yes" to either or both questions (2A and/or 2B). provide for each person the following: the name of each country and the length of stay; the person's status while there; the reasons for leaving; whether the person is entitled to return for lawful residence purposes; and whether the person applied for refugee status or for asylum while there, and. if not, why he or she did not do so.
My sister and I traveled through Italy. France and Mexico before we arrived in the United States.

3.   Have you, your spouse, or child(ren) ever ordered, incited, assisted, or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

☒ No   ☐ Yes If  "Yes," describe in detail each such incident and your own or your spouse's or child(ren)'s involvement.

OMB No. 1115-0086

## PART C. ADDITIONAL INFORMATION ABOUT YOUR APPLICATION Continued

4.  After you left the country where you were harmed or fear harm, did you return to that country?

    [X] No   [ ] Yes  If "Yes," describe in detail the circumstances of your visit (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s)).

5.  Are you filing the application more than one year after your last arrival in the United States?

    [X] No   [ ] Yes  If "Yes," explain why you did not file within the first year after you arrived. You should be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived. For guidance in answering this question, see Instructions. Part 1: Filing Instructions, Section V. "Completing the Form." Part C.

6.  Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted and sentenced for any crimes in the United States?

    [X]  No   [ ] Yes If "Yes," for each instance, specify in your response what occurred and the circumstances; dates; length of sentence received; location; the duration of the detention or imprisonment; the reason(s) for the detention or conviction; any formal charges that were lodged against you or your relatives included in your application; the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

OMB No 1115-0086

## PART D.    YOUR SIGNATURE

*[text partially illegible]* regarding penalties if the instructions complete and sign even if someone helped you prepare this application, he or she must sign in Part E.

I certify under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546, provides in part: "Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or knowingly presents any such application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned not more than five years, or both." I authorize the release of any information from my record which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.



*WARNING.* Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an Asylum Officer or an Immigration Judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. See 208(d)(6) of the Act and 8 CFR 208.20.

| Print Complete Name | Write your name in your native alphabet |
|---|---|
| Sefide Demiraj | |

Did your spouse, parent, or children assist you in completing this application?   [X] No   [ ] Yes   *If "Yes" list the name and relationship(s).*

|  (Name) |  (Relationship) |  (Name) |  (Relationship) |
|---|---|---|---|

Did someone other than your spouse, parent, or children prepare this application?   [ ] No   [X] Yes   *If "Yes" complete Part E.*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?   [X] No   [ ] Yes

Signature of Applicant *(The person in Part A. I.)*

[ _signature_ ]

Sign your name so it all appears within the brackets                    Date *(Mo Day Yr)*

## PART E.    DECLARATION OF PERSON PREPARING FORM IF OTHER THAN APPLICANT, SPOUSE, PARENT OR CHILD

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324c(c).

| Signature of Preparer | Print Complete Name |
|---|---|
| | |
| Daytime Telephone Number | Address of Preparer: Street Number and Name |
| | |

| Apt. No. | City | State | ZIP Code |
|---|---|---|---|
| | | TX | |

## PART F.    TO BE COMPLETED AT INTERVIEW OR HEARING

*You will be asked to complete this Part when you appear before an Asylum Officer of the Immigration and Naturalization Service (INS), or an Immigration Judge of the Executive Office for Immigration Review (EOIR) for examination.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are all true to the best of my knowledge taking into account correction(s) numbered _____ to _____ that were made by me or at my request.

Signed and sworn to before me by the above named applicant on

_____                         _____
Signature of Applicant                                        Date *(Mo Day Yr)*

_____                         _____
Write Your Name in Your Native Alphabet            Signature of Asylum Officer or Immigration Judge

Form I-589 (Rev. 10/18/01) N Page 8

OMB No. 1115-0086
**SUPPLEMENT B FORM I-589**

**ADDITIONAL INFORMATION ABOUT YOUR CLAIM TO ASYLUM.**

| A # (If available) None | Date |
|---|---|
| Applicant's Name Sefide Demiraj | Applicant's Signature |

*Use this as a continuation page for any information requested. Please copy and complete as needed.*

PART **B**

QUESTION **1A**

were scared and we asked these people where we were going. They told us to shut up because if we talked they were going to kill us. I was scared to death. We stayed for 45 minutes in the train station waiting for the train at 2:05 a.m. We got in the train, myself, my sister and these four persons. They put us in a room and we stayed there for six hours. When we arrived in Napoli they took us and put us in another train. We stayed again in a room for about 7 hours. We went to another city called Genova. These people took us to another house in Genova. It was 3.30 pm on April 16. 2003. They brought us some spaghetti While we were there a man dressed up in black jeans and a black leather jacket came to talk to us. He had a plastic bag in his hand and told us that he had clothes for us and ordered us to put them on. We put them on. He left and came back later that night. He told us we looked pretty in our new clothes. He said we had to get ready because we were going out and started to laugh. We asked him where we were going. He told us that we were going to work as prostitutes for him. We started to cry. We told him that we were not prostitutes. He got mad and started beating us. We kept telling him we would not do that because we were not prostitutes and that we would not go. He beat us with his belt. We asked him why are you doing this to us. He said this was payback to your uncle Edmund for when I was in the United States. Then we understood who he was. He was the same person that shot our Uncle, Edmund Demiraj only a few days earlier. Again we told him we were not going to do that job. Then he called on his mobile phone and after that came three more men. They tied us up - back to back, and put tape in our mouths and started beating us. They told us if we don't obey they will kill us and our family in Albania. After that they went out and left us tied up in the middle of the room with no food or water. Several times one of them would come in and ask us if we were going to work. We still said no. We stayed like that for two days. We both had pain all over, felt sick and nauseated. They didn't untie us to go to the bathroom and we had both urinated on ourselves. It was really a horrible experience. At some point Lorena signaled to me that we should say yes. I figured we'd have a better chance at escaping. We did say yes and they released us we were able to shower, eat and drink and change our clothes. We put the make-up on as we were told and then they took us out. The same man was there who shot our Uncle Edmund. He gave us some condoms and told us how to use them for sex. They put us in a dark street. They separated us and put us in different places on the same street. They told us if we leave their going to kills us and our families in Albania. Then they left us and we were alone and scared. We tried to get closer together on the street but someone came and wouldn't let us. It started to rain. They came to get us and they took us to a place caqlled "Piazza ferrari." When we arrived we took a taxi and told the driver that we wanted to go to the train station in Genova. When we arrived at the station we told the driver we didn't have any money and tried to tell him our situation. He felt sorry for us and gave us 30 euros each. We bought tickets to go to Roma because it the first place to go quickly. The train was leaving in 20 minutes. We waited in the bathroom for the train. When we heard the annoiucement to leave we left the bathroom and boarded the train. It was the morning of April 20, 2003. After many hours the train arrived in Roma. As soon as we arrived we called our family in Albania. We told our grandparents what had happened. Our father is somewhere in Greece and our mother is deceased. So we were living with our grandparents before we were kidnapped. We told our grandparents that the man who shot our uncle ed mund had had us kidnapped. My grandfather was afriad we would be harmed if we returned to Albania because the government officials had done nothing to help Edmund when he reported the shooting to government officials. They had ignored him and told him it was his problem from the United States. My grandfather told us to wait at the station he had a friend in Italy that would come and get us. After about an hour a tall man came and took us in his car, a fiat tipo, and he told us that we were going to his house in "Peruxhia." When we arrived at his house he told us to call out family in Albania. When we talked to our grandfather he told us that this man was going to help us get to the United States where we would be safe with our other relatives. We told him that we really wanted to come home to Albania but he told us that it was too dangerous to come back to Albania. HE told us that that man would kidnap us again because of the feud between him and Edmund. We stayed in that house for five days. On April 26. 2003 we left Italy and went to France by train. Someone else went with us. We arrived in France and stayed at a hotel calle "Champayner." The next day at 10:45 a.m. we took a plave from France to Mexico. We went to Mexico with this person. When we arrived in Mexico this person called somebody else with a white car. We got into it and went to the bus station. at the bus station a Mexican man told us to get on the bus after him. We did. We traveled all night on the bus and in the morning we were in Matamoros. When we arrived a woman was waiting for us with a truck. Ahe took us to a house. The house was very dirty and smelled bad. Late at night a man came and took us to pass the river. The river was deep so he had to help us get across. After we crossed the river we walked for about three hours. We stayed there for two days in a house that was next to a pizza place. After that we were separated and taken in different cars. When we went to the check point the driver talked to the officer and then he kept driving. From there we went to Houston. The driver took us to my sister-in-law's apartment on Nasa Road. We only had her address. The driver called on his mobile phone. We spoke to the the man who had brought us from France to Mexico. He told us that we would be safe now. Then we called our family in Albania. Grandpa told us he borrowed $30,000.00 to get us to the United States.

