In May, a group of journalists and editors issued a press release in which they raised concerns about the Government's efforts to restrict press freedom. They argued that the Government's arbitrary use of financial audits and lawsuits against journalists restricted freedom of the press; however, the Government's position was that the complaints were generated by ire at more effective tax collection.

Journalists also raised complaints about direct or indirect censorship by their publishers or editors because of political or commercial pressure or interests. The absence of employment contracts for many journalists was cited as a frequent hindrance to unconstrained reporting. Some media outlets complained that increased frequency of tax auditing conducted at their offices was in retaliation for reporting critical of government policies. From March to May and again in September, the tax auditing office conducted tax inspections of the newspaper Koha Jone.

Libel carries criminal sentences, from a fine to 2 years imprisonment. There were a number of high-profile libel suits during the year involving politicians and well-known journalists. For example, in January, Prime Minister Nano sued the publisher and Member of Parliament Nikolle Lesi for libel for claims published in an edition of his newspaper, Koha Jone, alleging that the Prime Minister inappropriately awarded himself and his advisers an additional 5 months worth of salary. The first instance court ruled in favor of the Prime Minister; however the case was pending hearing in the appellate court at year's end.

In May, the Xhoana Nano, the wife of the Prime Minister, lodged a request with the High Court to lift the parliamentary immunity of Nikolle Lesi in order to pursue criminal charges against him for publishing unflattering stories about her in his newspaper, Koha Jone. In September, the High Court ruled in favor of the Prime Minister's spouse; however, in November, Parliament reversed the decision.

Former Minister of Youth, Culture, and Sport Arta Dade and Minister of Local Government Ben Blushi sued Democratic Party Chairman Sali Berisha for libel, and the publishing company that owns the magazine Spekter sued columnist Fatos Lubonja for libel; Lubonja previously wrote for the magazine. These cases were pending in the Tirana District Court or Court of Appeals at year's end. In December, the Chairman of the New Democrat Party, Genc Pollo, won a libel case against Farudin Arapi, Chairman of the Pyramid Schemes Assets Commission.

In July, the Democratic Party of Albania cancelled private NEWS 24 TV's accreditation with the party and denied it access to the party's headquarters for allegedly providing biased reporting. The AHC denounced the decision as a violation of the Constitution. The case was pending at year's end.

The Government did not restrict access to the Internet; however, Internet access remained limited especially outside the capital.

The Government at times restricted academic freedom. For example, Professor Doka was dismissed as chief of the University of Tirana's Geography Department for having an "antinationalistic approach in his work" for publishing an atlas which broadened the geographical minority zones. The Government also, after initial availability, banned publication of the atlas.

b. Freedom of Peaceful Assembly and Association

The Constitution provides for freedom of assembly, and the Government generally respected this right in practice.

The law requires organizers to notify state police about gatherings in public places 3 days before the protests. The police may refuse to permit them only for reasons of national security and public security, the prevention of terrorist acts, the prevention of crime, the protection of health or morals, or for traffic reasons; there were no reports that such denials were made arbitrarily.

There were a few instances where the police maltreated protesters during the year. In April, protesters clashed with police over the compensation of former political prisoners and victims of political persecution for their unpaid labor during their imprisonment or persecution; many protestors were taken into custody and detained at the police commissariat for several hours. Police did not press charges.

During the year, Mjaft, a civic youth movement, organized several protests and frequently encountered problems with police over permission to protest. The police pressed charges against some Mjaft organizers, but no trial had begun by the year's end.

The Constitution provides for the right of association, and the Government generally respected this right; however, the Constitution prohibits the formation of any political party or organization that is totalitarian; incites and supports racial, religious, or ethnic hatred; uses violence to take power or influence state policies; or is nontransparent or secretive in character (see Section 3). There were no reports that this provision was used against any group during the year.

c. Freedom of Religion

The Constitution provides for freedom of religion and the Government generally respected this right in practice. There is no official religion, and all religions are equal; however, the predominant religious communities (Sunni Muslim, Bektashi Muslim, Orthodox, and Roman Catholic) enjoy a greater degree of official recognition (e.g., national holidays) and social status based on their historical presence in the country. Religious movements may acquire the official status of a juridical person by registering with the Tirana District Court under the Law on Non-Profit Organizations, which recognizes the status of a nonprofit association regardless of whether the organization has a cultural, recreational, religious, or humanitarian character.

While the Government does not require registration or licensing of religious groups, the State Committee on Cults keeps records and statistics on foreign religious organizations that contact it for assistance.

The Albanian Evangelical Alliance, an association of approximately 97 Protestant churches, complained that it had encountered administrative obstacles to accessing the media. However, Evangelical Alliance representatives stated that it was not clear whether the limited access was due to the organization's small size or its religious affiliations. Religion was not taught in public schools. There is no law restricting the demonstration of religious affiliations in public schools; however, some students were not allowed to do so in practice. According to the Ministry of Education, there were 14 religious schools in the country, with approximately 2,600 students.

In 2003, a male Muslim student was prohibited from having his diploma photograph taken because he had a beard. The student was eventually permitted to graduate through the intervention of the Office of the People's Advocate.

The Government failed to return to the various religious communities all of the properties and religious objects that were confiscated under the Communist regime in 1967. In cases where religious buildings were returned, the Government often did not return the land surrounding the buildings or provide comparable compensation. In addition, the Government did not have the resources to compensate churches adequately for the extensive damage that many religious properties suffered.

The Orthodox Autocephalous Church of Albania complained that, in addition to problems in recovering property, it also had difficulty in retrieving some religious icons from the Government for restoration and safekeeping and reported some isolated incidents of vandalism to the churches and crosses.

In June, Kastriot Myftari, author of the book "Albanian National Islamism," was acquitted of all charges of inciting religious hatred.

Relations among the various religious groups were generally amicable. However, representatives of the country's Orthodox Church noted that some churches, crosses and other buildings, were the targets of vandalism, although these incidents were isolated and believed to be the result of the country's weak public order rather than due to religious intolerance. At year's end, the investigation into the 2003 killing of former General Secretary of the Islamic Community Sali Tivari was ongoing.

Unlike in previous years, the Bektashi community did not experience intimidation, threats, vandalism, and violence.

For a more detailed discussion, see the 2004 International Religious Freedom Report.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The Constitution provides for these rights, and the Government generally respected them in practice.

As a result of significant internal migration, many citizens no longer had local registration and status, which led to a loss of access to basic services such as education and medical care. In many educational institutions, students must have, among other documents, an official document from district authorities that acknowledges

69

they are inhabitants of the district. The lack of these documents prevented many students from attending school, with the Roma community especially affected.

There was little progress on the Ministry of Local Government's project to create a standardized national identification document.

The Constitution prohibits forced exile, and the Government did not employ it.

The law provides for the granting of asylum or refugee status in accordance with the 1951 U.N. Convention Relating to the Status of Refugees or its 1967 Protocol. In practice, the Government provided protection against refoulement, the return of person to a country where they feared persecution. The Government granted refugee status or asylum. The Government also provided temporary protection to individuals who may not qualify as refugees or asylees under the 1951 Convention/1967 Protocol; this was done for approximately 17 individuals. There is an appeals procedure, but it was not functioning during the year.

The Government cooperated with the office of the U.N. High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting refugees and asylum seekers. The UNHCR, through the state-run National Reception Center for Asylum Seekers, provided social and legal service, health care coverage, insurance, and limited training support for the country's small refugee community and coordinated further assistance through a network of NGOs.

In April, together with international organizations (UNHCR, the International Organization for Migration (IOM), the Organization of Security and Cooperation in Europe (OSCE)), the Government, through the European Union's CARDS Program, extended the prescreening program to illegal immigrants stopped at all border crossing points.

Section 3
Respect for Political Rights: The Right of Citizens to Change Their Government

The Constitution provides citizens with the right to change their government peacefully, and citizens exercised this right in practice through periodic elections held on the basis of universal suffrage.

Although municipal elections in 2003 resulted in several reruns, overall the elections met basic democratic standards and the police, leadership of the electoral campaigns, some local election officials, and electoral institutions performed their duties well. However, the elections were marred by repeated refusals of the political leadership of the two main parties to accept unfavorable results. The OSCE and the Office of Democratic Institutions and Human Right's (ODIHR) recommendations on the municipal elections called for setting up of a parliamentary bipartisan commission that would address shortcomings in the election system. From July to December, the bipartisan commission addressed the shortcomings connected with the Central Electoral Commission, voter's list, vote counting procedures, and party financing, among others, to prepare for the upcoming general election in the summer of 2005. The bipartisan commission's proposed amendments to the electoral code were pending approval by Parliament at year's end.

Several political parties participated in the political system; the Socialist Party (SP) and the Democratic Party (DP) were the two largest and held a majority of the seats in Parliament. The SP, formed from the former Communist Party (known as the Party of Labor) in 1991, led the governing party during the year. Its coalition included the HRUP, the Social Democratic Party, Agrarian Party, the Democratic Alliance Party and the Social Democracy Party. SP Party Chairman, Fatos Nano, also served as Prime Minister. The DP, led by former President Sali Berisha, was the primary opposition party in the Government.

A political party must apply to the Tirana District Court for registration and declare an aim or purpose that is not anticonstitutional or otherwise contrary to law, describe its organizational structure, and account for all public and private funds it receives. Registration was granted routinely; however, in April, the Motherland Party, composed of members from the Muslim community, was refused registration. The founders of the party reapplied and in November registration was granted.

Corruption remained a major obstacle to meaningful reform in the country. The Government has created a special ministerial position to tackle corruption issues, and also enacted new anticorruption legislation. In 2003, the High Inspectorate for the Declaration and Audit of Assets (HIDAA) was established to oversee the financial disclosures of public officials. Of the 4,160 declaration forms that HIDAA reviewed during the year, only 2 cases were referred to the prosecutor's office for further criminal investigation. However, in the absence of a national conflict of interest law, senior government officials continued to hold public offices even when it appeared to be in conflict with their private business interests. During the year, the prosecutor's office dealt with 376 cases of

government officials accused of abuse of authority and other types of corruption; however, no major punishments were issued in the cases. In August, Management System International (MSI) issued a survey that reported that 94 percent of the general public and 90 percent of business managers believed that corruption among public officials was widespread.