 

IMMIGRATION COURT
26 FEDERAL PLZ 12TH FL, RM 1237
NEW YORK, NY 10278

In the Matter of                                    Case No : A78-717-876

DEMBA LY SEFIDE                                     IN REMOVAL PROCEEDINGS
        Respondent

                    ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on : _December 6 2004_
This memorandum is solely for the convenience of the parties.  If the
proceedings should be appealed or reopened, the oral decision will become
the official opinion in the case.
[  ]  The respondent was ordered removed from the United States to
                                                  or in the alternative to
[  ]  Respondent's application for voluntary departure was denied and
      respondent was ordered removed to
      alternative to
[  ]  Respondent's application for voluntary departure was granted until
           upon posting a bond in the amount of $ _____
      with an alternate order of removal to
[X]  Respondent's application for asylum was ( X )granted  ( )denied
      ( )withdrawn.
[  ]  Respondent's application for withholding of removal was ( )granted
      ( )denied  ( )withdrawn.
[  ]  Respondent's application for cancellation of removal under section
      240A(a) was ( )granted  ( )denied  ( )withdrawn.
[  ]  Respondent's application for cancellation of removal was ( ) granted
      under section 240A(b)(1)    ( ) granted under section 240A(b)(2)
      ( ) denied  ( ) withdrawn.  If granted, it was ordered that the
      respondent be issued all appropriate documents necessary to give
      effect to this order.
[  ]  Respondent's application for a waiver under section _____ of the INA was
      ( )granted  ( )denied  ( )withdrawn or ( )other.
[  ]  Respondent's application for adjustment of status under section _____
      of the INA was ( )granted  ( )denied  ( )withdrawn.  If granted, it
      was ordered that respondent be issued all appropriate documents necessary
      to give effect to this order.
[  ]  Respondent's status was rescinded under section 246.
[  ]  Respondent is admitted to the United States as a _____ until _____.
[  ]  As a condition of admission, respondent is to post a $ _____ bond.
[  ]  Respondent knowingly filed a frivolous asylum application after proper
      notice.
[  ]  Respondent was advised of the limitation on discretionary relief for
      failure to appear as ordered in the Immigration Judge's oral decision.
[  ]  Proceedings were terminated.
[  ]  Other: _____
      Date: _December 6 2004_
      Appeal: Waived Reserved   Appeal Due 2:

                                        _____
                                        PHILIP L. MORACE
                                        Immigration Judge

ALIEN NUMBER: 98-317-828                    ALIEN NAME: DEMIRAJ, SEFIDE

CERTIFICATE OF SERVICE

THIS DOCUMENT WAS SERVED BY: MAIL (M)    PERSONAL SERVICE (P)
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [ ] ALIEN's ATT/REP  [ ] INS
DATE: _____ BY: COURT STAFF _____
      Attachments: [ ] EOIR-33  [ ] EOIR-26  [ ] Legal Services List  [ ] Other

Feud forces asylum-seeker into hiding
By Rebecca DiGirolamo and Natalie O'Brien
24nov03

ALBANIAN asylum-seeker Engjell "Angelo" Pemaj has gone into hiding in suburban Canberra hoping to escape a medieval-style death sentence.

The 33-year-old has less than three months to convince Immigration Minister Amanda Vanstone that he is genuinely the target of an ancient blood feud in his home country. Mr Pemaj fears being shot dead in the streets of Dajc, in the northern Albanian district of Shkodra.

His life would be a payback for driving the vehicle that hit and killed motorcyclist Vehbi Beqi in an accident involving Mr Pemaj's father Pashuk in February 1998.

His migration agent Marion Le has sought a ministerial intervention from Senator Vanstone, saying the Refugee Review Tribunal should not have discounted evidence given by other Albanians about blood feuds.

Mrs Le also raised new evidence in the form of a letter from an organisation that is recognised by the Albanian Government as an official body for negotiating and settling blood feuds.

Mr Pemaj's father, found by the courts to be innocent of any wrongdoing in the accident, owes the Beqi family blood under the "Kanun" - a complicated set of rules introduced in the 15th century by feudal ruler Leke Dukagjini.

The ancient law allows family dignity to be preserved by taking a life for a life.

"If someone kills my brother, there is no way in the world I can live without gaining revenge - that's how it works," explained Cesk, an Albanian-born man now living in Adelaide who did not want to disclose his surname. Cesk and his brother Aleks gave evidence to the Refugee Review Tribunal supporting Mr Pemaj's blood feud claims.

Cesk said blood feuds were an "everyday occurrence" after the fall of communism in 1990 and traditionally only ended with the death of the targeted person or a male family member.

"Everyone now has a gun and they just chase them and shoot them down, even 20 years later," he said.

Cesk said he had been confronted by the father of Beqi when he returned to Albania to visit his family, which lives in the same province as the Pemaj family. "The father told me that one day Angelo would have to come back home and, when he did, he would get his revenge," Cesk said.

The tribunal, however, ruled there was not a genuine blood feud and that the story had been fabricated to allow Mr Pemaj to stay in Australia. The tribunal ruled that if there was a blood feud only Angelo Pemaj's father would be at risk.

But, according to Albanian news reports, the ancient Kanun is open to modern interpretations. Decade-old debts are being settled with blood extending to the wives, children and broader family members of the male killer. Gunfire is no longer the only way of carrying out the death sentence. The use of hand grenades to wipe out families is now common.

In the Pemaj family's Shkodra district, more than 500 families are involved in blood feuds

and an estimated 6000 children are confined to their homes. The homes are decreed off-limits to revenge killings under the Kanun.

International newspaper Shqiperia Etnike (Ethnic Albania) claims members of the Beqi family attempted to kidnap Mr Pemaj's wife to force him to return.

A letter of "verification" in October from the Peace Missionaries Union of Albania, an official body recognised by UNESCO and UNICEF to settle blood feuds, states Angelo Pemaj, his wife Silvana and father have been forced to live in "shut-in" - that is, they are confined to their homes for fear of revenge from the Beqi family. Adelaide solicitor Jane McGrath, who represented the first Alabanian to gain permanent residency after fleeing a blood feud, said part of the problem was Australia's scepticism over the "totally bizarre" canon. "The risk of persecution from blood feuds is very real," she said.

Investigations by The Australian reveal the tribunal has granted protection to at least six Albanian asylum-seekers escaping blood feuds since 1996.

privacy © Herald and Weekly Times

www.heraldsun.news.com.au...16,00.html

 CATEGORIES  TV  RADIO  COMMUNICATE  WHERE I LIVE  INDEX  SEARCH    Go 

## BBC NEWS

You are in: World: Europe

Sunday, 5 May, 2002, 06:43 GMT 07:43 UK

Front Page
World

# Eyewitness: Albania's blood feuds

Africa
Americas
Asia-Pacific
Europe
Middle East
South Asia
--------------
From Our Own
Correspondent
--------------
Letter From America
UK
UK Politics
Business
Sci/Tech
Health
Education
Entertainment
Talking Point
In Depth
AudioVideo






Marc Emur fears for his life because of a blood feud


By the BBC's Mike Donkin
In Northern Albania

There are 72 people in what the Laciy family call their "tribe".

They live in the beautiful mountains of northern Albania, but for nearly four years they have not dared stray beyond the gates of their yard because a "gjakmarrya" - a blood feud - has been declared against them.

One of their sons killed a man and so, under an ancient code revived in these remote valleys, the victim's family must take revenge against any of the killer's male relatives.

It means the women must farm the land and that even a 10-month-old boy, born "locked in", will eventually be a target unless the feud is resolved.

So cousins Zecir and Gentian, who are 16, cannot go to school or play football with their friends.

"If we went outside these walls we know they'd find us with their guns," Zecir says. "This is no life

### See also:

26 Oct 01 | Europe
Albania cracks down on dirty money
17 Apr 01 | Europe
Albania blamed for human trafficking
06 May 00 | From Our Own Correspondent
Picking up the pieces in Albania
20 Mar 02 | Country profiles
Country profile: Albania
19 Oct 01 | Americas
Rebuilding Albania

### Internet links:

Cafod
Albanian.com
Albanian daily news
Albanian Parliament

The BBC is not responsible for the content of external internet sites

### Top Europe stories now:

Mass resignations rock Turkey
Crash pilots given conflicting orders
Serbia jails first war criminal
New hope for Aids vaccine
Ukraine mine death toll rises
Russian anti-Jewish sign explodes
Sicilians dish up anti-Mafia pasta
Finland and Sweden plan 'Eurocity'

**Links to more Europe stories are at the foot of the page.**

SERVICES
Daily E-mail
News Ticker
Mobiles/PDAs
Feedback
Help
Low Graphics



for us. Maybe we can escape to Europe illegally."