The Constitution guarantees the right to access of information; according to the Access-to-Information Law, all citizens, including foreign media, have the right to obtain information about the activities of government bodies, and of persons who exercise official state functions. Under this law, persons in offices with public authority are obligated to release all information, official documents, except classified documents, state secrets, etc. However, this law has not been fully implemented and access to information for citizens and noncitizens remained a problem. For example, a local NGO filed charges against the Ministry of Education because it denied access to requested information. The trial continued at year's end.

There were 9 women in the 140-seat Parliament. There was only one woman in the Cabinet, the Minister of Integration. The major political parties had women's organizations, and women served on their central committees; however, overall, women were very poorly represented in the central and local governments, and few were elected to public office at any level. During the 2003 municipal government elections, fewer than 3 percent of all candidates were women.

Several members of the Greek minority served in both the Parliament and the executive branch in ministerial and sub-ministerial positions, and there was 1 member of the Vlach minority in the 140-seat Parliament. No other minorities were thought to be represented in Parliament or the Cabinet.

Family voting occurred everywhere, but it was more common in rural areas.

Section 4
Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations

of Human Rights

A number of domestic and international human rights groups generally operated without government restriction, investigating and publishing their findings on human rights cases. Government officials were increasingly cooperative and responsive to their views; however, in some areas–such as violence against women, including domestic violence, and children's issues–little progress was made. There were several domestic NGOs active in addressing human rights problems. Despite the assistance of international donors, the work of these organizations was hampered by a shortage of funds and equipment.

There were no reports of government restrictions on the activities of domestic human rights NGOs. The AHC monitored human rights issues as they related to minorities, security forces, the judiciary, and elections. The AHRG, in addition to offering legal assistance, ran a complaint center and conducted police training. Both organizations operated independently from the Government and often issued press releases and reports calling for government action. The CRCA was the only organization that monitored children's rights in the country. The NGO Citizen's Advocacy Office (CAO), served as a corruption watchdog and investigative unit; citizens could call the CAO hotline to report corruption in government.

The Government cooperated with international organizations, such as the UNHCR, the IOM, and the ICRC, and did not restrict their access to the country.

The People's Advocate investigated inappropriate, inadequate, or illegal actions on the part of the Government. Although it lacked the power to enforce decisions, the People's Advocate acted as a watchdog for human rights violations. Its most common cases included citizen complaints of police and military abuse of power, lack of enforcement of court judgments in civil cases, wrongful dismissal, and land disputes (see Sections 1.c. and 1.e.). In many cases, the Government took steps to correct problems in response to the findings of the People's Advocate; however, disputes between the People's Advocate and the Prosecutor General hampered cooperation.

Section 5
Discrimination Based on Race, Sex, Disability, Language, or Social Status

The Constitution prohibits discrimination based on sex, race, ethnicity, or language; however, discrimination against women and Roma minority groups persisted.

71

### Women

There was no legislation specifically addressing violence against women or domestic violence; however, violence against women and spousal abuse remained serious problems. In the country's traditionally male-dominated society, cultural acceptance and lax police response resulted in most abuse going unreported. Rape is punishable by law, as is spousal rape; however, in practice, spousal rape was not reported or prosecuted. The concepts of spousal rape and sexual harassment were not well established, and, consequently, such acts often were not considered crimes by authorities or the public. For this reason, it was difficult to quantify the number of women who have experienced rape, domestic violence, or sexual harassment; however, the Counseling Center for Women and Girls noted that, in 2002, its Tirana hotline received 80 to 100 calls per month from women reporting some form of violence. A 1999 poll conducted by the NGO Advice Center for Women and Girls showed that 64 percent of women surveyed had experienced some form of physical, emotional, or sexual abuse; later statistics were not available.

An NGO maintained a shelter in Tirana for abused women, although the facility had the capacity to house only a few victims at a time. The same NGO also operated a hotline that provided advice and counseling to women and girls.

The law prohibits prostitution; however, it was a problem. Trafficking in women and children remained a problem (see Section 5, Trafficking).

Many men, particularly those from the northeastern part of the country, still followed the traditional unwritten code—the kanun—in which, according to some interpretations, women are considered to be, and were treated as, chattel. Under the kanun, some interpretations dictate that a woman's duty is to serve her husband and to be subordinate to him in all matters.

The February killing of a 21-year old young woman by her father for alleged tardiness and the father's subsequent sentence of fewer than 2 years' imprisonment received much attention from the media and the NGO community; however, the case was not appealed.

Women were not excluded, by law or in practice, from any occupation; however, they were not well represented at the highest levels of their fields. The Labor Code mandates equal pay for equal work; however, this provision was not fully implemented, although women continued gradually to gain economic power. Women enjoyed equal access to higher education, but they were not accorded full and equal opportunity in their careers, and well-educated women were often underemployed or worked outside their field of training.

In July, Parliament approved a new Law on Gender Equality which guarantees equal rights for men and women, promotes equal opportunities in order to eliminate direct and indirect discrimination, and defines responsibilities for drafting of governmental policies promoting gender equality. However, some NGOs criticized the new law as poorly written and inadequately financed. Under the law, the Government's State Committee on Equal Opportunity was tasked with drafting, promoting and monitoring gender equality programs for the entire country. However, the Committee was underfunded and lacked political influence. The new law also created an advisory body, the Inter-Ministerial Committee on Gender Equality.

Various NGOs worked to promote women's rights. Some of these groups successfully promoted public awareness regarding domestic violence and implemented programs to empower women; however, their ability to lobby the Government and other prominent individuals to institute actual change in government policies and practices regarding women's issues remained limited.

### Children

The Government's commitment to children's rights and welfare is codified in domestic law; however, in practice, there was limited commitment.

The law provides for the right to 9 years of free education and also authorizes private schools. School attendance was mandatory through the ninth grade (or until age 16, whichever came first); however, in practice, many children left school earlier than allowed by law in order to work with their families, especially in rural areas (see Section 6.d). Parents had to pay for supplies, books, school materials, and space heaters for some classrooms, which was prohibitively expensive for many families. The lack of proper documents—many of which were lost due to internal migration—prevented many students from attending school (see Section 2.d.). The CRCA estimated that only 62 percent of girls who finished primary schools continued on to high school; the percentage was significantly higher for boys, but figures were not available at year's end. According to UNICEF, the primary school attendance rate for all children ages 7 to 14 years was 90 percent. The net primary



school enrollment rate was 97 percent for both boys and girls.

Equal access to medical care was available in principle for both boys and girls; however, a high level of bribery in the medical care system sometimes limited access.

After a decade of significant internal migration, high civil registration fees have prevented many citizens from registering with authorities in their actual places of residence. As a result, children born to these individuals have no birth certificates or other legal documentation. The law requires parents who do not register their children within 30 days of the child's birth to go to court, where fines for not being properly registered in the first place are likely to be incurred. Thus, the country has a large-and growing-population of vulnerable, unregistered children, who are at risk for trafficking or exploitation, particularly from the Roma community.

According to statistics for the year issued by the National Reconciliation Committee, as many as 160 children remained endangered by blood feuds involving their families; 73 of those children were considered to be living in especially dangerous circumstances (see Section 1.a.).

Child abuse, including sexual abuse, was rarely reported; however, authorities and NGOs believed that it was prevalent. According to the Ministry of Public Order, 25 cases of sex crimes against children were reported during the year. Trafficking in children, although not widespread, was problematic (see Section 5, Trafficking). In a few cases, criminals kidnapped children from families or orphanages to be sold to prostitution or pedophilia rings abroad and there were reports that some families sold their children to traffickers (see Section 5, Trafficking).

Child labor remained a major problem. NGOs estimated that there were approximately 50,000 children working part time or full time. There is no legislation or government policies that regulates this concern (see Section 6.d.).

Homeless, displaced or street children remained a problem, especially among Roma children. Roma children lived in extreme poverty throughout the country. They begged in the street or did other petty work, and many immigrated to neighboring countries, especially during the summer.

There is no state authority responsible for children's issues. Since July, the State Committee of Equal Opportunity, which supplanted the State Committee for Women and Family, no longer had a mandate over children's issues.

Various NGOs and international organizations worked on issues related to trafficking of children. In addition, Save the Children created an early childhood development program; Catholic Relief Services sponsored after-school programs and promoted greater community involvement in the education system, and UNICEF worked to develop a juvenile justice system.

Trafficking in Persons

The law criminalizes trafficking in persons and provides penalties for traffickers; however, trafficking in persons, particularly women and children, remained a problem. Police corruption and involvement in trafficking was a problem.

According to the Criminal Code, the penalties for human trafficking for sexual exploitation or forced labor are: Trafficking in persons (5 to 15 years in prison); trafficking of women for prostitution (7 to 15 years in prison); and trafficking in minors (15 to 20 years in prison). Aggravating circumstances, such as kidnapping or death, can increase the severity of the sentence to a maximum term of life in prison.

In February, Parliament approved the addition of fines to the existing penalties: Those convicted of exploitation for prostitution of a minor are fined $4,000 to $6,000 (400,000 to 600,000 lek); for women, the fine is $3,000 to $6,000 (300,000 to 600,000 lek). In addition, the amended Penal Code states that any government official or public servant convicted of exploitation for prostitution faces 125 percent of the standard penalty. In October, Parliament approved a new law that mandates the sequestration and confiscation of assets if their source comes from organized crime and trafficking.

The prosecution of traffickers remained a problem; traffickers who were arrested often were released because of insufficient evidence, and, if prosecuted, they often were charged for lesser crimes or were given less than the minimum sentence for trafficking. During the year, according to the Prosecutor's Office, there were 234 ongoing trafficking in persons cases and 362 individuals were convicted of trafficking in persons during the

year. For example, two pimps, who mistreated a girl from Tirana and trafficked her to Italy to work as a prostitute, were sentenced to 17 and 19 years imprisonment.

In 2003, police arrested several servicemen on suspicion of raping and trafficking a 16-year-old girl; the girl was smuggled onto the Bishti i Palles naval base to have sex with conscripted sailors and held in a semi-abandoned building on the base for two months and repeatedly raped before she was trafficked to Kosovo. A total of 11 officers and noncommissioned officers—including the 7 participants—were suspended or reassigned. Prosecutors dropped charges against one of the girl's alleged traffickers in August, and the trial of eight sailors and two civilians began in October. Two other individuals allegedly involved have not yet been formally charged.