Indoors and out of the line of fire the men are smoking and drinking raki as they meet with a team of peace missionaries who are trying to broker an end to the feud.

Zecir Laciy could be killed if he leaves his house

The killer's father, Lan Laciy, says he prays they succeed.

"Our enemies have punished us enough. None of us men can work" he says. "We are already ruined as a tribe."

**Huge task**

The missionaries, who are funded by Britain's Catholic Agency for Overseas Development (Cafod), have a huge task on their hands.

This is one of hundreds of blood feuds which are blighting the lives of thousands of people in Albania.

"We have to change peoples' mentality here," the missionaries' leader Emin Spahia says.

"But we know it won't be easy because we are asking them to set aside traditions they have upheld for 600 years."



Peace missionaries negotiate with local men

Those traditions are based on the Kanun Law drawn up in the 15th Century by feudal leader Lek Dugajine. His code states that if one man kills another "blood should always be avenged by blood" and lays down precise rules for how.

Kanun Law was suppressed by Albania's harsh Communist regime but revived when it collapsed in 1991 because in the mountains



the laws of the weak new government are
rarely enforced.

State Security Director Neritan Cekas insists
the authorities are doing all they can to stamp
out blood feuds.

"We have seized many weapons," he says.
"And we tell citizens that this traditional law
should now be just history."

**Bad impression**

"Blood feud killings give a very bad impression
of our country - especially at a time when
Albania wants to attract more foreign
investors and we hope to join the European
Union."

The government is relying on the peace
missionaries to intervene where it cannot by
holding a series of village meetings in the
north where the whole community is urged to
"swear to abstain" from blood feuds.

These can become emotional gatherings.

In Kelmend, missionary Emin Spahija held up
a file of pictures of children, all of whose
fathers were murdered under the Kanun. "Set
the code aside," he pleaded. "It brings only
pain."

One villager asked,
"Why should we?
When the state is not
doing its job in
punishing the guilty."



Another shouted: "It
is not for the state to
forgive my son's
killer. That is for me
to decide."

Villagers are shown images
of fatherless children

Kelmend's villagers
did finally vote "yes"
to setting up a pilot zone where blood feuds
will be outlawed - but the show of hands was
far from unanimous.

After the meeting we tested the mood by
calling on both sides in one bitter feud.

We called first on Ardiana Preka, whose
husband was killed and whose men folk have
sworn to avenge him.

After feeding the animals with her children
Ardiana went to put a fresh rose on their
father's shrine.

**'Hard to forgive'**

We asked her: Did she too want more blood
spilled? "In these matters the women do not
decide that" she said. "But it will be hard for
our men to forgive."

We then crossed the village to the house of
the man who killed Ardiana's husband and
then fled.

Behind the steel railings the women and the
daughters of the Emur family dug vegetables.
On the porch Marc Emur, who is 70, cleaned
his hunting rifle.



"For now I must be
ready," he said. "But
we ask the Preka
tribe to forgive us so
that all of our children
and all of theirs can
grow up without their
lives being
threatened. One day
all this must end."

Finally we took that
plea back to the
Preka's farm.

Ardiana Preka visits her
husband's shrine

Prek Preka, the father of the feud victim,
would not talk long about the duty to kill by
which he is now bound. He said simply,
"These are necessary things."

In the mountains of northern Albania when it
comes to a choice between a nation's progress
and a family's honour - for now there is little
contest. The old ways prevail.

✉ **E-mail this story to a friend**

**Links to more Europe stories**

In This Section                                    [GO]

---

**BBC**  ^^ Back to top

**News Front Page | World | UK | UK Politics | Business | Sci/Tech | Health |
Education | Entertainment | Talking Point | In Depth | AudioVideo**

--------------------------------------------------------------------------------
**To BBC Sport>> | To BBC Weather>>**
--------------------------------------------------------------------------------
© MMIII | News Sources | Privacy



gendercide
[ www.gendercide.org ]

watch

- what is gendercide?
- about gendercide watch
- case studies
- news releases
- staff & affiliates
- links & resources
- email gendercide watch

# Case Study:
# "Honour" Killings
# and Blood Feuds

Focus:
(1) Pakistan
(2) Jordan
(3) Palestine/Israel
(4) The Balkans

Select Case

▶ Further Reading



# (1)
# "Honour" Killings
# of Women

## Summary

"Honour" killings of women can be defined as acts of murder in which "a woman is killed for her actual or perceived immoral behavior." (Yasmeen Hassan, "The Fate of Pakistani Women," *International Herald Tribune*, May 25, 1999.) Such "immoral behavior" may take the form of marital infidelity, refusing to submit to an arranged marriage, demanding a divorce, flirting with or receiving phone calls from men, failing to serve a meal on time, or -- grotesquely -- "allowing herself" to be raped. In the Turkish province of Sanliurfa, one young woman's "throat was slit in the town square because a love ballad was dedicated to her over the radio." (Pelin Turgut, "'Honour' Killings Still Plague Turkish Province," *The Toronto Star*, May 14, 1998.)

Most "honour" killings of women occur in Muslim countries, the focus of this case study; but it is worth noting that no sanction for such murders is granted in Islamic religion or law. And the phenomenon is in any case a global one. According to Stephanie Nebehay, such killings "have been reported in Bangladesh, Britain, Brazil, Ecuador, Egypt, India, Israel, Italy, Jordan, Pakistan, Morocco, Sweden, Turkey and Uganda." Afghanistan, where the practice is condoned under the rule of the fundamentalist Taliban movement, can be added to the list, along with Iraq and Iran. (Nebehay, "'Honor Killings' of Women Said on Rise Worldwide," Reuters dispatch, April 7, 2000.)



## Focus (1): Pakistan



Pakistan, where "honour" killings are known as *karo-kari*, is probably the country where such atrocities are most pervasive. Estimating the scale of the phenomenon there, as elsewhere, is made more difficult not only by the problems of data collection in predominantly rural countries, but by the extent to which community members and political authorities collaborate in covering up the atrocities. According to Yasmeen Hassan, author of *The Haven Becomes Hell: A Study of Domestic Violence in Pakistan*, "The concepts of women as property and honor are so deeply entrenched in the social, political and economic fabric of Pakistan that the government, for the most part, ignores the daily occurrences of women being killed and maimed by their families." (Hassan, "The Fate of Pakistani Women.") Frequently, women murdered in "honour" killings are recorded as having committed suicide or died in accidents.

One of the most notorious "honour" killings of recent years occurred in April 1999, when Samia Imran, a young married woman, "was shot in the office of a lawyer helping her to seek a divorce which her family could never countenance." According to Suzanne Goldenberg,

> Samia, 28, arrived at the Lahore law offices of Hina Jilani and Asma Jahangir, who are sisters, on April 6. She had engaged Jilani a few days earlier, because she wanted a divorce from her violent husband. Samia settled on a chair across the desk from the lawyer. Sultana, Samia's mother, entered five minutes later with a male companion. Samia half-rose in greeting. The man, Habib-ur-Rhemna, grabbed Samia and put a pistol to her head. The first bullet entered near Samia's eye and she fell. "There was no scream. There was dead silence. I don't even think she knew what was happening," Jilani said. The killer stood over Samia's body, and fired again. Jilani reached for the alarm button as the gunman and Sultana left. "She never even bothered to look whether the girl was dead."

The aftermath of the murder was equally revealing: "Members of Pakistan's upper house demanded punishment for the two women [lawyers] and none of Pakistan's political leaders condemned the attack. ... The clergy in Peshawar want the lawyers to be put to death" for trying to help Imran. (Suzanne Goldenberg, "A Question of Honor," *The Guardian* (UK), May 27, 1999.)

*Hina Jilani, Pakistani campaigner against "honour" killings.*





According to Goldenberg, "Those who kill for honour [in Pakistan] are almost never punished. In the rare instances [that] cases reach the courts, the killers are sentenced to just two or three years. Hana Jilani [the Jahore lawyer who witnessed Samia Imran's murder] has collected 150 case studies and in only eight did the judges reject the argument that the women were killed for honour. All the other [perpetrators] were let off, or given reduced sentences." (Goldenberg, "A Question of Honour.")