The 2003 case against operators of a child trafficking ring in Durres, involving a port custom officer and the head of local SHISH office, had not gone to trial by the year's end.

In August, a regional antitrafficking sweep organized through the Southeast European Cooperative Initiative Center called Mirage III, resulted in 125 arrests for various forms of trafficking, prostitution, and smuggling. At year's end, 65 suspects remained incarcerated.

In March, Parliament passed a witness protection law; although the law entered into force in November, the Government did not implement it by year's end. This impeded the Government's ability to build strong cases against traffickers, although cooperation from the international community led to the relocation and protection of three witnesses outside of the country during the year. Victims often did not identify themselves as trafficked persons and were unwilling to testify, due to fear of retribution from traffickers and distrust of the police. Cooperation between the police and prosecutors remained weak.

The country was both a source and a transit country primarily for women and children trafficked for the purposes of sexual exploitation and forced labor, including begging. To a lesser extent than in previous years, the country served as a transit route for trafficked women and girls. Most trafficked women and girls were transported to Italy, Greece, and—to a lesser extent—other European countries, such as Belgium, France, the United Kingdom, the Netherlands and Norway. There was a significant increase in the trafficking of children to Kosovo for exploitation as beggars and for sexual purposes. Traffickers largely used overland routes such as Albania-Macedonia-Greece or Albania-Montenegro or falsified documents to transport their victims via plane or ferry. Internal trafficking increased significantly during the year.

According to the Ministry of Public Order, there were 4,000 children trafficked from the country between 1992 and 2000. Children were generally trafficked for forced begging or sexual exploitation. Roma and Egyptian communities were particularly vulnerable due to poverty and illiteracy. Children also were trafficked for begging. Such children often were bought from families, and in a few cases were kidnapped, reportedly for begging or working abroad.

For example, in November 2003, five persons (two in Korca and three in Pogradec) received prison sentences ranging from 15 to 20 years for trafficking newborn babies to Greece. At year's end, the case had been appealed, after being transferred to the Court of Serious Crimes. Also in November 2003, there were press reports that an Albanian family sold their 3-year-old son to an Italian man; Italian authorities subsequently arrested two persons involved in the sale.

According to the Ministry of Justice, 3,300 unaccompanied Albanian children lived in Italy, although not all were victims of trafficking. A 2002 study conducted by the NGO International Social Service reported that 1,800 unaccompanied Albanian children—many of whom were trafficking victims—lived in Greece; however, according to Terre des Hommes, a Swiss child-welfare NGO operating in the country, the number of children trafficked to Greece has declined in recent years.

Foreign women and girls in transit mostly originated from Serbia and Montenegro (Kosovo), and—to a lesser extent—Moldova, Romania, Ukraine, Russia, and Bulgaria. Traffickers typically confiscated victims' documents, physically and sexually abused them, and sometimes forced them to work as prostitutes before they left the country. Both citizens and foreign women trafficked by domestic organized crime networks were abused, tortured, and raped. Traffickers also threatened many of the victims' family members.

The main form of recruitment involved marriage under false pretenses or false promises of marriage, with the trafficker luring the victims abroad as prostitutes. Due to the poor economic situation, men and women from organized criminal groups lured many women and young girls from all over the country by promising them jobs in Italy and Greece. To a lesser extent, the selling of victims to traffickers by family members or neighbors or kidnapping, including from orphanages, occurred, particularly of Roma children.

Case 1:03-cv-00114    Document 9-4    Filed in TXSD on 10/03/2006    Page 8 of 40
Country Report on Human Rights Practices in Albania
Page 14 of 17

The police often were involved directly or indirectly in trafficking. Six police officers were arrested for trafficking, but no convictions resulted and no other government officials were prosecuted for trafficking during the year. Lawyers and judges were also manipulated and bribed, permitting traffickers to buy their way out of punishment if arrested. During the year, the Ministry of Public Order's Office of Internal Control investigated only 12 cases of police involvement in all forms of trafficking.

Government services provided to trafficking victims remained very limited; however, several NGOs were active in addressing victims' needs. The IOM operated a reintegration center in Tirana that provided counseling and medical services, job training, and some legal assistance. The Vatra Hearth Shelter, an NGO in Vlora, provided similar services. Both shelters reported that a large percentage of their caseload in 2003 and during the year involved victims deported to the country from other European countries.

IOM also had five foster care cases related to trafficking in persons during the year.

Police treatment of trafficked women continued to improve during the year. Most police stopped treating trafficked women as criminals rather than victims and routinely referred them to local and international NGOs for assistance. Foreign women who were detained at times lacked translation services or were not given a choice of lawyers.

With significant input from the NGO community, the Government prepared a Memorandum of Understanding in April to be signed with Greece regarding the repatriation of victims of child trafficking. The Greek government had not signed the agreement by year's end.

Victims of trafficking often faced significant stigmatization from their families and society. According to the Vatra Hearth Shelter, there have been many cases where victims of trafficking, minors included, have been threatened with death by their families because of their past. Government services available to trafficking victims remained limited. Re-trafficking became a significant problem, with 141 out of 291 victims sheltered at the Vatra Hearth Shelter during the year reporting that they had been trafficked at least twice previously and seven of the victims were under continuous threats from the perpetrators.

During the year, the Government prepared a national strategy to combat child trafficking; it was pending approval before the Council of Ministers by year's end.

The Vlora Antitrafficking Center, which opened in 2001, had not become fully operational, although it was used as a command post for Mirage operations. National and international NGOs carried out most of the country's trafficking awareness campaigns.

Persons with Disabilities

There was some discrimination against persons with disabilities in employment, education, access to health care, and the provision of other state services. Widespread poverty, unregulated working conditions, and poor medical care posed significant problems for many persons with disabilities. They were eligible for various forms of public assistance; however, budgetary constraints greatly limited the amounts they actually received. No law mandates accessibility to public buildings for persons with disabilities, and little was done in this regard.

National/Racial/Ethnic Minorities

Constitutional protections against discrimination are applied to all minorities; however, societal discrimination against members of minority populations persisted, particularly members of Roma and Egyptian communities. In March, the Council of Ministers established the State Committee on Minorities. The Committee reported and represented the interests of all the minorities vis-a-vis the Government. The Committee is composed of representatives from the various national and ethnic-linguistic minorities.

According to the Minority Affairs Office, to qualify for national or ethno-linguistic minority status, a group of individuals must: Share the same language (different from Albanian), have documentation to prove its distinct ethnic origin or national identity, have distinct customs and traditions, or a link to a kinship state outside of the country. For example, the group known as Egyptians were not given minority status because they lacked some criteria, such as a distinct language and traditions, that could define them as a minority. Instead, the Egyptians were referred to as a community.

The Greeks are the largest national minority, followed by small groups of Macedonians and Montenegrins; Aromanians (Vlachs) and Roma are defined as ethno-linguistic minority groups.

The ethnic Greek minority, led by its cultural association Omonia, collectively pursued grievances with the Government regarding electoral zones, Greek-language education, property rights, and government documents. Minority leaders complained of the Government's unwillingness to recognize the possible existence of ethnic Greek towns outside communist-era "minority zones"; to utilize Greek on official documents and on public signs in ethnic Greek areas; to ascertain the size of the ethnic Greek population; and to include a higher number of ethnic Greeks in public administration.

Greek-language public elementary schools were common in much of the southern part of the country, where most ethnic Greeks lived. Every village in this zone had its own elementary-middle (9-year) school in the Greek language, regardless of the number of students, and Gjirokaster had two Greek language high schools. However, Omonia said that the ethnic Greeks needed more classes both within and outside the minority zones. The Minority Affairs Office stressed that the Government never closed a minority school or class even when the number of students dwindled as a result of graduation, migration or other factors. In 2003, Parliament passed an amendment that reauthorized the inclusion of nationality/ethnicity in the Civil Registry and internal identification, which was expected to alleviate the difficulty in proving ethnicity for future requests for minority language schools.

The Roma and the Egyptian communities were among the most politically, economically and socially neglected groups in the country. There were reports that police beat Roma and Egyptians during the year (see Section 1.c.). There were also reports of Roma and Egyptian families being displaced by police from temporary housing. In June, 51 Roma families were forced to abandon their living quarters (see Section 1.f.).

Members of the Egyptian community tended to settle in urban areas and generally were more integrated into the economy than the Roma. In addition to widespread societal discrimination, these groups generally suffered from high illiteracy, particularly among children, poor health conditions, lack of education, and marked economic disadvantages. The Government officially recognized the Roma as an ethno-linguistic rather than a national minority. By year's end, the Government had not implemented its National Strategy for the Improvement of Life Conditions of the Roma Minority. In spite of repeated denials, the Egyptian community continued to try to obtain minority status from the Government.

In 2003, the AHRG claimed that police targeted the country's homosexual community. According to the General Secretary of Gay Albania, the police often arbitrarily arrested homosexuals and then physically and verbally abused them while they were in detention. However, the police denied these charges and stated that when homosexuals were arrested, it was for violating the law--such as disturbing the peace--not for their sexual preference.

Section 6
Worker Rights

a. The Right of Association

Workers had the right to form independent trade unions, and exercised this right in practice; however, government employees are prohibited from joining unions or holding strikes. Two major federations acted as umbrella organizations for most of the country's unions: The Independent Confederation of Trade Unions of Albania (membership approximately 85,000) and the Albanian Confederation of Trade Unions (membership approximately 100,000). Both organizations experienced a continued drop in membership during the year due to unemployment and decreasing employee satisfaction with the unions. Some unions chose not to join either of the federations. No union had an official political affiliation, and the Government did not provide any financial support for unions.

The law does not prohibit antiunion discrimination; however, there were no reports of such discrimination in practice.

Unions were free to join and maintain ties with international organizations.

b. The Right to Organize and Bargain Collectively

Citizens in all fields of employment, except uniformed members of the armed forces, police officers, and some court employees, have the constitutional right to organize and bargain collectively, and the Labor Code establishes procedures for the protection of workers' rights through collective bargaining agreements; however, labor unions operated from a weak position. In practice, unions representing public sector employees negotiated directly with the Government. Effective collective bargaining remained difficult, and agreements were difficult to enforce.