A human-rights report published in March 1999 stated that "honour" killings took the lives of 888 women in the single province of Punjab in 1998 (Hassan, "The Fate of Pakistani Women"). Similar figures were recorded for 1999. In Sindh province, some 300 women died in 1997, according to Pakistan's independent Human Rights Commission. (Goldenberg, "A Question of Honour.") It is unknown how many women are maimed or disfigured for life in attacks that fall short of murder. Pamela Constable describes one such case:

Zahida Perveen's head is shrouded in a white cotton veil, which she self-consciously tightens every few moments. But when she reaches down to her baby daughter, the veil falls away to reveal the face of one of Pakistan's most horrific social ills, broadly known as "honour" crimes. Perveen's eyes are empty sockets of unseeing flesh, her earlobes have been sliced off, and her nose is a gaping, reddened stump of bone. Sixteen months ago, her husband, in a fit of rage over her alleged affair with a brother-in-law, bound her hands and feet and slashed her with a razor and knife. She was three months pregnant at the time. "He came home from the mosque and accused me of having a bad character," the tiny, 32-year-old woman murmured as she awaited a court hearing ... "I told him it was not true, but he didn't believe me. He caught me and tied me up, and then he started cutting my face. He never said a word except, "This is your last night." (Constable, "The Price of 'Honour'," *The Gazette* (Montreal), May 22, 2000.)

*Bangladeshi women scarred in acid attacks.*



Perveen's husband stated in court that "What I did was wrong, but I am satisfied. I did it for my honour and prestige." Often burning or scarring with acid are the preferred weapons of the men committing such crimes. "The Progressive Women's Association, which assists attack victims, tracked 3,560 women who were hospitalized after being attacked at home with fire, gasoline or acid between 1994 and 1999," according to Constable. About half the victims died. Lawyer and women's activist Nahida Mahbooba Elahi states that "We deal with these cases every day, but I have seen very few convictions. The men say the wife didn't obey their orders, or was having relations with someone else. The police often say it is a



domestic matter and refuse to pursue the case. Some judges even justify it and do not consider it murder." (Constable, "The Price of 'Honour.'") Such crimes are also rife in Bangladesh, formerly East Pakistan, where some 2,200 women are disfigured every year in acid attacks by jealous or estranged men. (Ellen Goodman, "How Long Before We Take the Honor out of Killing?," *The Washington Post* [in the *Guardian Weekly*, April 6-12, 2000.)

In August 1999, an international furore erupted when the Pakistani Senate rejected a resolution by former Prime Minister Benazhir Butto to condemn "honour" killings in the country. (See Zaffer Abbas, "Pakistan Fails to Condemn 'Honour' Killings", *BBC Online*, August 3, 1999.) In April 2000, the head of the Pakistani military regime, General Pervez Musharraf, pledged that his government would take strong measures to curb "honour" killings. "Such acts do not find a place in our religion or law," Musharraf stated. "Killing in the name of honour is murder, and it will be treated as such." Most observers were skeptical, however, that Musharraf's words would be followed up by committed actions. (See "Honour Killings Now Seen As Murder", *The Sydney Morning Herald* [from *The Telegraph* (UK)], April 24, 2000.)

While the victims of Pakistani "honour" killings are overwhelmingly female, tradition dictates that males involved in the "crimes" should face death as well. But the accused women are standardly killed first, giving men a chance to flee retribution. Moreover, targeted men can escape death by paying compensation to the family of the female victim, leading to an "'honour killing industry' involving tribespeople, police and tribal mediators," which "provides many opportunities to make money, [or] obtain a woman in compensation," according to Amnesty International. The organization also states: "Reports abound about men who have killed other men in murders not connected with honour issues who then kill a woman of their own family ... to camouflage the initial murder as an honour killing." (Amnesty International, "Pakistan: Honour Killings of Girls and Women", September 1999.)

[Note: For more information on "honour" killings in Pakistan, contact the International Network for the Rights of Female Victims in Pakistan, P.O. Box 17202. Louisville, KY 40217, USA; e-mail: inrfvvp@inrfvvp org.]

*A poster condemning "honour" killings, produced by
Kurdish Women Action Against Honour Killing.*



## Focus (2): Jordan

In Jordan, "honour" killings are sanctioned by law. According to Article 340 of the criminal code, "A husband or a close blood relative who kills a woman caught in a situation highly suspicious of adultery will be totally exempt from sentence." Article 98, meanwhile, guarantees a lighter sentence for male killers of female relatives who have committed an "act which is illicit in the eyes of the perpetrator." Julian Borger notes that "in practice, once a murder has been judged an 'honour killing,' the usual sentence is from three months to one year." (Julian Borger, "In Cold Blood," *Manchester Guardian Weekly*, November 16, 1997. See also "Four Men Sentenced to Year or Less for Brutal Jordan Honour Killings," Agence France-Presse dispatch, July 31, 1999; the perpetrators included a 19-year-old man, Hussein Suleiman, who "was accused of driving three times over his six-month-pregnant unmarried sister in a pick-up truck, despite her denials of immoral behaviour and pleas for help.") Ironically, as Borger notes, this legislation is "the result of Western influence in the Middle East," having arisen "out of a fusion between Egyptian tribal custom and the Napoleonic Code in 1810, after the French legions took Cairo." (Borger, "In Cold Blood.")

In a particularly tragic case in 1994, a handicapped 18-year-old girl, who had already served six months in jail (!) for becoming pregnant out of wedlock, was killed by her 17-year-old brother. A neighbour was quoted as saying the family "seemed relaxed, happy and satisfied after announcing the news that she was killed ...".(Rana Husseini, "18-year-old killed for 'family honor,'" *The Jordan Times*, September 19, 1994.) *Manchester Guardian Weekly* reporter Julian Borger described another typical case in 1997:

> One morning this summer, Rania Arafat's two aunts came to take her for a walk. They told their 21-year-old niece they had arranged a secret meeting with her boyfriend. She strolled with them through Gwiesmeh, a poor suburb where Amman's concrete sprawl peters out into desert. When the three women reached a patch of open land, the aunts suddenly stepped aside, leaving Arafat standing alone. She was shot four times in the back of the head at close range and once in the forehead. The gunman was her 17-year-old brother, Rami. ... Arafat's crime was to refuse an arranged marriage and elope with her Iraqi boyfriend. Rami is in jail, but is unlikely to be sentenced to more than a few months, especially as he is a minor, which is almost certainly why he was given the role of executioner. (Borger, "In Cold Blood.")

*Rana Husseini, a journalist with The Jordan Times, has exposed "honour" killings in her country.*



*The Jordan Times* estimated in 1994 that between 28 and 60 Jordanian women -- the difference between official police figures and commonly-cited estimates of the actual number -- die in "honour" killings every year (Rana Husseini, "Murder in the Name of Honour," October 6-7, 1994.) The death-toll may even run into the hundreds, with hundreds more women in perpetual hiding, fearful for their lives.



Case 1:03-cv-00114    Document 9-3    Filed in TXSD on 10/03/2006    Page 29 of 40

One positive sign is the staunch opposition to the practice displayed by the regime of King Abdullah II, who took power after the death of his father King Hussein in 1999. "The king has backed legislation to put honor killings on a par with other murders and has encouraged public support to change the law. ... The fact that the royal palace has taken such a stance has translated into tougher sentencing and investigations of honor killings by the courts and police. The king's support has also encouraged activist groups to speak out more strongly against honor killings." (Stephen Franklin, "Jordan Begins to Punish Practice of 'Honor Killings'", *The Chicago Tribune*, September 1, 2000.)

Such efforts continue to encounter staunch resistance from conservative elements, however. In early February 2000, the Jordanian parliament "took only three minutes to reject a draft law calling for the cancellation of Article 340." The country's leading political party, the Islamic Action Front (IAF), denounced the draft law as an effort to "destroy our Islamic, social and family values, by stripping the man from his humanity, [and] not allowing him to get angry when he is surprised by [i.e., surprises] his wife committing adultery." Ten days later, in an unprecedented action, some 5,000 protesters flooded the streets of Amman demanding the repeal of the penal code provision allowing "honour" killings. The protesters included "Prince Ali, who is King Abdullah's brother and his personal guard, as well as Prince Gazi, the king's advisor for tribal affairs."

## Focus (3): Palestine/Israel



"Honour" killings are also regularly reported in the Palestinian territories of the West Bank and Gaza Strip. In the Canadian women's magazine *Chatelaine*, Sally Armstrong described the fate of one victim:

> Flirting was a costly mistake for Samera. She was only 15 years old when her neighbours in Salfeet, a small Palestinian town on the West Bank, saw her chatting with a young man without a male chaperone. Her family's honour was at stake; a marriage was quickly arranged. By 16, she had a child. Five years later, when she could stand the bogus marriage no longer, she bolted. In a place where gossip is traded like hard currency, and a girl's chastity is as public as her name, Samera's actions were considered akin to making a date with the devil. According to the gossips, she went from man to man as she moved from place to place. Finally, last July [1999], her family caught up with her. A few days later she was found stuffed down a well. Her neck had been broken. Her father told the coroner she'd committed suicide. But everyone on the grapevine knew that Samera was a victim of honour killing, murdered by her own family because her actions brought dishonour to their name. ... Here in the West Bank, the Palestinian Authority law allows honour killing. Samera's parents are walking the streets of their neighbourhood with their heads held high, relieved that the family honour has been restored. (Armstrong, "Honour's Victims", *Chatelaine*, March 2000.)