The Constitution and other legislation provide that all workers, except civil servants including uniformed military, police, and some court officials, have the right to strike. The law prohibits strikes that are declared openly to be political or that are judged by the courts to be political.

In January, the employees of a Ferrous-Chromium factory in Burrel held a 12-day hunger strike to protest the nonpayment of their salaries. After intervention of the trade union, the factory paid back-salaries to the striking employees.

In April, 10 employees of the Urban Transport Park in Tirana held a 5-day hunger strike to protest illegal dismissal. The director of the park claimed that their strike violated the employment contract. However, the AHRG and Ombudsman stated that the hunger strike was legal and that the Director of the park had not abided by the Labor Code in the firing of the employees. The strike lasted 5 days. By year's end, employees were not reinstated.

There are no export processing zones.

c. Prohibition of Forced or Compulsory Labor

The Constitution and the Labor Code prohibit forced or compulsory labor, including by children; however, such practices occurred (see Sections 5, Trafficking and 6.d.).

d. Prohibition of Child Labor and Minimum Age for Employment

The Labor Code sets the minimum age of employment at 14 years and limits the amount and type of labor that can be performed by children under the age of 16. Children between the ages of 14 and 16 legally may work in part time jobs during summer vacation. The Ministry of Labor may enforce minimum age requirements through the courts; however, there were no reports that enforcement took place. Labor inspections of factories carried out in the first half of the year found only 0.01 percent of the employees were underage. The majority of factories inspected were shoe and textile companies. More than 70 percent of the underage workers were girls. The fine for employing an underage worker was normally 20 to 30 times the monthly minimum wage of the employee. The CRCA estimated that roughly 50,000 children under the age of 18 worked either full or part time. UNICEF estimated that 23 percent of children ages 5 to 14 years in the country were working in between 1999 and 2003. Children considered to be working included those who have performed any paid or unpaid work for someone who is not a member of the household, who have performed more than 4 hours of housekeeping chores in the household, or who have performed other family work. NGOs reported that labor inspectors, who were charged with investigating child labor complaints, did not give out fines, penalties, or convictions to those who violated child labor laws.

There were young children working, some as many as 16 hours a day. According to the CRCA, the majority of child laborers worked as street or shop vendors, beggars, farmers or shepherds, drug runners, vehicle washers, textile factory workers, shoeshine boys, or prostitutes; however, in Tirana and other cities, children—mostly Roma—worked as beggars or sold cigarettes and other items on the street; the police generally ignored this practice. The CRCA also noted that there were approximately 800 street children in Tirana. Increasing numbers of children in Tirana fell victim to prostitution and other forms of exploitation. There were reports that children were trafficked for forced labor (see Section 5, Trafficking).

e. Acceptable Conditions of Work

The legal minimum wage for all workers over the age of 16 was approximately $110 (10,800 lek) per month, which was not sufficient to provide a decent standard of living for a worker and family. Remittances from those working abroad were vital for many families. The law provides for social assistance (income support) and unemployment compensation; however, these were very limited, both in terms of the amounts received and the number of persons actually covered. The average wage for workers in the public sector was approximately $217 (21,325 lek) per month. Approximately 25 percent of the population lived under the official poverty line.

The Labor Code establishes a 40-hour work week; however, in practice, hours typically were set by individual or collective agreements. Many persons worked 6 days a week. By law overtime pay must be provided and there were mandated rest periods; however, these provisions were not always observed in practice.

The Government set occupational health and safety standards; however, it had limited funds to make improvements in the remaining state-owned enterprises and a limited ability to enforce standards in the private sector. Actual conditions in the workplace sometimes were very poor and in some cases dangerous. A number of job-related deaths were reported in the press during the year, particularly in the construction and mining



industries. The Labor Code lists the safety obligations of employers and employees but does not provide workers with the right to leave a hazardous workplace without jeopardy to their continued employment. The Ministry of Labor and Social Affairs was responsible for enforcing health and safety regulations; however, these regulations were generally not enforced in practice.

# Yvette M. Mastin, P.C.
## Attorneys And Counselors At Law

2323 South Voss, Suite 400 ♦ Houston, Texas 77057
(832) 251-3662 ♦ Fax (832) 251-3664

March 20, 2005

Judith P. Vacanti
Attorney At Law
Suite 570
550 Post Oak Blvd
Houston, TX 77027

RE:    My Client:    **Rudina Demiraj**
A 95 218 801

Rediol Demiraj
A 95 218 802

Dear Ms. Vacanti:

I am submitting this letter to you in accordance with 8 C.F.R. § 208.4 (a) (5) (iii) (B). Your prompt written response is requested. Ms. Demiraj is asserting before the immigration court that your representation of her was ineffective for the following reason. The regulations require an alien to claim asylum based on changed circumstances within a reasonable period of time.

In May 2003 Ms. Demiraj informed you that her husband Edmond Demiraj had been detained by immigration officials when he was discovered after entering the United States, illegally. Ms. Demiraj informed you that he had been shot by a person in Albanian who he feared. At the time, Ms. Demiraj had an appeal pending before the Board of Immigration Appeals that you had submitted on her behalf.

Ms. Demiraj gave you the factual account of what had occurred. You did not advise her to file a Motion To Remand her case back to the immigration court to present her claim of these changed circumstances relevant to her safety if she were to be removed to Albania. In May, you did contact me and ask me if I was representing her husband, but we did not discuss Ms. Demiraj's case.

Please explain why you did not advise her to file such a Motion to Remand and / or submit one on Ms. Demiraj's behalf.

*Exclusive Practice in Federal Law*

79

The immigration regulations require that you be informed of the allegations leveled against you and that you be given the opportunity to respond.

Please forward a written response to me at your earliest convenience as I must file this response with the immigration court, shortly.

Sincerely,

Yvette M. Mastin, Esquire

*Exclusive Practice in Federal Law*


**UNITED STATES POSTAL SERVICE**®

## Track & Confirm

### Current Status

You entered 0304 3490 0000 2231 7585

Your item was delivered at 1:46 pm on March 22, 2005 in HOUSTON, TX 77027.

*Shipment Details >*

### Notification Options



▸ Track & Confirm by email     What is this?     *Go >*

**Track & Confirm**

Enter label number:

**Track & Confirm FAQs**

POSTAL INSPECTORS
Preserving the Trust

**site map**  **contact us**  **government services**
Copyright © 1999-2002 USPS. All Rights Reserved. Terms of Use  Privacy Policy



U.S. Department of Justice
Immigration and Naturalization Service

OMB No 1115-0086

# Application for Asylum and for Withholding of Removal

*Start Here - Please Type or Print.*  USE BLACK INK. SEE THE SEPARATE INSTRUCTION PAMPHLET FOR INFORMATION ABOUT ELIGIBILITY AND HOW TO COMPLETE AND FILE THIS APPLICATION. (Note: There is NO filing fee for this application.)

*Please* check the box if you also want to apply for withholding of removal under the Convention Against Torture.  [X]

## PART A. I.   INFORMATION ABOUT YOU

| | |
|---|---|
| 1. Alien Registration Number(s) (A#'s) (If any)   95 218 802 | 2. Social Security No. (If any) none |

| | | |
|---|---|---|
| 3. Complete Last Name   Demiraj | 4 First Name   Rediol | 5. Middle Name |

6. What other names have you used? (Include maiden name and aliases.)
none

| | |
|---|---|
| 7. Residence in the U.S. <br> C O  Edmond Demiraj | Telephone Number <br> (832) 251-3662 |

| | |
|---|---|
| Street Number and Name    800 Nasa Rd 1 | Apt. No.   260 |

| | | |
|---|---|---|
| City    Webster | State    TX | ZIP Code    77598 |

| | |
|---|---|
| 8. Mailing Address in the U.S., if other than above <br> Yvette M. Mastin, Atty | Telephone Number <br> 251-3662 |

| | |
|---|---|
| Street Number and Name    2323 South Voss Rd. | Apt. No.   400 |

| | | |
|---|---|---|
| City    Houston | State    TX | ZIP Code    77057 |

| | |
|---|---|
| 9. Sex  [X] Male  [ ] Female | 10. Marital Status:  [X] Single  [ ] Married  [ ] Divorced  [ ] Widowed |

| | |
|---|---|
| 11. Date of Birth (Mo/Day/Yr) <br> 06/15/1993 | 12. City and Country of Birth <br> Lushnje. Albania |

| | | |
|---|---|---|
| 13. Present Nationality (Citizenship) <br> Albanian | 14. Nationality at Birth <br> Albanian | 15. Race, Ethnic or Tribal Group <br> white  |  16. Religion <br> Muslim |

17.   *Check the box, a through c that applies:*   a. [ ] I have never been in immigration court proceedings.

b [X] I am now in immigration court proceedings.   c. [ ] I am **not** now in immigration court proceedings. but I have been in the past.