Twenty-two other women died in the Palestinian territories in the same year as Samera. The killings often spill over into neighbouring Israel, as with the



killing of "40-year-old Ittihaj Hassoon" near Haifa in 1995:

> On Oct. 16, 1995, ... Hassoon got out of a car with her younger
> brother on a main street of Daliat al Carmel, a small Israeli
> Druze village ... Over 10 years before, Ittihaj had committed the
> unpardonable sin of marrying a non-Druze man. Now, after
> luring her back to her home village with promises that all was
> forgiven and her safety assured, her brother finally had the
> chance to publicly cleanse the blot on the family name with the
> spilling of her blood. In broad daylight in front of witnesses, he
> pulled out a knife and began to stab her. The witnesses quickly
> swelled to a crowd of more than 100 villagers who – approving,
> urging him on – chanted, ululated, danced in the street. Within
> minutes, Hassoon lay dead on the ground while the crowd
> cheered her killer, "Hero, hero! You are a real man!" (Suzanne
> Zima, "When Brothers Kill Sisters," *The Gazette* [Montreal], April
> 17, 1999. See also Walter Rodgers, "Honor Killings: A Brutal
> Tribal Custom", *CNN World News*, December 7, 1995.)

According to Zima, "Ibrahim had agonized over his decision: 'She is my sister
– my flesh and blood – I am a human being. I didn't want to kill her. I didn't
want to be in this situation. They [community members] push[ed] me to make
this decision. I know what they expect from me. If I do this, they look at me
like a hero, a clean guy, a real man. If I don't kill my sister, the people would
look at me like I am a small person.'"

## Who is responsible?

"Honour" killings of women (and occasionally their male "partners in crime")
reflect longstanding patriarchal-tribal traditions. In a "bizarre duality," women
are viewed "on the one hand as fragile creatures who need protection and on
the other as evil Jezebels from whom society needs protection." Patriarchal
tradition "casts the male as the sole protector of the female so he must have
total control of her. If his protection is violated, he loses honour because
either he failed to protect her or he failed to bring her up
correctly." (Armstrong, "Honour's Victims.") Clearly, the vulnerability of women
around the world to this type of violence will only be reduced when these
patriarchal mindsets are challenged and effectively confronted.

As many of the examples cited in this case study indicate, state authorities
frequently ignore their obligation to prosecute "honour" killings. They should
be viewed as "co-conspirators" in such crimes, and held accountable by
organizations such as the United Nations.

The typical "honour" killer is a man, usually the father, husband, or brother of
the victim. Frequently teenage brothers are selected by their family or
community to be the executioners, because their sentences will generally be
lighter than those handed down to adults (as was the case with the killing of
Rania Arafat in Jordan, cited above). "Talking and writing about this atrocity is
a good start," wrote Marina Sanchez-Rashid in a letter to *The Jordan Times,*
"but I believe that action to start treating and judging the men who commit
these crimes as the first degree murderers that they are, as well as to protect
the victims as they deserve to be protected, is needed as soon as
possible." (Quoted in Patrick Goodenough, "Middle East Women Campaign
Against 'Family Honor' Killings," Conservative News Service, March 8, 1999.)

As with **witch-hunts**, however, "honour" killings also need to be viewed from a broader societal perspective; they derive from expectations of female behaviour that are held and perpetuated by men and women alike. Women's role has often been underappreciated. Occasionally, they participate directly in the killings. More frequently, they play a leading role in preparing the ground. In Palestine, for example, the anthropologist Ilsa Glaser has noted that "women acted as instigators and collaborators in these murders, unleashing a torrent of gossip that spurred the accusations." (Quoted in *The Calgary Herald*, April 20, 2000.) Jordanian women running for parliament have also been "reluctant to break the taboo" on condemning and prosecuting "honour" killings; one told the *Manchester Guardian Weekly* that "This is our tradition. We do not want to encourage women who break up the family." (Borger, "In Cold Blood.") In the Ramle district of Israel, police commander Yifrach Duchovey lamented his inability to secure the cooperation of community members in investigating "honour" killings: "Even other women -- the mothers -- won't cooperate with us. Sometimes the women co-operate with the men who commit the murders. ... A woman may think it is OK -- maybe she thinks the victim deserves it." (Quoted in Zima, "When Brothers Kill Sisters.")

---

# (2)
# Blood Feuds

## Summary

The institution of the "blood feud" is the little-known but highly-destructive male counterpart to "honour" killings of women. Every year, at least a thousand men and boys die in blood-feud killings in Albania alone; the lives of tens of thousands more are spent in isolation and perpetual fear. Women and girls are virtually never targeted.

## Focus (4): The Balkans

The Balkans, along with the Caucasus region, Sicily, and Corsica, are the areas where the "blood feud" still holds greatest sway today. (In the past, the institution was also prominent in Scotland -- and in the U.S. region of Appalachia, as with the famous feud between the Hatfields and McCoys.)



The institution of the blood feud is most virulent in the *malësi* (mountain regions) of northern Albania, spilling over into



the territory that is today the Yugoslav province of **Kosovo**. The institution has its roots in the *Kanun* (canon) of Lek Dukagjin, a legal code compiled in the fifteenth century that enshrined "many customary practices which went back much further into the past," according to Noel Malcolm. Malcolm writes that

> The importance of the *Kanun* to the ordinary life of the Albanians of Kosovo and the Malësi can hardly be exaggerated. ... One leading scholar has summed up the basic principles of the *Kanun* as follows. The foundation of it all is the principle of personal honour. Next comes the equality of persons. From these flows a third principle, the freedom of each to act in accordance with his own honour, within the limits of the law, without being subject to another's command. And the fourth principle is the word of honour, the *besë* ... which creates a situation of inviolable trust. Gjeçov's version of the Kanun ["the fullest and most authoritative text"] decrees: "An offence to honour is not paid for with property, but by spilling of blood or a magnanimous pardon." And it specifies the ways of dishonouring a man, of which the most important are calling him a liar in front of other men; insulting his wife; taking his weapons; or violating his hospitality. ... This was very much a man's world. ... Women had their honour, but it existed through, and was defended by, men. (Malcolm, *Kosovo: A Short History* [London: Papermac, 1998], pp. 18-19.)

The blood feud was the result of perceived violations of this code of "honour." It "is one of the most archaic features of northern Albanian society," notes Malcolm. "... What lies at the heart of the blood-feud is a concept alien to the modern mind, and more easily learned about from the plays of Aeschylus than from the works of modern sociologists: the aim is not punishment of a murderer, but satisfaction of the blood of the person murdered — or, initially, satisfaction of one's own honour when it has been polluted. If retribution were the real aim, then only those personally responsible for the original crime or insult would be potential targets; but instead, honour is cleansed by killing any male member of the family of the original offender, and the spilt blood of that victim then cries out to its own family for purification." The blood feud granted blanket exemption to females, the killing of whom was seen as a profound violation of a *man's* personal honour. "The strongest taboo of all concerned the murder of women, and any woman could walk through raging gunfire in the knowledge that she would never be shot at." (Malcolm, *Kosovo: A Short History*, pp. 19-20.)

In his study of the blood-feud in the Yugoslav province of Montenegro, Christopher Boehm gives a vivid picture of the surreal lengths to which this gender-selectivity is carried:

> In the old days, women were free to come and go as they chose under feuding conditions, since taking their blood did nothing to help the blood score and also counted as a dishonor, morally speaking. Thus, their normal daily activities could continue. But men were sorely pressed when it came to doing any work other than herding, which allowed them to stay under cover with a rifle ready at all times. In 1965 [at the time of field research] it was for this reason that women still did so much of the heavier work in the fields, so I was told by the slightly apologetic Montenegrin "male chauvinists," who viewed this as a once-necessary



custom formed in an earlier era. ... Whatever might happen to
the men during a feud, the women were always free to keep the
household economy going because the rules of feuding were
taken so seriously by the opposing party.

With respect to the sanctity of women, it was even possible for
them to enter directly into combat during the first stage of a feud,
when the killer's clan shut itself in and the victim's clan attacked
the fortified stone farmhouse, which had loopholes [for firing
rifles] everywhere. With no fear of being harmed, women could
carry straw and firebrands up to the house to try to burn it. Also,
women of a besieged house could go outside at night carrying
torches, to light up the enemy so that their own men could shoot
at them. This exemplifies the strength of these particular rules:
to shoot a woman was a source of shame (*sramota*) for the
entire clan. (Boehm, *Blood Revenge: The Anthropology of
Feuding in Montenegro and Other Tribal Societies* [Lawrence:
University Press of Kansas, 1984], pp. 111-12.)