18. *Complete 18 a through c.*

a. When did you last leave your country? (Mo/Day/Yr)  10/01/00    b. What is your current I-94 Number, if any?

c. Please list each entry to the U.S. beginning with your most recent entry.
*List date (Mo/Day/Yr), place, and your status for each entry. (Attach additional sheets as needed.)*

| | | | | | |
|---|---|---|---|---|---|
| Date  10/15/2000 | Place  Brownsville, TX | Status  EWI | Date Status Expires  N/A |
| Date | Place | Status | |
| Date | Place | Status | |
| Date | Place | Status | |

| | | |
|---|---|---|
| 19. What country issued your last passport or travel document? none | 20. Passport # N/A <br> Travel Document # N/A | 21. Expiration Date (Mo/Day/Yr) |

| | | |
|---|---|---|
| 22.   What is your native language? <br> Albanian | 23. Are you fluent in English? <br> [ ] Yes  [X] No | 24. What other languages do you speak fluently? <br> None |

| FOR EOIR USE ONLY | FOR INS USE ONLY |
|---|---|
| | Action: <br> Interview Date: _____ <br> Decision: <br> _ Approval Date: _____ <br> _ Denial Date: _____ <br> _ Referral Date: _____ <br> Asylum Officer ID# _____ |

OMB No. 1115-0086

## PART A. II.  INFORMATION ABOUT YOUR SPOUSE AND CHILDREN

**Your Spouse.** ☐ I am not married. (Skip to *Your Children, below*)

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | 3. Date of Birth *(Mo/Day/Yr)* | 4. Social Security No. *(If any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Maiden Name |
| 9. Date of Marriage *(Mo/Day/Yr)* | 10 Place of Marriage | 11. City and Country of Birth | |

| 12. Nationality *(Citizenship)* | 13. Race, Ethnic or Tribal Group | 14. Sex ☐ Male ☐ Female |
|---|---|---|

15. Is this person in the U.S.? ☐ Yes *(Complete blocks 16 to 24.)* ☐ No *(Specify location)*

| 16. Place of last entry in the U.S.? | 17. Date of last entry in the U.S. *(Mo/Day/Yr)* | 18. I-94 No. *(If any)* | 19. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 20. What is your spouse's current status? | 21. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | 22. Is your spouse in immigration court proceedings? ☐ Yes ☐ No | 23. If previously in the U.S., date of previous arrival *(Mo/Day/Yr)* |

24. If in the U.S., is your spouse to be included in this application? *(Check the appropriate box.)*

☐ Yes *(Attach one (1) photograph of your spouse in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

## Your Children.  Please list ALL of your children, regardless of age, location, or marital status.

☒ I do not have any children. (Skip *to Part A. III., Information about Your Background.)*
☐ I do have children. Total number of children _____

*(Use Supplement A Form I-589 or attach additional pages and documentation if you have more than four (4) children.)*

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. Social Security No. *(If any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

13 Is this child in the U.S.? ☐ Yes *(Complete blocks 14 to 21.)* ☐ No *(Specify Location)*

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S. *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (Mo/Day/Yr) | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*

☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

83

Form I-589 (Rev. 10/18/01)N Page 2

OMB No. 1115-0086

## PART A. II.   INFORMATION ABOUT YOUR SPOUSE AND CHILDREN Continued

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. Social Security No. *(If any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

13. Is this child in the U.S.?  ☐ Yes *(Complete blocks 14 to 21.)*   ☐ No *(Specify Location)*

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. Social Security No. *(If any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

13. Is this child in the U.S.?  ☐ Yes *(Complete blocks 14 to 21.)*   ☐ No *(Specify Location)*

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

| 1. Alien Registration Number (A#) *(If any)* | 2. Passport/ID Card No. *(If any)* | 3. Marital Status *(Married, Single, Divorced, Widowed)* | 4. Social Security No. *(If any)* |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10. Nationality *(Citizenship)* | 11. Race, Ethnic or Tribal Group | 12. Sex ☐ Male ☐ Female |

13. Is this child in the U.S.?  ☐ Yes *(Complete blocks 14 to 21.)*   ☐ No *(Specify Location)*

| 14. Place of last entry in the U.S.? | 15. Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16. I-94 No. *(If any)* | 17. Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | 20. Is your child in immigration court proceedings? ☐ Yes ☐ No | |

21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐ No

OMB No. 1115-0086

## PART A. III.    INFORMATION ABOUT YOUR BACKGROUND

1. Please list your last address where you lived before coming to the U.S. If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State, and Country.) (Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Number and Street *(Provide if available)* | City/Town | Department, Province or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| Pallati 210 | Berat | Lushnje | Albania | 06/1993 | 10/2000 |
| | | | Albania | | |

2. Provide the following information about your residences during the last five years. List your present address first. *(Use Supplement Form B or additional sheets of paper if necessary)*

| Number and Street | City/Town | Department, Province or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
| 800 Nasa Rd 1 | Webster | TX | USa | 03/2004 | Present |
| 535 W. Nasa Rd 1 #2008 | Webster | TX | USA | 03/2000 | 03/2004 |
| Pallati 210 | Berat | Lushnje | Albania | 03/1993 | 03/2000 |
| | | | | | |

3. Provide the following information about your education, beginning with the most recent. *(Use Supplement B Form I-589 or additional sheets of paper if necessary)*

| Name of School | Type of School | Location (Address) | Attended From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|
| | elemenetary school | Webster, TX | 11/2000 | 03/2005 |
| elementary school | elementary school | Berat, Lushnje, Albania | | |
| | | | | |

4. Provide the following information about your employment during the last five years. List your present employment first. *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|
| none | | | |
| none: | | | |
| | | | |
| | | | |
| | | | |

5. Provide the following information about your parents and siblings (brother and sisters). Check box if the person is deceased. *(Use Supplement B Form I-589 or additional sheets of paper if necessary)*

| Name | City/Town and Country of Birth | Current Location |
|---|---|---|
| *Mother* Rudina Demiraj | Berat, Albania | ☐ Deceased  Houston, TX USA |
| *Father* Edmond Demiraj | Lushnje, Albania | ☐ Deceased  Houston, TX USA |
| *Siblings* Alban Demiraj | HoustonUSA | ☐ Deceased  Houston, TX  USA |
| | | ☐ Deceased |

OMB No. 1115-0086

## PART B.   INFORMATION ABOUT YOUR APPLICATION

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in PART B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the Act or withholding of removal under the Convention Against Torture) you should provide a detailed and specific account of the basis of your claim to asylum or other protection. To the best of your ability, provide specific dates, places, and descriptions about each event or action described. You should attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim. If this documentation is unavailable or you are not providing this documentation with your application, please explain why in your responses to the following questions. Refer to Instructions. Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A - D, Section V, "Completing the Form," Part B, and Section VII, "Additional Documents that You Should Submit" for more information on completing this section of the form.

1.   Why are you applying for asylum or withholding of removal under section 241(b)(3) of the Act, or for withholding of removal under the Convention Against Torture? Check the appropriate box (es) below and then provide detailed answers to questions A and B below:

I am seeking asylum or withholding of removal based on

- ☐ Race
- ☐ Religion
- ☐ Nationality
- ☐ Political opinion
- ☒ Membership in a particular social group
- ☒ Torture Convention

A. Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

☐ No   ☒ Yes   If your answer is "Yes," explain in detail:

1) What happened;
2) When the harm or mistreatment or threats occurred;
3) Who caused the harm or mistreatment or threats; and
4) Why you believe the harm or mistreatment or threats occurred.

Please refer to my parents' statements.

B. Do you fear harm or mistreatment if you return to your home country?

☐ No   ☒ Yes   If your answer is "Yes," explain in detail:

1) What harm or mistreatment you fear;
2) Who you believe would harm or mistreat you; and
3) Why you believe you would or could be harmed or mistreated.

Please refer to my parents' statements.

86

OMB No. 1115-0086

## PART B.   INFORMATION ABOUT YOUR APPLICATION Continued

2.  Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States?

☐ No  ☒ Yes  If "Yes," explain the circumstances and reasons for the action.

Members of my parents' family were incarcerated by members of the Communist Party.

3.  A.  Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No  ☒ Yes  If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

My mother was a member of the Balli Kombetar Party.

B.  Do you or your family members continue to participate in any way in these organizations or groups?

☒ No  ☐ Yes If "Yes," describe for each person, your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

4.  Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No  ☒ Yes  If "Yes," explain why you are afraid and describe the nature of the torture you fear, by whom, and why it would be inflicted.

Please see my parents' statements.

OMB No. 1115-0086

**PART C.    ADDITIONAL INFORMATION ABOUT YOUR APPLICATION**

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.)*

1    Have you, your spouse, your child(ren), your parents, or your siblings ever applied to the United States Government for refugee status, asylum, or withholding of removal?    ☐ No  ☒ Yes

If "Yes" explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision. Please indicate whether or not you were included in a parent or spouse's application. If so, please include your parent or spouse's A- number in your response. If you have been denied asylum by an Immigration Judge or the Board of Immigration Appeals, please describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

My parents have applied for asylum, before.

2.    A. After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside in any other country before entering the United States?    ☐ No  ☒ Yes

B. Have you, your spouse, your child(ren), or other family members such as your parents or siblings ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?    ☒ No  ☐ Yes

If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay; the person's status while there; the reasons for leaving; whether the person is entitled to return for lawful residence purposes; and whether the person applied for refugee status or for asylum while there, and, if not, why he or she did not do so.

We traveled from Albania to Europe and flew to Mexico and then entered the United States.

3.    Have you, your spouse, or child(ren) ever ordered, incited, assisted, or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

☒ No    ☐ Yes If "Yes," describe in detail each such incident and your own or your spouse's or child(ren)'s involvement.

OMB No. 1115-0086

## PART C.  ADDITIONAL INFORMATION ABOUT YOUR APPLICATION Continued

4    After you left the country where you were harmed or fear harm, did you return to that country?

[X] No    [ ] Yes  If "Yes," describe in detail the circumstances of your visit (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s)).

5.   Are you filing the application more than one year after your last arrival in the United States?

[ ] No   [X] Yes  If "Yes," explain why you did not file within the first year after you arrived. You should be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived. For guidance in answering this question, see Instructions, Part 1: Filing Instructions, Section V, "Completing the Form," Part C.

6.   Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted and sentenced for any crimes in the United States?

[X] No    [ ] Yes  If "Yes," for each instance, specify in your response what occurred and the circumstances; dates; length of sentence received; location; the duration of the detention or imprisonment; the reason(s) for the detention or conviction; any formal charges that were lodged against you or your relatives included in your application; the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

89

OMB No. 1115-0086

## PART D.    YOUR SIGNATURE

*After reading the information regarding penalties in the instructions, complete and sign below. If someone helped you prepare this application, he or she must complete Part E.*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546, provides in part: "Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or knowingly presents any such application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned not more than five years, or both." I authorize the release of any information from my record which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.

Staple your photograph here or the photograph of the family member to be included on the extra copy of the application submitted for that person.

**WARNING.** Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an Asylum Officer or an Immigration Judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. See 208(d)(6) of the Act and 8 CFR 208.20.