The death-toll exacted by the blood feud has historically been heavy for
Balkans men. "At the end of the Ottoman period it was estimated that 19
percent of all adult male deaths in the Malësi were blood-feud murders, and
that in an area of Western Kosovo with 50,000 inhabitants, 600 died in these
feuds every year." (Malcolm, *Kosovo: A Short History*, p. 20.) In Albania, the
feuds gave rise to another enduring institution: the "sworn virgin," women who
"cut their hair short, wear trousers and drink fiery local brandy with the men."
According to Julius Strauss, "The tradition of the sworn virgins was born of
necessity in this barren land racked by war, blood feuds and intense poverty.
In times past when the male line of a family was wiped out, such a virgin was
entitled to take over as the head of the family." (Strauss, "The Virgins Who
Live Like Men," *The Daily Telegraph* [UK], February 6, 1997.)

Blood feuds generally declined in the Balkans after the Second World War, as
the authoritarian rulers of Albania (Enver Hoxha) and Yugoslavia (Josip Broz
Tito) clamped down on practices that were seen as a legacy of the feudal
past. In Albania, however, the blood feud has returned with -- one might say --
a vengeance. It has also spread from the traditional heartland of the Malësi to
Tirana, the capital, and to the south of the country.

The origins of the current blood-feud crisis in Albania date to the collapse of
the communist regime in 1991, and the weakness of the quasi-democratic
government that replaced it. From 1992 to 1996, "press reports in Tirana"
spoke of "more than 5,000 murders linked to vendettas in the past four
years." (Branko Jolis, "Honour Killing Makes a Comeback," *The Guardian*
[UK], August 14, 1996.) It is worth noting that this rate of approximately 1,250
men killed in blood feuds annually is slightly greater than the number of
known "honour" killings of women in Pakistan -- in a country with about 1/35th
the population. Estimates of fatalities are made difficult by the fact that many
blood-feud murders go unreported. As one Albanian clan leader told *The New
York Times*, "People don't want to report killings to the police because then
the accused would be protected by the state in prison instead of being
available to kill." (Jane Perlez, "Blood Feuds Draining a Fierce Corner of
Albania," *The New York Times*, April 15, 1998.)

In March 1997, the post-communist regime was rocked by "the collapse of
enormous, government-endorsed pyramid investment schemes. The public
looted army weapons depots as furious investors clashed with security forces.



Roughly 1 million firearms are said to be in circulation in a Balkan nation of only 3.2 million." (Michael J. Jordan, "In Albania, A Return to 'Eye for Eye'", *The Christian Science Monitor*, August 7, 1997.) Between 1,600 and 5,000 Albanians died in the ensuing six months, and "revenge killings skyrocketed." (Perlez, "Blood Feuds.") In 1998, Gjin Mekshi, a leader of the Committee of Blood Reconciliation in the town of Shkoder, stated that "In some families there are no men left," although "So far no women have been killed." (Owen Bowcott, "Thousands of Albanian Children in Hiding to Escape Blood Feuds," *The Guardian* [UK], September 30, 1998.)

In addition to the thousands killed, tens of thousands of men live in fear and seclusion as a result of the blood feuds. Mihaela Rodina cites estimates by Albanian non-governmental organizations that "the men of some 25,000 families in northern Albania live thus, never going out of the house for fear of being victims of ... feuding. The women, who are unaffected by the *kanun*, are left alone to provide for the family's needs." (Rodina, "Blood Code Rules in Northern Albania," Agence France-Presse dispatch, June 30, 1999.) In 1997, *The Christian Science Monitor* interviewed one man in Shkoder who "ha[d] been homebound for six years ... The man says he dreams of escaping with a visa to America. 'This is actually worse than prison,' he says, standing in his fenced-in garden. 'At least in prison I'd know that one day I could get out.'" Even school-age boys must remain cloistered: "up to 6,000 children [were] said to be hiding" in 1998. (Bowcott, "Thousands of Albanian Children.")

The resurgence of the blood feud has led Gjin Mekshi and others to join forces in an attempt to reconcile feuding families. "The Committee of Blood Reconciliation has 3,000 members in Albania and is pressing the government to accept its arbitrations as part of the legal process. 'I have a good reputation and my father was a man of good reputation, too,' says Mr. Mekshi. 'I am approached to arrange truces by those who are in hiding and dare not go out during the day. When we agree a deal, we sanctify the arrangement with a procession led by the local priest." (Bowcott, "Thousands of Albanian Children.") Albanian Radio reported in August 2000 that "Seven hundred and fifty-six blood feuds have been reconciled, allowing the people involved to put an end to self-confinement at home." (BBC Worldwide Monitoring, August 10, 2000.) In neighbouring Kosovo, a similar campaign was mounted in the 1990s by Anton Çetta. (Malcolm, *Kosovo: A Short History*, p. 20.) Nonetheless, according to Deutsche Presse-Agentur, the success of such campaigns has been "only limited." ("Albanian Blood Feuds Affect 210,000," Deutsche Presse-Agentur, March 11, 2000.) "The feuds have very deep roots," said Perlat Ramgaj, mayor of the town of Koplik. "They're ingrained on our souls, and in this period of transition people feel free to do just about anything." (Quoted in Helena Smith, "Lost Land Where Vengeance is Written in Blood," *The Guardian* [UK], February 12, 1995.)



**[ Further reading ]**   [ Back to main ]   [ Back to top ]

Researched and written by Adam Jones
© Gendercide Watch 1999-2002. All rights reserved.
Copyright-cleared for educational and other non-profit use if source is credited.

*61*



## U.S. DEPARTMENT of STATE

### Albania

**Country Reports on Human Rights Practices** - 2004
Released by the Bureau of Democracy, Human Rights, and Labor
February 28, 2005

Albania is a republic with a multiparty Parliament, and a Prime Minister and a President both elected by Parliament. The Prime Minister heads the Government; the Presidency is a largely ceremonial position with limited executive power. In 2003, local elections were held throughout the country, which were judged to be an improvement over previous elections, with only a few isolated incidents of irregularities and violence. The Constitution provides for an independent judiciary; however, corruption and political pressure limited its ability to function independently and efficiently.

Local police units report to the Ministry of Public Order and are responsible principally for internal security. The military forces have a special 151-person "commando" unit, which operates in an antiterrorist role under the Minister of Defense. During times of domestic crisis, the law allows the Minister of Public Order to request authority over this unit. The State Intelligence Service (SHISH) is responsible for both internal and external intelligence gathering and counterintelligence. Civilian authorities generally maintained effective control over the security forces. Some members of the security forces committed human rights abuses.

The country had a mixed economy that was in transition from central economic planning to a free market system. The country continued to experience slow but steady economic progress; the economy grew by 6 percent. However, approximately 25 percent of the population of approximately 3.1 million lived below the poverty line. According to the Government, the unemployment rate was 15.2 percent; however, some unofficial reports put it as high as 22 percent. The average inflation was 3.2 percent and public sector wages increased by 10 percent.

The Government generally respected the human rights of its citizens; however, there were serious problems in several areas. Police beat and abused suspects, detainees, and prisoners. Prison conditions remained poor. The police occasionally arbitrarily arrested and detained persons, and prolonged pretrial detention was a problem. Official impunity was a problem. The Government occasionally infringed on citizens' privacy rights. Political interference in the media occurred less frequently than in previous years. Police reportedly used excessive force against protestors. Individual vigilante action, mostly related to traditional blood feuds, resulted in some killings and an atmosphere of fear in some areas of the country. Societal violence and discrimination against women and children were serious problems. Societal discrimination against Roma, the Egyptian community, and homosexuals persisted. Child labor was a problem. Trafficking in persons remained a problem, which the Government took some steps to address.

### RESPECT FOR HUMAN RIGHTS

Section 1
Respect for the Integrity of the Person, Including

Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no political killings; however, security forces killed one person during the year.

In July, Erigert Ceka, a 17-year-old minor, died as a result of being beaten by police while in detention. As a result of the death, the prosecutor initiated criminal proceedings against two police guards who were charged with committing "arbitrary actions." In November, one guard was sentenced to a 6-month prison term for



committing arbitrary actions in violation of the law while escorting detainees, and in December, the other police guard was sentenced to an 8-month prison term for violating the rules of guard service under the military code and misuse of duty. The cases were being appealed at year's end; however, the court did not hold anyone accountable for Ceka's death.