Print Complete Name    _Rediol Demiraj_

Write your name in your native alphabet

Did your spouse, parent, or child(ren) assist you in completing this application?    [X] No  [ ] Yes  *(If "Yes" list the name and relationship.)*

_Rudina Demiraj_        _mother_

(Name)        (Relationship)        (Name)        (Relationship)

Did someone other than your spouse, parent, or child(ren) prepare this application?    [ ] No  [ ] Yes  *(If "Yes," complete Part E)*

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?    [ ] No  [ ] Yes

Signature of Applicant *(The person in Part A. I.)*

[ _Rudina Demiraj signed on behalf of Redial Demiraj_

Sign your name so it all appears within the brackets        Date *(Mo/Day/Yr)*

## PART E.    DECLARATION OF PERSON PREPARING FORM IF OTHER THAN APPLICANT, SPOUSE, PARENT OR CHILD

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324(c).

Signature of Preparer    _Yvette M. Mastin_    Print Complete Name    _Yvette M. Mastin_

Daytime Telephone Number  _832 251 3662_    Address of Preparer: Street Number and Name    _2323 S. Voss Rd_

Apt. No.  _400_    City  _Houston_    State  _TX_    ZIP Code  _77057_

## PART F.    TO BE COMPLETED AT INTERVIEW OR HEARING

*You will be asked to complete this Part when you appear before an Asylum Officer of the Immigration and Naturalization Service (INS), or an Immigration Judge of the Executive Office for Immigration Review (EOIR) for examination.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are all true to the best of my knowledge taking into account correction(s) numbered _____ to _____ that were made by me or at my request.

Signed and sworn to before me by the above named applicant on:

Signature of Applicant        Date *(Mo/Day/Yr)*

Write Your Name in Your Native Alphabet        Signature of Asylum Officer or Immigration Judge

_90_

Form I-589 (Rev. 10/18/01)N Page 9

## Attachment to Form I-589
## Application for Asylum and for Withholding of Removal

Part C. Question 5.
My mother's application for asylum was filed within a year. Circumstances arose after her application was appealed to the BIA that caused me to fear persecution independent of my mother.

My mother discovered the new circumstances and requested her case be reopened after it was denied. My mother infdormed her previous attorney who filed the asylum application and appealed its denial in April 2003. She did not advise my mother to do anything at that time when her appeal was pending.

. After her case was deined and my dad had come home, my mother hired a new lawyer who advised my mom to file a motion to remand.

This lawyer later realized that I had an independent claim because of what happened to my dad when he was shot in March 2003 due to a blood feud in Albania.

She is filing this application for me.

91

REPUBLIC OF ALBANIA
CITY - HALL ( COMUNE )
CIVIL REGISTRY OFFICE No.

Lushnje, on March 19  , 2001

## CERTIFICATE OF BIRTH

As it results from the fundamental register of the quarter Xh.Nep., No. 110 - 1 ,  in the year 1974 , it is attested the following composition : 

----------------------------------------------------------------

PERSONAL DATA

| | |
|---|---|
| Name and surname | Rediol Demiraj |
| Father's name | Edmond |
| Mother's name | Rudina |
| Date of birth | June 15, 1993 |
| Place of birth | Lushnje |
| District | Lushnje |
| Sex | Male |
| Marital status | Single |
| Nationality | Albanian |
| Citizenship | Albanian |

----------------------------------------------------------------

the stamp of taxes
the seal of the office

It is delivered this certificate of birth as a document .

THE REGISTRAR
Mimoza Nushi
the signature

----------------------------------------------------------------

PERKTHYESI
TRANSLATOR
TRADUCTEUR     KASHMIR
USERSETZER     BERISHA
TRADUTTORE
DIOC

92

REPU    IKA E SHQIPERISE
NOTERIA LUSHNJE
Nr. *131* prot.                                    Lushnje, me *04.04.* 2001

### VERTETIM FIRME

Vertetohet me anen e kesaj firma e perkthyesit Kashnir Berisha , i njohur personalisht prej meje noterit Lirim Gina , i cili deklaroi se perktheu fjale per fjale dhe korrektesisht dokumentin e mesiperm nga gjuha shqipe ne gjuhen angleze dhe une noteri e firmos dhe e vulos ate ne besim .

NOTERI.
LIRIM R. GINA



REPUBLIC OF ALBANIA
NOTARY OFFICE OF LUSHNJE
No. *731* of reg.                                  Lushnje, on *04.04.* 2001

### SIGNATURE VERACITY

It is certified  the signature of the translator Kashnir Berisha , known personally by me the notary public Lirim Gina , who swore that the translation of the above mentioned document from Albanian into English language is literally and correctly in conformity with the original and me the notary public sign and seal it in faith .

NOTARY PUBLIC
LIRIM R. GINA



93

REPUBLIKA E SHQIPERISE
Bashkia (Komuna)
Zyra e gjendjes civile Nr. _____

Mod. 11

Në bazë te regjistrit _____
perberja si me poshte

**Ç E R T I F I K A T E**

| GJENERALITETET | | |
|---|---|---|
| Emri e mbiemri | | |
| Emri i atit | | |
| Emri i nënes | | |
| Datelindja | 15 06 1993 | |
| Vendlindja | | |
| Fshati,qyteti,rrethi | | |
| Seksi | | |
| Gjendja civile | | |
| Kombësia | | |
| Shtetësia | | |
| Data e | | |
| Shkaku i | | |
| Vendi i | | |
| Vendimi Nr.datë | | |
| Mbiemri pas | | |

vërtetohet



94

# PERBERJA FAMILJARE

| Nr. R | Emri e mbiemri | Atësia | Mëmësia | Seksi | Lidhja me k.familjarit | Datëlindja | | | Gjendja civile |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Dita | Muaji | Viti | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Kjo çertifikate leshohet për

PULLE TAKSE

R.SHQIPERISE

50 LEKE

Nepunsi i Gjendjes Civile
(emri, mbiemri, firma)

U.S. Department of Justice
Immigration and Naturalization Service

OMB No. 1115-0086

# Application for Asylum and for Withholding of Removal

*Start Here - Please Type or Print.* USE BLACK INK. SEE THE SEPARATE INSTRUCTION PAMPHLET FOR INFORMATION ABOUT ELIGIBILITY AND HOW TO COMPLETE AND FILE THIS APPLICATION. (Note: There is NO filing fee for this application.)

*Please* check the box if you also want to apply for withholding of removal under the Convention Against Torture. ☑

## PART A. I.   INFORMATION ABOUT YOU

| | |
|---|---|
| 1. Alien Registration Number(s)(A#'s)(*If any*)  95 218 801 | 2. Social Security No. (*If any*)  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 |

| | | |
|---|---|---|
| 3. Complete Last Name  Demiraj | 4. First Name  Rudina | 5. Middle Name  N/A |

6. What other names have you used? (*Include maiden name and aliases.*)   none

| 7. Residence in the U.S. C/O | Telephone Number 281-557-8228 |
|---|---|
| Street Number and Name  535 W. Nasa Rd 1 | Apt. No.  2008 |

| City  Webster | State  TX | ZIP Code  77598 |
|---|---|---|

| 8. Mailing Address in the U.S., if other than above   Yvette M. Mastin, Atty At Law | Telephone Number 832-251-3662 |
|---|---|
| Street Number and Name  2323 S. Voss | Apt. No.  420 |

| City  Houston | State  TX | ZIP Code  77057 |
|---|---|---|

| 9. Sex ☑ Male  ☐ Female | 10. Marital Status: ☑ Single  ☐ Married  ☐ Divorced  ☐ Widowed |
|---|---|

| 11. Date of Birth (*Mo/Day/Yr*) 05/28/1976 | 12. City and Country of Birth Berat, Albania |
|---|---|

| 13. Present Nationality (*Citizenship*) Albanian | 14. Nationality at Birth Albanian | 15. Race, Ethnic or Tribal Group White | 16. Religion Muslim |
|---|---|---|---|

17. *Check the box, a through c that applies:*
a. ☐ I have never been in immigration court proceedings.
b. ☑ I am now in immigration court proceedings.
c. ☐ I am not now in immigration court proceedings, but I have been in the past.

18. *Complete 18 a through c.*
a. When did you last leave your country? (*Mo/Day/Yr*)  10/01/2000    b. What is your current I-94 Number, if any?  n/a

c. Please list each entry to the U.S. beginning with your most recent entry.
*List date (Mo/Day/Yr), place, and your status for each entry. (Attach additional sheets as needed.)*

| Date 10/15/00 | Place Brownsville, TX | Status EWI | Date Status Expires  n/a |
|---|---|---|---|
| Date | Place | Status | |
| Date | Place | Status | |
| Date | Place | Status | |

| 19. What country issued your last passport or travel document?  none | 20. Passport #  none Travel Document #  none | 21. Expiration Date (*Mo/Day/Yr*) n/a |
|---|---|---|

| 22. What is your native language? Albanian | 23. Are you fluent in English? ☐ Yes ☑ No | 24. What other languages do you speak fluently? None |
|---|---|---|

| FOR EOIR USE ONLY | FOR INS USE ONLY |
|---|---|
| | Action: Interview Date: _____ Decision: __ Approval Date: _____ __ Denial Date: _____ __ Referral Date: _____ Asylum Officer ID# _____ |

Form I-589 (Rev. 10/18/01)N

OMB No. 1115-0086

**PART A. II.    INFORMATION ABOUT YOUR SPOUSE AND CHILDREN**
**Your Spouse.** ☐ I am not married. (Skip to *Your Children, below.)*

| 1. Alien Registration Number (A#) *(If any)*<br>74 700 122 | 2. Passport/ID Card No. *(If any)*<br>unknown | 3. Date of Birth *(Mo/Day/Yr)*<br>07/26/1969 | 4. Social Security No. *(If any)*<br>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 |
|---|---|---|---|
| 5. Complete Last Name<br>Demiraj | 6. First Name<br>Edmond | 7. Middle Name<br>n/a | 8. Maiden Name<br>n/a |
| 9. Date of Marriage *(Mo/Day/Yr)*<br>09/30/1992 | 10. Place of Marriage<br>Kushnje, Albania | | 11. City and Country of Birth<br>Lushnje, Albania |
| 12. Nationality *(Citizenship)*<br>Albanian | 13. Race, Ethnic or Tribal Group<br>white | | 14. Sex ☑ Male ☐ Female |

| 15. Is this person in the U.S.? ☑ Yes *(Complete blocks 16 to 24.)* ☐ No *(Specify location)* |
|---|

| 16. Place of last entry in the U.S.?<br>Brownsville | 17. Date of last entry in the U.S.<br>*(Mo/Day/Yr)*<br>04/2003 | 18. I-94 No. *(If any)*<br>n/a | 19. Status when last admitted<br>*(Visa type, if any)*<br>withholding grante |
|---|---|---|---|
| 20. What is your spouse's current status?<br>EWI | 21. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* indefinite | 22. Is your spouse in immigration court proceedings?<br>☐ Yes ☑ No | 23. If previously in the U.S., date of previous arrival *(Mo/Day/Yr)*<br>2000 |

| 24. If in the U.S., is your spouse to be included in this application? *(Check the appropriate box.)* |
|---|
| ☑ Yes (Attach one (1) photograph of your spouse in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)<br>☐ No |