Unlike in previous years, there were no reported deaths due to land mines. However, there were six deaths from mine-related accidents including a cluster bomb in a training facility that killed two and injured several, and a antitank mine that killed four others, three of whom were children.

The country continued to experience high levels of violent crime. Many killings continued to occur as the result of individual or clan vigilante actions connected to traditional "blood feuds" or criminal gang conflicts. According to the Ministry of Public Order, at least 10 individuals were killed during the year in blood feuds, which are based on the medieval Code of Lek Dukagjini (the kanun), which was practiced by individuals particularly in the northern part of the country. Under the kanun, only adult males are acceptable targets for blood feuds; however, women and children often were killed or injured in the attacks. As a result of blood feuds, during the year, 670 families were self-imprisoned, 650 families accepted legal procedures rather than personal vendettas for resolving the conflict, and 54 families were living under protection outside of the country; 160 children were prevented from attending school due to fear of revenge, of which 73 were considered to be in serious danger. This was a decrease from 2003 when it was estimated that there were 1,370 families self-imprisoned at home and 711 children prevented from attending school due to fear of revenge. Land property conflicts and issues related to human trafficking remained the main reasons forcing families to enter into blood feuds. In August, Emin Spahija, the head of the Non-Government organization (NGO) Peace Missionaries League that worked exclusively on blood feud issues, was murdered near his house in the city of Shkodra. Police have not apprehended any suspects in the murder.

Blood feud cases were adjudicated in the Court of Serious Crimes. Cases of blood killings carry a sentence of 20 years or life imprisonment. Although blood feud prosecution rates were not available, estimates indicated that 60 to 65 percent of all cases were brought to court and nearly all of them ended up at the appellate level.

b. Disappearance

There were no reports of politically motivated disappearances.

Three former officials of the SHISH, who were arrested in 2003 in connection with the kidnapping of Ziso Kristopulli and Remzi Hoxha in 1995, were released (one in 2003 and two in May) for lack of evidence and the case was suspended. Although Kristopulli was eventually released, the whereabouts of Hoxha remained unknown.

Human rights groups, including the Albanian Helsinki Committee (AHC) and the Albanian Human Rights Group (AHRG), have questioned the release of the SHISH officials and the suspension of the disappearance case. In November, the NGOs organized a press event and Amnesty International wrote a letter to the Prime Minister requesting that the case be reopened. No actions have taken place so far.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The Constitution prohibits such actions; however, the police at times beat and tortured suspects. The AHC and the AHRG continued to report that police forces nationwide used torture and inhumane or excessive treatment; however, both noted that the number of cases decreased during the year. According to the AHRG, most mistreatment took place at the time of arrest or initial detention. Roma and members of the Egyptian community were particularly vulnerable to police abuse (see Section 5).

In February, according to the AHRG, Niko Puriqi accused the Permeti Chief of Criminal Police of beating him during pretrial detention. The police medical examiner verified Puriqi's allegations. Puriqi initially was accused of theft, although the police later dismissed the charges. In March, the Chief of Criminal Police received a warning.

In October, Stathi Lako, a 31-year-old man from Korca, was detained and allegedly mistreated in pretrial detention by three police officers and the Chief of Office of Serious Crimes, Bajram Hyka. According to AHC, Lako's involvement with Hyka's daughter was the reason for the detention. The prosecutor's office has not initiated an investigation of the case.

In June, Beqir Kaba filed a complaint based on allegations of illegal arrest and maltreatment by two police officers of Dibra police commissariat. Following the Ombudsman Office's intervention, the two police officers



were temporarily suspended from work.

In December 2003, the investigation into the 2003 beating of Behar Dedolli by the police was transferred to the military police and later suspended due to lack of evidence.

In 2003, Romeno Nexhipi alleged that Fier police beat him after they asked him to accompany them to the police station. He was sent to the hospital for treatment, then taken to the police station where he was held overnight. Nexhipi was subsequently charged with disturbing the peace and assaulting a police officer; however, the case was suspended at the year's end.

Alnor Hasa, former Chief of Criminal Police accused of beating a detainee in 2002, was sentenced to 2 years' imprisonment.

There were no developments in the April 2002 Pergjini assault case, which alleged that three brothers were arrested and beaten by police in reprisal for a dispute with the officers. The 2002 Azgan Haklaj assault case, in which charges were filed against four police officers accused of assaulting Haklaj during his 2001 arrest, was suspended by the prosecutor's office during the year.

At times police abused and tortured juvenile detainees (see Section 1. a.). According to the Children's Rights Center of Albania (CRCA), police sometimes used threats, violence, and torture to extract confessions from minors. In 2003, according to the AHRG, police used violent means against three minors from Korca, who were witnesses in a trial, in order to manipulate their testimony to favor the prosecutor. No actions were taken against the police officers. The prosecutor charged Gjergji Dabulla with the trafficking of the three minors and continued to use evidence in the case allegedly extracted from the minors by violent means.

The AHRG claimed that police targeted the country's homosexual community. According to the General Secretary of Gay Albania, the police often arbitrarily arrested homosexuals and then physically and verbally abused them while they were in detention. In October, the General Secretary of Gay Albania claimed that he was refused citizenship because he was homosexual.

There were reports that police beat protesters during the year (see Section 2.b.).

Conditions inside the prisons and detention centers remained poor, despite government efforts to address problems such as poor facilities and overcrowding as well as efforts to transfer convicted inmates from detention centers to prisons. According to the European Union's Judicial Reform, Asylum and Migration Operations Section, detainees had limited access to bathroom and showering facilities, and insufficient food; in some cases, space and privacy limitations kept them from engaging in religious practices. Access to employment opportunities for prisoners did not exist. The prison staff was poorly trained. During the year, prisoners and detainees rioted in Vlora, Lezha and Lac and held hunger strikes in pretrial detention centers in Elbasan, Corovoda, Korca, Malesia e Madhe and in prisons in Tirana and Burrel to protest poor living conditions, slowness of prisoner transfers from pretrial detention cells to prison facilities and the absence of prison employment. There were no reports of injuries or death from riots.

Overcrowding remained a serious problem. This caused substandard living conditions for prisoners and significant security problems for the police forces. According to the Ministry of Public Order the country's overall space capacity for all pretrial detention facilities amounted to 803, but the actual number of detainees was 1,239. In July, the Ministry of Justice decided to transfer all convicted felons to prisons; however, 188 convicted felons still remained in pretrial detention centers at year's end.

Unlike in previous years, no felons committed suicide.

The transfer of jurisdiction from the Ministry of Public Order to the Ministry of Justice of all pretrial detention centers mandated by a 2001 law was only partially fulfilled with the pretrial detention centers of Tirana and Vlora transferred to the Ministry of Justice by year's end.

Police separated men from women in pretrial detention centers and prisons. According to NGOs monitoring prison conditions, Prison 325 for women in Tirana lacked facilities for newborns of those women prisoners who were pregnant at the time of incarceration. Pretrial detainees were not separated from convicted prisoners, and juvenile detainees were not separated from adults due to overcrowding.

The Ministry of Justice reported that 49 minors were serving prison sentences: 31 in pretrial detention centers in the Ministry of Justice-run centers in Tirana and Vlora and 18 in Vaqarr--the only prison in the country that

Case 1:03-cv-09114    Document 9-3    Filed in TXSD on 10/03/2006    Page 4 of 17

has a special wing for juveniles. Overall, there were 39 minors held in pretrial detention centers excluding those in Tirana and Vlora. The CRCA noted that juveniles at Vaqarr were mixed with adult prisoners for showers and leisure activities. As a result, there were several reports of sexual abuse of juveniles during the year. According to the CRCA, all minors were denied education in the pretrial detention system; the Government had not responded to the concern by year's end.

Unlike in previous years, there were no minor girls serving sentence in Prison 325 for women.

The Government permitted international human rights observers to visit both pretrial detention centers and prisons; there were no reports of refusals to permit access for inspections by domestic independent human rights monitors. The Government cooperated with the International Committee of the Red Cross (ICRC) and with other NGOs.

d. Arbitrary Arrest or Detention

The Constitution prohibits arbitrary arrest and detention; however, the police occasionally arbitrarily arrested and detained persons.

According to the Ministry of Public Order, there were 12,132 police officers in the Albanian State Police (ASP); the majority of police officers remained largely untrained, despite assistance received from foreign governments. A new restructuring of the ASP created two deputy directorates: One for operations and the other for administration. Operational Directorates included: Organized Crime and Witness Protection; Fight Against Terrorist Acts and Cold Cases; Public Order and Security; Territorial Control and Coordination; and Border Police and Migration. The overall performance of law enforcement remained weak. Unprofessional behavior and corruption remained major impediments to the development of an effective civilian police force. According to the Ministry of Public Order, only 40 percent of police officers received training beyond basic training. The State Police's Office of Internal Control could engage in the prevention, discovery and documentation of criminal activity committed by police and, during the year, pursued investigations leading to the arrest of 52 police officials and the dismissal of 323 for various degrees of misconduct.