**Your Children.** Please list ALL of your children, regardless of age, location, or marital status.

☐ I do not have any children. *(Skip to Part A. III., Information about Your Background.)*
☑ I do have children. Total number of children    2

*(Use Supplement A Form I-589 or attach additional pages and documentation if you have more than four (4) children.)*

| 1. Alien Registration Number (A#) *(If any)*<br>95 218 802 | 2. Passport/ID Card No. *(If any)*<br>n/a | 3. Marital Status *(Married, Single, Divorced, Widowed)*<br>single | 4. Social Security No. *(If any)*<br>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 |
|---|---|---|---|
| 5. Complete Last Name<br>Demiraj | 6. First Name<br>Rediol | 7. Middle Name<br>n/a | 8. Date of Birth *(Mo/Day/Yr)*<br>06/15/93 |
| 9. City and Country of Birth<br>Lushnje, Albania | 10. Nationality *(Citizenship)*<br>Albanian | 11. Race, Ethnic or Tribal Group<br>white | 12. Sex ☑ Male ☐ Female |

| 13. Is this child in the U.S.? ☑ Yes *(Complete blocks 14 to 21.)* ☐ No *(Specify Location)* |
|---|

| 14. Place of last entry in the U.S.?<br>Brownsville | 15. Date of last entry in the U.S.<br>*(Mo/Day/Yr)*<br>10/01/2000 | 16. I-94 No. *(If any)*<br>n/a | 17. Status when last admitted<br>*(Visa type, if any)*<br>EWI |
|---|---|---|---|
| 18. What is your child's current status?<br>none | 19. What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)*<br>n/a | 20. Is your child in immigration court proceedings?<br>☑ Yes ☐ No | |

| 21. If in the U.S., is this child to be included in this application? *(Check the appropriate box.)* |
|---|
| ☑ Yes (Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)<br>☐ No |

9

OMB No. 1115-0086

**PART A. II.   INFORMATION ABOUT YOUR SPOUSE AND CHILDREN Continued**

| 1. Alien Registration Number (A#) *(If any)* NOne | 2.   Passport/IDCard No. *(If any)* n/a | 3.  Marital Status *(Married, Single, Divorced, Widowed)* single | 4.   Social Security No. *(If any)* 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 |
|---|---|---|---|
| 5.  Complete Last Name Demiraj | 6.   First Name Alban | 7.   Middle Name n/a | 8.   Date of Birth *(Mo/Day/Yr)* 09/01/01 |
| 9. City and Country of Birth Galveston, USA | 10.   Nationality *(Citizenship)* American | 11. Race, Ethnic or Tribal Group white | 12.   Sex  ☑ Male  ☐ Female |

13.  Is this child in the U.S.?   ☑ Yes *(Complete blocks 14 to 21.)*   ☐ No *(Specify Location)*

| 14.   Place of last entry in the U.S.? n/a | 15.   Date of last entry in the U.S.? *(Mo/Day/Yr)* n/a | 16.   I-94 No. *(If any)* n/a | 17.   Status when last admitted *(Visa type, if any)* n/a |
|---|---|---|---|
| 18.  What is your child's current status? American citizen | 19.   What is the expiration date of his/her authorized stay,(if any) *(Mo/Day/Yr)* N/A | | 20.   Is your child in immigration court proceedings?  ☐ Yes  ☑ No |

21.  If in the U.S., is this child to be included in this application?  *(Check the appropriate box.)*
☐  Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☑  No

| 1. Alien Registration Number (A#) *(If any)* | 2.   Passport/ID Card No.*(If any)* | 3.  Marital Status *(Married, Single, Divorced, Widowed)* | 4.   Social Security No. *(If any)* |
|---|---|---|---|
| 5.  Complete Last Name | 6.   First Name | 7.   Middle Name | 8.   Date of Birth *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10.   Nationality *(Citizenship)* | 11.  Race, Ethnic or Tribal Group | 12.   Sex  ☐ Male  ☐ Female |

13.  Is this child in the U.S. ?   ☐ Yes *(Complete blocks 14 to 21.)*   ☐ No *(Specify Location)*

| 14.   Place of last entry in the U.S.? | 15.   Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16.   I-94 No. *(If any)* | 17.   Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18.  What is your child's current status? | 19.   What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | | 20.   Is your child in immigration court proceedings?  ☐ Yes  ☐ No |

21.  If in the U.S., is this child to be included in this application?  *(Check the appropriate box.)*
☐  Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐  No

| 1. Alien Registration Number (A#) *(If any)* | 2.  Passport/ID Card No. *(If any)* | 3.  Marital Status *(Married, Single, Divorced, Widowed)* | 4.   Social Security No. *(If any)* |
|---|---|---|---|
| 5.  Complete Last Name | 6.   First Name | 7.   Middle Name | 8.   Date of Birth *(Mo/Day/Yr)* |
| 9. City and Country of Birth | 10.   Nationality *(Citizenship)* | 11.  Race, Ethnic or Tribal Group | 12.   Sex  ☐ Male  ☐ Female |

13.  Is this child in the U.S.?   ☐ Yes *(Complete blocks 14 to 21.)*   ☐ No *(Specify Location)*

| 14.   Place of last entry in the U.S.? | 15.   Date of last entry in the U.S.? *(Mo/Day/Yr)* | 16.   I-94 No. *(If any)* | 17.   Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| 18.  What is your child's current status? | 19.   What is the expiration date of his/her authorized stay, if any? *(Mo/Day/Yr)* | | 20.   Is your child in immigration court proceedings?  ☐ Yes  ☐ No |

21.  If in the U.S., is this child to be included in this application?  *(Check the appropriate box.)*
☐  Yes *(Attach one (1) photograph of your child in the upper right hand corner of page 9 on the extra copy of the application submitted for this person.)*
☐  No

OMB No. 1115-0086

## PART A. III.    INFORMATION ABOUT YOUR BACKGROUND

1.  Please list your last address where you lived before coming to the U.S.  If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State, and Country.)  (Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Number and Street (Provide if available) | City/Town | Department, Province or State | Country | Dates From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|---|---|
| pALLATI 210 | Berat | Lushnje | ALBANIA | 09/1992 | 10/2000 |
| | | | | | |

2.  Provide the following information about your residences during the last five years.  List your present address first. *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Number and Street | City/Town | Department, Province or State | Country | Dates From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|---|---|
| 535 W. Nasa Rd 1 2008 | Webster | TX | USA | 10/2000 | 12/2003 |
| Pallati 210 | | Lushnje | Albania | 10/1993 | 10/2000 |
| | | | | | |
| | | | | | |
| | | | | | |

3.  Provide the following information about your education, beginning with the most recent. *(Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| Name of School | Type of School | Location (Address) | Attended From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|---|
| Berat | high school | Albania | 09/1990 | 06/1994 |
| | | | | |
| | | | | |
| | | | | |

4.  Provide the following information about your employment during the last five years. List your present employment first. *(Use Supplement Form B or additional sheets of paper if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From (Mo/Yr) | To (Mo/Yr) |
|---|---|---|---|
| Marios Flying Pizza | waitress | 2002 | 12/2003 |
| none | housewife | 09/1993 | 2002 |
| | | | |
| | | | |

5.  Provide the following information about your parents and siblings (brother and sisters).  Check box if the person is deceased. *(Use Supplement B Form I-589 or additional sheets of paper if necessary.)*

| | Name | City/Town and Country of Birth | | Current Location |
|---|---|---|---|---|
| Mother | Jolanda Mustafa | Berat Albania | ☐ Deceased | TIrana / ▆▆▆▆ |
| Father | Kujtim Mustafa | Berat Albania | ☐ Deceased | Tirana / ▆▆▆▆ |
| Siblings | Adriana Jashari | Berat Albania | ☐ Deceased | Macedonia |
| | Eduart Mustafa | Berat Albania | ☐ Deceased | USA |

99

OMB No. 1115-0086

**PART B.   INFORMATION ABOUT YOUR APPLICATION**

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in PART B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the Act or withholding of removal under the Convention Against Torture) you should provide a detailed and specific account of the basis of your claim to asylum or other protection.  To the best of your ability, provide specific dates, places, and descriptions about each event or action described.  You should attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim.  If this documentation is unavailable or you are not providing this documentation with your application, please explain why in your responses to the following questions.  Refer to Instructions, Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A - D,  Section V, "Completing the Form," Part B, and Section VII, "Additional Documents that You Should Submit" for more information on completing this section of the form.

1.   Why are you applying for asylum or withholding of removal under section 241(b)(3) of the Act, or for withholding of removal under the  Convention Against Torture?  Check the appropriate box (es) below and then provide detailed answers to questions A and B below:

I am seeking asylum or withholding of removal based on

- ☐ Race
- ☐ Religion
- ☐ Nationality
- ☐ Political opinion
- ☑ Membership in a particular social group
- ☑ Torture Convention

A.   Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?
☐ No  ☑ Yes  If your answer is "Yes," explain in detail:

1)   What happened;
2)   When the harm or mistreatment or threats occurred;
3)   Who caused the harm or mistreatment or threats; and
4)   Why you believe the harm or mistreatment or threats occurred.

Please see attached statement

B.   Do you fear harm or mistreatment if you return to your home country?
☐ No  ☑ Yes  If your answer is "Yes," explain in detail:

1)   What harm or mistreatment you fear;
2)   Who you believe would harm or mistreat you; and
3)   Why you believe you would or could be harmed or mistreated.