In its yearly tabulations, the People's Advocate—a government ombudsman charged with investigating citizen complaints of public officials' wrongdoing—reported that it handled 2,520 complaints, requests, and notifications related to all forms of public corruption and misconduct. Of those, 19 percent were determined to be legitimate and were forwarded to the appropriate authorities for further investigation. Among these 2,520 cases, the People's Advocate received 25 complaints against police officers for excessive force or maltreatment and determined that 7 were valid, 4 were outside their jurisdiction, 13 were groundless, and 1 was withdrawn; however, no further information on their status was available.

Corruption remained a problem among police forces and low salaries and widespread corruption throughout society made the problem difficult to combat. The State Police Office of Internal Control reported 223 cases of corruption to the Prosecutor's Office involving 230 police officers; 32 officers were arrested.

The 1995 Penal Procedures Code sets out the rights of detained and arrested persons. By law, a police officer or prosecutor may order a suspect into custody. Detained persons must be informed immediately of the charges against them and of their rights and a prosecutor must be notified immediately after the police detain a suspect. Within 48 hours of the arrest or detention, a suspect must appear before a judge. The judge has an additional 48 hours to determine whether the suspect may continue to be detained. In some cases, detained persons have been kept in pretrial detention longer than 48 hours without a court decision on whether the prosecutor has sufficient evidence.

The court may order pretrial detention in especially serious cases that could pose a danger to society. Alternatively, a suspect may be placed under house arrest. Bail may be required if the judge believes that the accused otherwise may not appear for trial.

Legal counsel must be provided free of charge if the defendant cannot afford a private attorney; however, this right was not widely known and police often failed to inform suspects of it. Access to legal information remained difficult for citizens. There were numerous cases in which persons were illegally detained and were unable to contact their private attorneys. In some cases, the detainees, minors included, were interrogated without their defense attorneys present. The services offered by the state bar association were considered inadequate and at times lacking in professionalism.

During the year, the People's Advocate cited nine complaints of arbitrary arrests and illegal detention by the police, and specified that some of the complaints had merit and were forwarded to the prosecutor's office.

The Penal Procedures Code requires completion of pretrial investigations within 3 months; however, the prosecutor may extend this period by 3-month intervals in particularly difficult cases. Lengthy pretrial detention as a result of delayed investigations remained a serious problem. The accused and the injured party have the right to appeal these extensions to the district court. Some prisoners were held in pretrial detention even after their trial.

There were no confirmed cases of detainees held strictly for political reasons. The charges against Ekrem Spahia, Chairman of the Legality Movement Party, in connection with the 1998 murder of a Democratic Party parliamentarian were subsequently dropped because he had parliamentary immunity, while the trial of 12 of his supporters remained pending at year's end.

e. Denial of Fair Public Trial

The Constitution provides for an independent judiciary; however, because of political pressure, intimidation, widespread corruption, bribery, and limited resources, much of the judiciary was unable to function independently and efficiently.

Tension continued between the police, prosecutors, and the judiciary particularly outside Tirana. Each side cited the failures of the other as the reason criminals avoided imprisonment; the courts accused the prosecutors and police of failing to provide the solid investigation and evidence necessary to prosecute successfully, and the police alleged that corruption and bribery tainted the courts. The Judicial Police were responsible, under the direction of prosecutors, for developing investigations initially conducted by the police.

The judicial system is composed of district courts of first instance, six courts of appeal, military courts of first instance and of appeal, and the High Court. There is also a separate and independent Constitutional Court. The High Court hears appeals from both the district courts and the courts of appeal, while the Constitutional Court primarily reviews those cases involving constitutional interpretation and conflicts between branches of government, and cases of individuals alleging denial of due process. The Serious Crimes Court and Serious Crime Court of Appeal became operational during the year and focused on increasing the effectiveness of the fight against organized crime and serious crimes and improving the quality of adjudication.

The President heads the High Council of Justice, which has authority to appoint, discipline, and dismiss judges of the courts of first instance and of the courts of appeal. Judges who are dismissed have the right to appeal to the High Court. In addition to the President, the Council consists of the Minister of Justice, the head of the High Court, nine judges of all levels selected by the National Judicial Conference, and three members selected by Parliament.

The President of the Republic appoints the 17 members of the High Court and the 9 members of the Constitutional Court with the consent of Parliament. Parliament has the authority to approve and dismiss the judges of the Constitutional Court and the judges of the High Court. According to the Constitution, dismissal may be ordered based on violation of the Constitution, conviction of a crime, mental or physical incapacity, or commission of an act that seriously discredits judicial integrity and reputation. The dismissed judges have the right to appeal to the Constitutional Court.

The performance of the Bailiffs Office, the body that ensures that civil judgments are enforced, despite some improvements was poor and, as a result, many civil judgments were not implemented.

The country has no juvenile justice system, and children's cases frequently were presented to judges who had not received any education in juvenile justice. According to the CRCA, recent increases in the length of sentences given to juveniles were due to lack of training of judges in juvenile law.

The Constitution provides for the right to a speedy trial; however, limited material resources, lack of space, and case overload in many instances prevented the court system from processing cases in a timely fashion. Long case backlogs were typical, and resulted in suspects being detained for longer than legal limits (see Section 1.d.). Defendants, witnesses, and others who do not speak Albanian are entitled to the services of a translator. Defendants are entitled to a lawyer, and, under the law, the Government provides lawyers for indigent defendants, although the quality of representation varied. If convicted, the accused has the right to appeal the decision within 10 days to the Court of Appeals. During the year, a number of trials, including some of the country's most important ones, were held in absentia, for example: The trial against Altin Arapi, the alleged murderer of the driver of the Prosecutor General; the trial against 13 members, 7 of them in absentia, that organized trafficking in persons in January that resulted in the death of 29 persons; and the "Gaxhai" trial against 5 gang members, 4 of whom were being tried in absentia.

The trial system does not provide for jury trials; the prosecutor and the defense lawyer have the right to be present in front of a panel of three judges, and defendants have the right to all the evidence that will be considered by the judges.

There were no reports of political prisoners.

In July, the Parliament approved a new law on the restitution and compensation of the properties confiscated during the Communist regime. Some former landowners, including religious communities, questioned the law's limitation on property restitution to 60 hectares in total. The Government has not established a monetary fund to be used for the purpose of compensation. The Ombudsman received 33 complaints related to property compensation disputes during the year.

*f. Arbitrary Interference with Privacy, Family, Home, or Correspondence*

The Constitution prohibits such actions; however, at times, the Government infringed on these rights.

In June, 51 Roma families were forced to abandon their homes, because they blocked the implementation of the local municipality's territory regulation plan.

Section 2
Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The Constitution provides for freedom of speech and of the press, and the media was active and largely unrestrained; however, there were serious, fundamental problems with the use of the media for political purposes. Political interference in the media occurred less frequently than in previous years. Publishers and newspaper owners continued to edit news stories to serve their own political and economic interests and sometimes to block ones that ran counter to those interests. Journalists continued to practice self-censorship. There was little transparency in the financing of media outlets.

Political parties, trade unions, and various societies and groups published their own newspapers or magazines. The independent media was active, but was constrained by limited professionalism and lack of finances. An estimated 200 publications were available, including daily and weekly newspapers, magazines, newsletters, and pamphlets. Three newspapers were published in Greek in the southern part of the country, and 15 Greek papers and magazines were distributed throughout the south; these dailies and weeklies had very small circulation figures.

The Albanian Radio and Television (RTSh) was the sole public broadcaster (30 percent of its budget came from the Government, 70 percent from private sources), and it continued to devote most of its coverage to the Government. RTSh includes a national television channel and a national radio channel. National radio operated a foreign language service that broadcasted in seven languages, including Greek.

Television was highly influential; approximately 80 percent of the public obtained its news and information from television. Television programming included some responsible journalism; however, political affiliation was pervasive in programming. Despite some improvements, the majority of stations were one-sided in their political coverage.

The National Council of Radio and Television (NCRT)—a seven-member bipartisan body elected by the Parliament, with one appointment by the President—governed broadcasting issues. The chairman of the Council resigned in the summer, citing pressure from powerful broadcasters.

Unlike in previous years, physical violence was not used against journalists.

In January, two reporters of Top Channel were detained briefly for secretly filming the Prime Minister in the public domain.

In February, security forces detained two ALSAT TV journalists for several hours and confiscated their videotape of the Prime Minister visiting a hospital.

Unlike in previous years, no television licenses were revoked for political reasons.