Please see attached statement

OMB No. 1115-0086

**PART B.    INFORMATION ABOUT YOUR APPLICATION Continued**

2.  Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States?

☐ No   ☑ Yes  If "Yes," explain the circumstances and reasons for the action.

    Yes, members of my family were incarcerated by the Communists.

3. A.  Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No   ☑ Yes  If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

    I was a member of the Balli Kombetar Party.

B.  Do you or your family members continue to participate in any way in these organizations or groups?

☑ No   ☐ Yes  If "Yes," describe for each person, your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

4.  Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No   ☑ Yes  If "Yes," explain why you are afraid and describe the nature of the torture you fear, by whom, and why it would be inflicted.

    Please see attached statement

OMB No. 1115-0086

## PART C.   ADDITIONAL INFORMATION ABOUT YOUR APPLICATION

*(Use Supplement B Form I-589 or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.)*

1.   Have you, your spouse, your child(ren), your parents, or your siblings ever applied to the United States Government for refugee status, asylum, or withholding of removal?   ☐ No  ☑ Yes

If "Yes" explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision. Please indicate whether or not you were included in a parent or spouse's application. If so, please include your parent or spouse's A- number in your response. If you have been denied asylum by an Immigration Judge or the Board of Immigration Appeals, please describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

```
I have been denied by the Immigration Judge and the Board of Immigration
Appeals.  This application is based on a changed circumstance.  I have fully
described the new circumstance in my written statement which is attached.
```

2.   A.  After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside in any other country before entering the United States?   ☑ No  ☐ Yes

B.  Have you, your spouse, your child(ren), or other family members such as your parents or siblings ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?   ☑ No  ☐ Yes

If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay; the person's status while there; the reasons for leaving; whether the person is entitled to return for lawful residence purposes; and whether the person applied for refugee status or for asylum while there, and, if not, why he or she did not do so.

3.   Have you, your spouse, or child(ren) ever ordered, incited, assisted, or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

☑ No  ☐ Yes  If "Yes," describe in detail each such incident and your own or your spouse's or child(ren)'s involvement.

OMB No. 1115-0086

**PART C.   ADDITIONAL INFORMATION ABOUT YOUR APPLICATION Continued**

4.   After you left the country where you were harmed or fear harm, did you return to that country?

☑ No   ☐ Yes  If "Yes," describe in detail the circumstances of your visit (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s)).

5.   Are you filing the application more than one year after your last arrival in the United States?

☐ No   ☑ Yes  If "Yes," explain why you did not file within the first year after you arrived.   You should be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived.  For guidance in answering this question, see Instructions, Part 1:  Filing Instructions, Section V. "Completing the Form," Part C.

     This application is an amended application in regards to the new circumstance that
     has arisen since i filed my original application for asylum.

6.   Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted and sentenced for any crimes in the United States?

☑ No   ☐ Yes  If "Yes," for each instance, specify in your response what occurred and the circumstances; dates; length of sentence received; location; the duration of the detention or imprisonment; the reason(s) for the detention or conviction; any formal charges that were lodged against you or your relatives included in your application; the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

10 ?

OMB No. 1115-0086

## PART D.    YOUR SIGNATURE

*After reading the information regarding penalties in the instructions, complete and sign below. If someone helped you prepare this application, he or she must complete Part E.*

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct. Title 18, United States Code, Section 1546, provides in part: "Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or knowingly presents any such application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned not more than five years, or both." I authorize the release of any information from my record which the Immigration and Naturalization Service needs to determine eligibility for the benefit I am seeking.

Staple your photograph here or the photograph of the family member to be included on the extra copy of the application submitted for that person.

**WARNING:** Applicants who are in the United States illegally are subject to removal if their asylum or withholding claims are not granted by an Asylum Officer or an Immigration Judge. Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn. Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act. See 208(d)(6) of the Act and 8 CFR 208.20.

| Print Complete Name | Write your name in your native alphabet |
|---|---|
| RUDINA  DEMIRAJ | RUDINA  DEMIRAJ |

Did your spouse, parent, or child(ren) assist you in completing this application?  ☒ No  ☐ Yes (If "Yes," list the name and relationship.)

_____ (Name)    _____ (Relationship)    _____ (Name)    _____ (Relationship)

Did someone other than your spouse, parent, or child(ren) prepare this application?  ☒ No  ☐ Yes (If "Yes," complete Part E)

Asylum applicants may be represented by counsel. Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?  ☒ No  ☐ Yes

Signature of Applicant *(The person in Part A. I.)*

[ *Rudina Demiraj* ]    11. 10. 2003

Sign your name so it all appears within the brackets    Date *(Mo/Day/Yr)*

## PART E.    DECLARATION OF PERSON PREPARING FORM IF OTHER THAN APPLICANT, SPOUSE, PARENT OR CHILD

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324(c).

| Signature of Preparer | Print Complete Name |
|---|---|
| *Yvette M. Mastin* | Yvette  M.  Mastin |

| Daytime Telephone Number | Address of Preparer: Street Number and Name |
|---|---|
| 832 251-3662 | 2323 S. Voss  #420 |

| Apt. No. | City | State | ZIP Code |
|---|---|---|---|
| | Houston | TX | 77057 |

## PART F.    TO BE COMPLETED AT INTERVIEW OR HEARING

*You will be asked to complete this Part when you appear before an Asylum Officer of the Immigration and Naturalization Service (INS), or an Immigration Judge of the Executive Office for Immigration Review (EOIR) for examination.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are all true to the best of my knowledge taking into account correction(s) numbered _____ to _____ that were made by me or at my request.

Signed and sworn to before me by the above named applicant on:

_____    _____
Signature of Applicant    Date *(Mo/Day/Yr)*

_____    _____
Write Your Name in Your Native Alphabet    Signature of Asylum Officer or Immigration Judge

101

Form I-589 (Rev.  10/18/01)N Page 9

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFIVE OF IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS
FALLS CHURCH, VIRGINIA

IN THE REMOVAL PROCEEDINGS OF  )
                               )
                               )        File No. 95 218 801
Rudina Demiraj                 )
                               )
                               )

### STATEMENT OF RUDINA DEMIRAJ

1. My name is Rudina Demiraj. I am over twenty-one years old and competent to make the following statement. The facts herein are true, correct and personally known to me.

2. I was born on May 28, 1976 in Berat, Albania. I am a citizen of Albania.

3. I am writing this statement in support of my Motion to Reopen which is before this Court.

4. Edmond Demiraj is my husband. We were married on September 30, 1992. We have two sons: Rediol Demiraj and Alban Demiraj. Rediol was born in Albania and is included in my application for asylum. Since the date of our marriage we have been married and lived together. We have never separated and plan to remain married and raise our children.

5. I am personally aware of new facts that have developed after my merits hearing on July 8, 2002 that I believe justify the reopening of my case and its remand to the Immigration Court for reconsideration of my application of asylum, withholding of removal under the Immigration and Nationality Act ("INA") and withholding of removal under the Convention Against Torture. I was not able to present these facts at my merits hearing because they did not exist at that time.

6. On November 19, 2003 Edmond Demiraj was granted withholding of removal pursuant to Section 241 (b) (3) of the INA. The Department of Homeland Security stipulated to the fact that I faced circumstances that exists which would cause me to be persecuted. I believe that the situation which would cause his persecution would also cause me to be persecuted as well.

7. I believe that I will be persecuted and murdered by his former boss Bill Belini and his family because they have already tried to murder Edmund Demiraj. They will try to murder me because I am married to Edmond Demiraj and personally known to Bill Belini. I will not be protected by the Albanian government and therefore I will be killed.

8.     Bill Belini jumped bond in the United States attempted to murder Edmund Demiraj by shooting him when he was recently deported to Albania. Edmund was named a material witness in the criminal case against Bill Belini and planned to testify against him at his federal criminal trial in Laredo, Texas.

9.     The person who shot Edmund Demiraj and his family have vowed to murder Edmund Demiraj and all known family members.

10.     In Albania many killings are committed by vendettas against entire families. I am extremely fearful for my safety and my son's ask that my case be reopen to give me the opportunity to present this information to an immigration court to reconsider my application for asylum, withholding of removal under INA and withholding of removal pursuant to the Convention Against Torture.

11.     An overwhelming number of Albanian government officials have succumbed to corruption and would not protect me or the rest of our family from persecution and from being murdered.

12.     Thank you for your consideration of this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Signature: _Rudina Demiraj_

Date: _12/16/03_

106

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFIVE OF IMMIGRATION REVIEW
BOARD OF IMMIGRATION APPEALS
FALLS CHURCH, VIRGINIA

IN THE REMOVAL PROCEEDINGS OF  )
                                 )     File No. 95 218 801
Rudina Demiraj                 )
                                 )
                                 )

## STATEMENT OF EDMUND DEMIRAJ

1. My name is Edmund Demiraj. I am over twenty-one years old and competent to make the following statement. The facts herein are true, correct and personally known to me.

2. I was born on July 26, 1969 in Lushnje, Albania. I am a citizen of Albania.

3. I am writing this statement in support of Rudina Demiraj's Motion to Reopen which is before this Court.

4. I am the husband of Rudina Demiraj ("Rudina"). We were married on September 30, 1992. We have two sons: Rediol Demiraj and Alban Demiraj. Rediol was born in Albania and is included in Rudina's application for asylum. Since the date of our marriage we have been married and lived together. We have never separated and plan to remain married and raise our children.

5. I am personally aware of new facts that have developed that I believe justify the reopening of Rudina's case and its remand to the Immigration Court for reconsideration of Rudina's application of asylum, withholding of removal under the Immigration and Nationality Act ("INA") and withholding of removal under the Convention Against Torture.

6. On November 19, 2003 I was granted withholding of removal pursuant to Section 241 (b) (3) of the INA. The Department of Homeland Security stipulated to the fact that I faced circumstances that exists which would cause me to be persecuted. I believe that the situation which would cause my persecution would also cause my wife to be persecuted as well.

7. I believe that all members of my family and extended family will be subjected to harm due to this situation. Along with this statement, Ms. Mastin has provide a number of documents in my case which were issued by Department of Homeland Security officials or submitted to the immigration court in my case to prove the persecution that I would suffer if I was to return to Albania.