8.   The brief account of my situation is that a Bill Bedini my former boss and a known fugitive jumped bond in the United States attempted to murder me by shooting me when I was recently deported to Albania. I was named a material witness in his case and planned to testify against him at his federal criminal trial in Laredo, Texas. The person who shot me and his family has vowed to harm me, my wife and my entire family. The circumstances which exist in Albania make my murder and my wife's and families' likely if we were to return to Albania.

9.   In Albania many killings are committed by vendettas against entire families. I am extremely fearful of the safety of my wife and son and ask that her case be reopen to give her the opportunity to present this information to an immigration court to reconsider her application for asylum, withholding of removal under INA and withholding of removal pursuant to the Convention Against Torture.

10.  I am extremely afraid for the safety of my wife and son if they should be removed to Albania at this time. Mr. Belini intended to murder me. There is no doubt in my mind that he will harm my wife and children if they return to Albania.

11.  Thank you for your consideration of this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Signature: _Edmond Demery_

Date: _12/16/03_

10 \8

IMMIGRATION COURT
RT 3 BOX 341  BUENA VISTA DR
LOS FRESNOS, TX  78566

Case No:  A74-700-122

In the Matter of:

DEMIRAJ, EDMOND

Applicant                              IN WITHHOLDING-ONLY PROCEEDINGS

On Behalf of the Applicant             On Behalf of the INS

ORDER OF THE IMMIGRATION JUDGE

This is a summary of the oral decision entered on Nov 19, 2003 and
is issued solely for the convenience of the parties.  If the proceedings
should be appealed or reopened, the oral decision will become the official
opinion in the case.

    ORDER:    It is hereby ordered that the applicant's request for:

    [ ] 1. Withholding of Removal under INA 241(b)(3) is:
            [✓] Granted
            [ ] Withdrawn
            [ ] Denied

    [ ] 2. Withholding of Removal under the Convention Against Torture is:
            [ ] Granted
            [ ] Withdrawn
            [✓] Denied

    [ ] 3.  Deferral of Removal under the Convention Against Torture is
            granted.

    Date:  Nov 19, 2003

                                        _David Ayala_
                                        DAVID AYALA
                                        Immigration Judge

APPEAL: WAIVED
APPEAL DUE BY:

                        CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY: MAIL (M)    PERSONAL SERVICE (P)
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [ ] ALIEN's ATT/REP  [ ] INS
DATE: _____  BY: COURT STAFF
    Attachments: [ ] EOIR-33 [ ] EOIR-28 [ ] Legal Services List [ ] Other

                            109                              Q5

REPUBLIC OF ALBANIA
MUNICIPALITY ( COMUNE)
CITY RECORDER OFFICE No.

Lushnje , on March 19  , 2001

## CERTIFICATE OF MARRIAGE

As it results from the fundamental register of the quarter Xh.Nep. , No.
110/1 , in the year 1974 , it is attested the following composition :

| PERSONAL DATA | HUSBAND | WIFE |
|---|---|---|
| Name and surname | Edmond Demiraj | Rudina Mustafaj |
| Father's name | Haxhi | Kujtim |
| Mother's name | Isnije | Jolanda |
| Date of birth | July 26 , 1969 | May 28 , 1976 |
| Place of birth | Lushnje | Berat |
| District | Lushnje | Berat |
| Sex | Male | Female |
| Marital status | Married | Married |
| Nationality | Albanian | Albanian |
| Citizenship | Albanian | Albanian |
| Date of marriage | 30.09.1992    Act of marriage No. 78 | |
| Place of marriage | Civil Registry Office | |
| Surname after the marriage | of the husband | "Demiraj " |

the stamp of taxes
the seal of the office

It is delivered this certificate as a document.

THE REGISTRAR
Mimoza Nushi
the signature

PERXTHYESI
TRANSLATOR
TRADUCTEUR    KASHMIR
ÜBERSETZER   BERISHA
THAJUTIRE

**REPUBLIKA E SHQIPERISE**
Bashkia (Komuna) _____
Zyra e gjendjes civile Nr._____

Shkruajtëse P.3. Mod. 11
200__

# ÇERTIFIKATE Vdekje

Çemeltet Durg të vitit 1921 1974 vërtetohet

Në bazë të regjistrit
përbërja si më poshtë :

| GJENERALITETET | | |
|---|---|---|
| Emri e mbiemri | Edmond Dervishi | Ruçdina Mustafa |
| Emri i atit | Faxha Isufe | Rustem Jolanda |
| Emri i nënës | | |
| Datëlindja | 26.07.1961 | 28.05.1976 |
| Vendlindja | Durres | Berat |
| Fshati,qyteti,rrethi | | |
| Seksi | Mashkull | Femer |
| Gjendja civile | Uh martuar | t martuar |
| Kombësia | Shqiptar Shqiptar | Shqiptar Shqiptar |
| Shtetësia | Shqiptar 1918 t 23 | 4 |
| Data e | Vdekje | |
| Shkaku i | Vdekje nr 12 9 c | |
| Vendi i | | |
| Vendimi Nr.datë | Jatrit | |
| Mbiemri pas | Vdekje | |

AO 99 (Rev. 8/85) Appearance Bond of Witness

U.S. MAGISTRATE COURT
MGN – SDTX
FILED

MAY 0 9 2002

Michael N. Milby, Clerk
Laredo Division

# UNITED STATES DISTRICT COURT

_____ SOUTHERN _____   District of   _____ TEXAS _____

UNITED STATES OF AMERICA

v.                                                          **APPEARANCE BOND OF WITNESS**

_____ EDMOND DEMIRAJ _____
                Witness                                  CASE NUMBER:    L-02-1606M
                                                                                                L-01-CR-973

Surety:  ✔ We, the undersigned, jointly and severally acknowledge that we and our . . .
personal representatives are bound to pay to the United States of America the sum of $ __5,000.00__  dollars
__FIVE THOUSAND_____ ). (Unsecured by Collateral)

The condition of this bond is _____ EDMOND DEMIRAJ _____ is to appear to testify in
                                                            Name of Witness
the above entitled case before the U.S. District Court for _____ SOUTHERN _____
District of _____ TEXAS _____  at _____ LAREDO, TEXAS _____ , and at such other places as
the witness may be required to appear, in accordance with any and all orders and directions relating to the witness'
appearance in the above entitled matter as may be given or issued by this court or any other United States district court
or which the witness may be required to appear or the cause transferred and is not at any time while so appearing to be
absent or depart from the court without leave and if the witness appears and attends as ordered, then this bond is to be
void. If the witness fails to perform this condition, payment of the amount of the bond shall be due forthwith. If the bond
is forfeited and the forfeiture is not set aside or remitted, judgment may be entered, upon motion in the United States
district court having jurisdiction over the case, against each debtor jointly and severally for the amount above stated
together with interest and costs, and execution may be issued or payment secured as provided by the Federal Rules of
Criminal Procedure and other laws of the United States.

This bond is signed _____ May 8, 2002 _____ at _____ LAREDO, TX _____
                                                Date                                                                Place       (281)338-2877
Witness. _Edmond Demiraj_ 15/9/___ Address. _Bannum Place of Laredo/AAMA, Laredo, Tx._
          EDMOND DEMIRAJ              Date              535 W. Nasa Rd., Apt. 1099, Webster, Tx 77598
Surety. _E. Shehu_ 15-9-2 Address. 431 7th Street, San Leon, Tx  77539
          EMIN SHEHU            Date                          (281)339-3221
Surety. _____              Address. _____

Signed and acknowledged before me _____ May 8, 2002 _____
                                                                            Date
                        Michael N. Milby, Clerk

_____ / _____          _Linda Davila_
   Clerk              Date                                      Clerk Linda Davila

199A    (Rev. 6/97) Order Setting Conditions of Release                                    Page 1 of ___3___ Pages

S. MAGISTRATE COURT
MCN – SDTX
FILED

MAY 0 9 2002

Michael N. Milby, Clerk
Laredo Division

# UNITED STATES DISTRICT COURT

|  SOUTHERN  | District of |  TEXAS  |

United States of America

V.

EDMOND DEMIRAJ
Witness

## ORDER SETTING CONDITIONS OF RELEASE

Case Number: L-02-1606M
L-01-CR-973

ORDERED that the release of the witness is subject to the following conditions:

The witness shall not commit any offense in violation of federal, state or local law while on release in this case.

The witness shall immediately advise the court, defense counsel and the U.S. attorney in writing before any change in address and telephone number.

The witness shall appear at all proceedings as required.

The witness shall appear at (if blank, to be notified)
904 Juarez or

| 1300 Matamoros St., Laredo, Tx | on | U.S. DISTRICT COURT |
|  |  | Place |
|  |  | WHEN NOTIFIED |
|  |  | Date and Time |

### Release on Personal Recognizance or Unsecured Bond

FURTHER ORDERED that the witness be released provided that:

) (4)  The witness promises to appear at all proceedings as required.

) (5)  The witness executes an unsecured bond binding the witness to pay the United States the sum of
FIVE THOUSAND —————————————————— dollars ($ 5,000.00 ———————— )
in the event of a failure to appear as required.

1998   (Rev. 5/99) Additional Conditions of Release                                    Page ___2___ of ___3___

## Additional Conditions of Release

Upon finding that release by one of the above methods will not by itself reasonably assure the appearance of the defendant and the safety of other persons and the community,

FURTHER ORDERED that the release of the witness is subject to the conditions marked below:

) (6)   The witness is placed in the custody of:

(Name of person or organization)   EMIN SHEHU

(Address)   431 7th Street

(City and state)   San Leon, Texas   77539                    (281) 339-3221

agrees (a) to supervise the witness in accordance with all the conditions of release, (b) to use every effort to assure the appearance of the witness at all scheduled court
proceedings, and (c) to notify the court immediately in the event the witness violates any conditions of release or disappears.

ED                     Signed: _E Shehu_____      _5-9-2_
                                     Custodian or Proxy                    Date

) (7)   The witness shall:
( ✔ )(a)   report to the  _Pretrial Office for Supervision_   5/9/07
           telephone number _956-790-1733_ , not later than
( ✔ )(b)   execute a bond or an agreement to forfeit upon failing to appear as required the following sum of money or designated property:
           $5,000.00 (UNSECURED BY COLLATERAL)
(   )(c)   post with the court the following indicia of ownership of the above-described property, or the following amount or percentage of the above-described

(   )(d)   execute a bail bond with solvent sureties in the amount of $ _____.
( ✔ )(e)   maintain or actively seek employment.
(   )(f)   maintain or commence an education program.
(   )(g)   surrender any passport to:
(   )(h)   obtain no passport.
( ✔ )(i)   abide by the following restrictions on personal association, place of abode, or travel:
           RESTRICTED TRAVEL TO BE ARRANGED BY PRETRIAL SERVICES. NO TRAVEL TO MEXICO.
( X )(j)   avoid all contact, directly or indirectly, with any persons who are or who may become a victim or potential witness in the subject investigation or
           prosecution, including but not limited to:

(   )(k)   undergo medical or psychiatric treatment and/or remain in an institution as follows:

(   )(l)   return to custody each (week) day as of _____ o'clock after being released each (week) day as of _____ o'clock for employment,
           schooling, or the following limited purpose(s):

(   )(m)   maintain residence at a halfway house or community corrections center, as deemed necessary by the pretrial services office or supervising officer.
( ✔ )(n)   refrain from possessing a firearm, destructive device, or other dangerous weapons.
( ✔ )(o)   refrain from (   ) any  ( ✔ ) excessive use of alcohol.
( ✔ )(p)   refrain from use or unlawful possession of a narcotic drug or other controlled substances defined in 21 U.S.C. § 802, unless prescribed by a licensed medical
           practitioner.
(   )(q)   submit to any method of testing required by the pretrial services office or the supervising officer for determining whether the defendant is using a prohibited
           substance. Such methods may be used with random frequency and include urine testing, the wearing of a sweat patch, a remote alcohol testing system, and/or
           any form of prohibited substance screening or testing.
(   )(r)   participate in a program of inpatient or outpatient substance abuse therapy and counseling if deemed advisable by the pretrial services office or supervising
           officer.
(   )(s)   refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or electronic
           monitoring which is (are) required as a condition(s) of release.
(   )(t)   participate in one of the following home confinement program components and abide by all the requirements of the program which   (   ) will or
           (   ) will not include electronic monitoring or other location verification system. You shall pay all or part of the cost of the program based upon your ability
           to pay as determined by the pretrial services office or supervising officer.
           (   ) (i)  Curfew. You are restricted to your residence every day  (   ) from _____ to _____ , or  (   ) as directed by the pretrial
                     services office or supervising officer; or
           (   ) (ii) Home Detention. You are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse,
                     or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as pre-approved by the pretrial services
                     office or supervising officer; or
           (   ) (iii) Home Incarceration. You are restricted to your residence at all times except for medical needs or treatment, religious services, and court
                     appearances pre-approved by the pretrial services office or supervising officer.
(   )(u)   report as soon as possible, to the pretrial services office or supervising officer any contact with any law enforcement personnel, including, but not limited
           to, any arrest, questioning, or traffic stop.
( ✔ )(v)   IMMEDIATE PLACEMENT AT THE BANNUM PLACE OF LAREDO RESIDENTIAL FACILITY, UPON HIS RELEASE.
( ✔ )(w)   ONCE DOCUMENTS ARE SECURED WITH IMMIGRATION AND NATURALIZATION SERVICES, THE MATERIAL WITNESS IS TO
           RESIDE WITH ~~Relative Veterans~~ his family AND TO OBTAIN EMPLOYMENT UNTIL THE CASE OF Bill Bedini IS DISPOSED OF.
(   )(x)

199C    (Rev.6/97)  Advice of Penalties . . .                                    Page ___3___ of ___3___ Pages

## Advice of Penalties and Sanctions

ARE ADVISED OF THE FOLLOWING PENALTIES AND SANCTIONS:

A violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for your arrest, a ...tion of release, an order of detention, and a prosecution for contempt of court and could result in a term of imprisonment, a fine, or both.
If after release, you knowingly fail to appear as required by the conditions of release, you may be prosecuted for failing to ...r and may be fined not more than $100,000 and imprisoned not more than one year, or both.
A term of imprisonment imposed for failure to appear or surrender shall be in addition to the sentence for any other offense.  In ...on, a failure to appear or surrender may result in the forfeiture of any bond posted.

## Acknowledgment of Witness

I acknowledge that I am the witness in this case and that I am aware of the conditions of release.  I promise to obey all conditions of ...se, to appear as directed, and to surrender for service of any sentence imposed.  I am aware of the penalties and sanctions set forth ...e.

5/9/0.

_____
Signature of Witness, EDMOND DEMIRAJ

Bannum Place of Laredo/AAMA
_____
Address

Tx 78041
_____
City and State                              Telephone

Upon Release:  535 W. Nasa Rd., Apt. 1099, Wesbster, Tx 77598
(281)338-2877

## Directions to United States Marshal

) The witness is ORDERED released after processing.
) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judicial officer that the
defendant has posted bond and/or complied with all other conditions for release.  The defendant shall be produced before the
appropriate judicial officer at the time and place specified, if still in custody.

_____
May 8. 2002

_____
Signature of Judicial Officer

MARCEL C. NOTZON, U.S. MAGISTRATE JUDGE
_____
Name and Title of Judicial Officer

DISTRIBUTION:   COURT    DEFENDANT    PRETRIAL SERVICE    U.S. ATTORNEY    U.S. MARSHAL

S 7
Rev 07/93)

## PRETRIAL RELEASE REPORTING INSTRUCTIONS

| DEFENDANT Edmund Demieri | DISTRICT COURT Texas Southern | DOCKET NO. S:01 CR 973-99 |
|---|---|---|
| CASE SUPERVISOR David M. Medellin | TELEPHONE NUMBER (956) 727-4844 | 956-790-1733 ext 222 |

### REPORT AS FOLLOWS:

In Person: ___
    BY: ___

TO: U. S. PRETRIAL SERVICES
    515 Rusk Avenue, Suite 6214
    Houston, TX 77208-1127
    TEL: (713) 250-5218
    ATTN: Duty Officer

By Telephone:
    BY: 05/13/02    AT:( ) 9:00 A.M.

Additional Instructions:

Report by telephone and ask for the Duty officer
    Tel- 713-250-5218

Home visits will be conducted throughout your period of supervision.

Notify your Pretrial Services Officer immediately of any change in address, telephone, or employment.

days notice must be given for approval of travel outside the restricted area.

You shall not commit a federal, state, or local crime during the period of release. You shall inform the Pretrial Services Officer immediately if you are charged with an offense.

### DEFENDANT'S STATEMENT

I understand the above stated instructions and understand that failure to comply will be reported to the Court and may result in the revocation of my bond and my detention pending the outcome of my case.

| SIGNATURE OF DEFENDANT | DATE |
|---|---|
| SIGNATURE OF UNITED STATES PRETRIAL SERVICES OFFICER | DATE 5-9-02 |



**U.S. Department of Justice**
Immigration and Naturalization Service
Office of Internal Audit

*425 I Street NW*
*Washington, DC 20536*

DEC 1 2 2002

Yvette M. Mastin
Kuniansky & Rozan
5051 Westheimer, #700
Houston, TX 77056

Dear Ms. Mastin:

    Your complaint has been received on behalf of Edmond Demiraj by the Office of Internal Audit, Immigration and Naturalization Service, and has been assigned case number 03X01043. We have initiated action to resolve the allegation(s). You will be notified of the outcome upon completion of our work.

    Thank you for bringing this matter to our attention.

                                Sincerely,

                                Sue Armstrong
                                Assistant Director
                                Internal Investigations Branch

REPUBLIC OF ALBANIA
JUSTICE MINISTRY
Expert Forensic Service

Ser. Nr: 16214

Lushnja

## Forensic Evidence Nr: __27__
FOR EXAMINATION OF ___Edmond Demirai___

Today the date of ___March 8ᵗʰ. 2003___    in ___Lushnia Hospital___    I forensic expert Dr.____Vangjel Stambolliu____ under the request of investigator ___OPGJ Feriat Vatoci___ made under his decision dated ___March 8ᵗʰ. 2003___    I examined ___Edmond Demirai___ years __34__ son/daughter of ___Haxhi___ occupation _____ resident of ___Lushnia___

Examination is completed to answer the questions of above decision:
1. What injuries were caused to the injured?
2. With what sort of object?
3. In what category?
4. __In case of being injured with the firearm. what is the distance and the direction of shooting?__

### Conditions of the case

___Examination is completed based on the clinical request dated: March 7ᵗʰ. 2003. Nr. 1129 of the Lushnia Hospital.___

### Objective Check Up

___Comes in the hospital in overall severe condition. pale. with cold sweats. arterial pressure 80/60. mmhf pulse 120 per minute. in the left groin area there is a wound in the round form with the diameter 08 cm. in the glottal area (in the left sitting area there is a wound in the messy form with dimensions 1.5x1 cm. around the wound in the groin area there is evidence of burning areas. continues to stay at the hospital diagnosed with wounds caused by a firearm. hemorrhagic shock. He is getting treated with antibiotics. blood etc.___

CONCLUSION: Based on the above evidence I conclude:
1- To the injured are evident ___firearm wounds. hemorrhagic shock.___

2- These injuries are caused with __firearm.__
3- The above injuries are categorized as __severe injuries because they are life threatening.__
4- __The direction of shooting was from front to behind. in the distance inside the area of additional shooting factors (close range).__

Forensic Expert

(Dr. _____)
Doctor's Signature and Stamp

I. _Albert Kasumaj_ certify that I am fluent in the Albanian and English languages. I am competent to translate documents attached. and this translation is a true and accurate translation of the attached documents: to the best of my knowledge.

Signed this 24th day of June, 2003, in the city of Houston. Texas

Albert Kasumaj
9610 Ravens Nest Ct.
Houston, TX 77083
Tel. 281-494-0567 home
      832-439-2281 cell
akasumaj@hotmail.com

**REPUBLIKA E SHQIPERI**
**MINISTRIA E DREJTËSISE**
*Shërbimi i Ekspertimit Mjekoligjor*

Lushnje



**Nr.ser**        16214

Akt Dëshmi Mjekoligjore Nr: 27
Edmond Demiraj

Dr. _____ Sot më datë 05-03-03 _____ në spitalin e Lushnjes und eksperti mjekoligjor
_____ sipas kërkesës së hetuesit _____ und ekspertova
bërë në vendimin e tij dt. 05-03-03 _____ ekzaminova _____ vjeç
i biri /e bija _____ me profesion _____ banues në Lushnjes _____

Ekzaminimi kryhet për t'u dhënë pyetjeve të vendimit të mësipërm:

1. Çfarë dëmtimi konstaton tek i dëmtuari ?
2. Me çfarë mjeti ?
3. Në ç'kategori ?
4. e rast se jane shkaktuar me arme zjarri, cila eshte distanca dhe drejtimi i qitjes?

Rrethanat e çështjes

_____ Ekzaminimi behet ne baz te kartelas klinike dt.05 03 03,
n.129 te snit-lit te Lushnjes.

Kqyrja objektive

Vjen ne spital ne gjendje te pergjitheshme te rende, i zbehte,
me djers te ftobt, tension arterial 5/00 mmHf uu si 120 ne minute
ne rrezen e kofshes se majte vrehet nje plage me forme te rrumbullake
e me diameter 08 cm, ne nisen glutealeite ndenjuren e majte vrehet nje
plage me forme te crregullte me dimensione 1.5x1 cm, per rreth plages
ne rrezen e kofshes vrehen zona djenie,vazhdon te qendroje ne spital
me dia uozen plage arme zjarri, shok hemoragjik.u mjeku me antibiotik,
gjak,etj.

KONKLUZION: Duke u mbështetur në të dhënat e sipërme konkludoj:
1- Tek i (e) dëmtuari konstatohen _____ plage arme zjarri, shok hemorgjik.

2- Këto dëmtime janë shkaktuar me arme zjarri.

3- Dëmtimet e sipërme hyjnë në kategorinë e _____ atyre te rendve sepse jane te

4- rejtimi i qitjes ka qene nga perpara rapa,ne distance brend
a veprimit te faktoreve plotesues te qitjes(distance e afert).

**TOL** home

**FOR broadcasters**

| week in review | in focus | features | opinions | media | books | week in review | in their own words | letters to the editor |

| 27 October 2003 | join TOL | about us | ad info | jobs | archive | country files | EU observer | columns |

**Search TOL**

[ ] Go

advanced search

This month:

28 October - 3 November 2003,
14 - 20 October 2003,
7 - 13 October 2003,
30 September - 6 October 2003

single page view
printer friendly
email this article
discuss article

## 21 - 27 October 2003

**Our Take:** Forward to the Past

- **Russia: Mikhail Khodorkovsky, Prisoner**
- Russia and Ukraine: In Dire Straits
- Romania: Winning Votes, Losing Ministers
- Bosnia: An Emotional Farewell
- Georgia: Dead Man Voting
- Belgrade, Hague Exchange Fire
- Velcom to a Belarusian Prison
- Tajikistan or 'Typhoidistan'?
- Moldova's Broadcasting Discord Continues

Albanian Government on Cusp of Another Electoral Victory

TIRANA, Albania—After six years in power, Albania's ruling Socialist Party (PS) appears to have a narrow advantage over the main opposition Democratic Party (PD) following the 12 October local elections. But as votes are still being counted, the minimal victory is threatening to turn sour for the PS, with a government crisis that may result in calls for a new parliamentary vote.

The elections are one of the numerous tests Albania must pass, in order to prove it can sustain the fragile stability it has built following the tumultuous 1990s.

By late on 26 October, the votes in Tirana had still not been counted, but in the nationwide aggregate of municipal council votes, where the vote is cast for parties rather than candidates, the ruling Socialists appeared to have only a 1.5-percent lead over the opposition Democrats.

With final results still unknown, the Socialists have so far won around 33.2 percent of the national vote, and the Democrats around 31.7 percent. According to the Central Election Commission, out of 362 municipalities, the Socialists have won 183 and the Democrats 136, with smaller parties and independent candidates taking the rest.

Voter turnout was around 50 percent, low for the Albanian average of around 60 percent in the past decade, reflecting a lack of interest in local elections.

NATO and the European Union—both institutions in which Albania is hoping to gain membership—called on the government and political parties to meet



21 - 27 October 2003

Addressing the public on national television the day before elections, Albanian President Alfred Moisiu appealed to citizens, reminding them that the country's image "is linked with the success or failure of these elections. Let's be part of this process, to do our civil and legal duty, so that Albania and Albanians win on 12 October."

As in past elections in post-communist Albania, these were not without controversy, as nationalist tensions were sparked in the south and last-minute changes on the lists that allotted voters to polling stations caused chaos on election day.

In the southern coastal region of Himara, tensions were high between pro-Albanian and pro-Greek forces, the latter claiming that ballot boxes had been stuffed. Shortly after the accusation was made, an ethnic-Greek man showed up at the central police station in Himara, bloodied and beaten. The news spread fast, sparking an anti-Albanian demonstration in the central square. Police intervened in the standoff.

DELAYED RESULTS

The Socialists won for a second consecutive time in Albania's second-largest city, Durres, with Lefter Koka—a businessman and close friend of Socialist leader and Prime Minister Fatos Nano. They also made surprise advances in the Democrat strongholds in central and northern Albania, including Shijak and Kukes.

But the Democrats earned their first victories in southern Albania since the near-civil war of 1997 had pitted the chiefly pro-Democrat north against the pro-Socialist south.

The democrats won municipalities in Korca, the south's largest town, as well as Delvina and Saranda—both cities that had revolted in 1997 against the Democratic Party and its leader, Sali Berisha, then the country's president. Three years ago, in the tumultuous general elections that followed the 1997 conflict, Democrats had practically given up campaigning in the south because of the general hostility against them. At that time, the Socialists had won 67 percent of the vote, compared to 31 percent for the Democrats.

International monitors from the Organization for Security and Cooperation in Europe (OSCE) and the Council of Europe said the elections showed some progress, but called on the government to avoid voting chaos in the general elections, which, barring a government crisis, are expected in 2005.

However, on 22 October, OSCE observation mission head Robert Barry told local media that the post-electoral period had been "disappointing," and previously favourable evaluations of the process had been "greatly undermined."

"This has been caused by a mixture of carelessness, incompetence, and deliberate political obstructionism," Barry said.

Electoral commission spokesman Erton Sinani said the announcement of the results had been delayed "because of disputes between representatives" of the two parties.

The opposition Democrats cited electoral irregularities, accusing the Socialist government of attempting to keep some 10,000 of its supporters from voting. The Socialists denied the accusation.

media that any problems with the elections where "technical and not political," and came about as a result of improper registration of citizens that led to the voting chaos.

CRISIS AFTER VICTORY

The ruling party slid into crisis after Interior Minister Luan Rama physically assaulted a television news editor on the evening of 14 October, as senior leaders were celebrating their apparent victory at Rozafa, a *nouveau riche* club in eastern Tirana.

Assisted by his bodyguards, Rama beat Ilir Babaramo, the editor of *Vizion*, Albania's fourth largest television station. The feud between the two men had started last August, when Babaramo called for Rama's resignation following several high-profile murders in the country. Protests by journalist groups, as well as the International Federation of Journalists (IFJ), secured Rama's downfall.

Rama was sacked as prosecutors opened an investigation into the assault incident.

On 23 October, a group of 17 Socialist parliamentarians led by Prime Minister Nano blocked the election of Rama's successor, as well as a replacement for foreign minister, demanding a larger share of government posts for their faction of the PS.

The government has remained without a foreign minister since ex-prime minister Ilir Meta—Nano's bitter own-party rival—resigned as foreign minister in July and blocked Nano's replacement candidate for the post. Deputy Foreign Minister Luan Hajdaraga has been serving as acting foreign minister in the interim.

The move left Nano with a minority of 63 votes, less than half of the 140 seats in parliament.

Nano said he would empower Hajdaraga and Deputy Interior Minister Igli Toska as acting ministers until he meets Meta for a face-off in the party congress on 12 December.

The prime minister said that if he is confirmed at the PS leader, he will demand new parliamentary elections in the constituencies of the rebellious parliamentarians to solidify his majority.

Meta has accused Nano of running the government like his own "private club," while Nano charged that Meta staged a "palace coup" against him. Both Nano and Meta have stepped up their trading of allegations that the other has links to organized crime. In the meantime, bitter infighting has resulted in a government stalemate that has seen important issues—such as economic reform and the fight against organized crime—completely sidelined.

Albanian President Alfred Moisiu is clearly impatient with the Socialist internecine troubles, and on 24 October demanded that Nano brave a confidence vote in parliament.

The close results of the elections have given the Democrats a new lease on life. The party now prepares for a possible return to power and has called on Nano to either submit to a motion of confidence or resign, proposing snap polls in the middle of next year.



include both friends and foes.

—by Altin Raxhimi

Related Articles:

Analysis: Albania's Sloths
The government can't get a handle on the privatization of its banking and
telecom sectors, while the economy lags behind.
by Altin Raxhimi
28 January 2003

Analysis: Maturity Test
In Albania's recent elections, local institutions performed their constitutional
and legal duties with a previously unseen degree of professionalism.
by Eno Ngjela
25 July 2001

Features: Is Berisha Up To His Old Tricks?
Recent disturbances following disputed local elections in Albania mark a
worrying return to violence.
by Altin Raxhimi
1 December 2000

For more articles on the Balkans, go to http://balkanreport.tol.cz.

---

We want your feedback.
If you would like to discuss or comment on this, or any other TOL article,
please visit our Discussion Board

---

Copyright © 2003 Transitions Online. All rights reserved.



HUMAN RIGHTS WATCH

hrw.org | DEFENDING HUMAN RIGHTS WORLDWIDE

PORTUGUÊS  FRANÇAIS   РУССКИЙ   DEUTSCH
ESPAÑOL    中文       العربية    OTHER

Home
News Releases
About HRW
Contribute
Community
Publications
Info by Country
  Africa
  Americas
  Asia
  Europe/Central Asia
  Middle East/N. Africa
  United States
Global Issues
  Arms
  Children's Rights
  HIV/AIDS
  International Justice
  Prisons
  Refugees
  Women's Rights
  United Nations
  More...
Campaigns
Film Festival
Photo Galleries
Site Map
Contact Us

[Search]

Table of Contents > Europe & Central Asia >

# Albania

- Human Rights Developments
- Defending Human Rights
- The Role of the International Community

Table of Contents
Download
Printer Friendly Version
Order Online
Press Release
More on Albania

## HUMAN RIGHTS DEVELOPMENTS

Europe & Central Asia
Albania
Armenia
Azerbaijan
Belarus
Bosnia and Herzegovina
Croatia
Georgia
Kazakhstan
Kyrgyzstan
Macedonia
Russian Federation
Tajikistan
Turkey
Turkmenistan
Ukraine
Uzbekistan
Federal Republic of Yugoslavia

Following a series of political crises, by mid-year Albania entered a period of what appeared to be more stable and inclusive governance. Nonetheless, impunity for police abuse, failures of various government branches to uphold the rule of law, trafficking in human beings, and widespread violations of children's rights continued to be major concerns. The government's desire to cast Albania as part of the European mainstream made it unfortunately more reluctant to acknowledge and address the country's human rights problems.



In early 2002, political life was dominated by a dramatic split within the governing Socialist Party (SP), triggered by chairman Fatos Nano's campaign against what he described as the party's "moral crisis" of corruption, nepotism, and criminal connections. Nano's attacks focused on then-Prime Minister Ilir Meta and his top ministers, who reciprocated by making similar allegations against Nano and his faction. The scathing cross-accusations led to Meta's resignation in January 2002.

The tensions within the SP, and the return of the opposition Democratic Party (DP) to Parliament despite its continuing refusal to recognize the outcome of the 2001 parliamentary election, shaped a situation that led to Prosecutor General Arben Rakipi's impeachment. Meta's parliamentary faction accused Rakipi of abusing his powers to support Nano's campaign, and the opposition, which had long been demanding Rakipi's resignation, joined votes to initiate his impeachment. Acting on Parliament's proposal—adopted at the end of a swift, one-day debate, without even giving Rakipi a chance to respond—the President of the Republic dismissed Rakipi and quickly appointed a new prosecutor general. Rakipi took the case to the Constitutional Court, claiming violations of his rights to be informed of the charges and to defend himself. The court ruled that the impeachment had indeed run afoul of constitutional due process and remanded the case to Parliament "for reconsideration."

The ruling was met with strong criticism, including from the president,

some of whom went as far as calling for the Constitutional Court's dissolution. Parliament took no action whatsoever to comply with the ruling, dealing a severe blow to the court's authority and the rule of law generally. Instead, a consensus emerged that the court's powers ought to be curtailed. Irrespective of the merits of the allegations against Rakipi and the legitimacy of the court's jurisdiction over the case, the impeachment process suffered from an arbitrariness that was reminiscent of socialist-style purges. The excessive reactions against Albania's highest court revealed a thin commitment to rule of law when political stakes are high.

In July, Albanian politics took another dramatic turn with the first rapprochement in years between the two major parties. A Nano-Meta compromise within the SP and negotiations with the DP led to the consensus election of retired general Alfred Moisiu as the new president, and Fatos Nano's appointment to head the third Socialist government within months. The new atmosphere resulted in some positive initiatives, including the establishment of a bipartisan committee to investigate the violations that marred the 2001 elections and another to look into possible abuses by the Intelligence Service—a long-standing opposition request. The campaign against official corruption launched by Nano's "catharsis movement" did not, however, give rise to any prosecutions.

The year saw a continuation of widespread violations of media freedoms, a problem documented in a sixty-page Human Rights Watch report published in June. The report detailed harassment and violent attacks against journalists, often intended to suppress critical reporting. Such violence went largely unpunished, and in a majority of cases the perpetrators were police officers. The research also revealed that Albanian defamation laws, and their application by Albanian courts, fell far short of international standards. Statutes and courts granted government officials unacceptable privileges and special protections. The Human Rights Watch report identified the unfair allocation of state advertising and subsidies to the media as another major concern: government officials were reported to have used their financial powers to blackmail critical outlets and unjustly reward media of their liking. The combined chilling effect of these interferences continued to handicap the development of a free and professional media. The pattern was further in evidence in late October, when the daily Koha Jonë (Our Time) received an array of financial and labor inspections days after it published a series of articles critical of Prime Minister Nano. Later, inspectors were also sent to several other media critical of the government.

Albania's executive and judicial authorities continued to fail to combat police violence. Torture and physical abuse of detainees were widespread and unpunished. Developments in the case of a minor brutally tortured by the Saranda police in June 2000 were illustrative of official indifference. In 2000, protests by human rights groups had caused the minister of interior to fire the main suspect, police officer Rrapo Xhavara, and the public prosecutor started a criminal investigation into the case. Within months, however, Saranda prosecutors had dropped the charges for "lack of evidence." In 2001, new protests by rights groups and high-level interventions by the Albanian ombudsman forced then-Prosecutor General Rakipi to reluctantly order the re-opening of the case. When Xhavara was finally tried under reduced charges in July 2002, he received an eighteen-month sentence that was immediately converted to parole. The conviction did not affect his June 2002 appointment as commander of Saranda's municipal police.

Impunity also seemed to be the rule in the case of the former Elbasan



human rights records in Albania. After years of victim complaints, Koseni was fired and indicted for torture in late 2001. By April 2002, however, the office of the Tirana prosecutor had closed the case without filing charges and without notifying the victim or his defense lawyer at the Albanian Human Rights Group (AHRG). The case was re-opened only after Koseni himself publicized the dropping of the charges (reportedly hoping to rejoin the police), and the AHRG called on the new prosecutor general to intervene. The case was then assigned to another prosecutor, who as of late October had yet to conclude the investigation. Such cases of prosecutorial failure indicated that the prosecution service required systematic monitoring and support.

Violations committed by Albania's police force also marred its efforts to support the global war on terrorism. On September 12, 2001, the police and Intelligence Service detained Ilir Hajrullai and his pregnant sister, Aishe, whose Kuwaiti husband was under investigation for alleged links to al-Qaeda. The two were kept incommunicado for twenty-one days, during which they were subjected to threats, psychological pressures, and polygraph tests carried out by a foreign intelligence officer. On February 6, Ilir Hajrullai was re-arrested. Only five days later was he brought before a judge, who then ordered his indefinite detention, without giving him the opportunity to be defended by a lawyer of his choice.

Albania continued to be a major point of transit and origin in the regional web of trafficking in human beings. Most victims were women and girls trafficked for forced prostitution and children trafficked into forced labor. The Albanian government did begin to take some encouraging steps to address the problem. In December 2001, Parliament adopted an anti-trafficking strategy and set up a special anti-trafficking police unit. The government also agreed to refer all illegal migrants to the Office of the United Nations High Commissioner for Refugees, which did a first screening for trafficking victims. The prosecutor general also issued instructions that trafficking victims should no longer be charged with the crimes of prostitution and illegal border crossing. These steps caused the U.S. Department of State to move Albania, in its 2002 report on trafficking in human beings, up to the class of countries not yet in compliance with international standards but making significant efforts to meet the minimum standards for combating trafficking.

Progress notwithstanding, there remained many obstacles to the implementation of the government's anti-trafficking strategy. Particularly problematic was the government's reluctance to recognize that Albania continued to be a major country of origin. This attitude was mirrored by the police and courts, which often viewed trafficking as an issue of illegal migration rather than a serious human rights violation. Prosecution of traffickers continued to be the weakest link in the system: only a small fraction of those arrested by the police were successfully prosecuted and tried. Even when traffickers were found guilty, they received prison sentences that were generally much lower than the new statutory minimum of seven years. Police corruption and the absence of a witness protection system also hindered investigations. According to the Department of State report, "10 per cent of foreign victims trafficked through Albania reported that police were directly involved."

In 2002, new evidence emerged about the plight of thousands of trafficked Albanian children subjected to forced labor, prostitution, use in criminal activities, adoptions, and possibly organ donations. Despite a few arrests, traffickers continued to prey upon vulnerable children and babies who were kidnapped or bought from their indigent parents and smuggled to Italy,

rates remained very high, especially in rural areas. In northern Albania, where a blood feud tradition was allowed to re-emerge in the 1990s, hundreds of children continued to live locked up in their homes, fearing for their lives.

Albania's Roma community continued to suffer from pervasive discrimination, miserable living conditions, and inadequate access to basic social services, which in turn reinforced their social exclusion.

## DEFENDING HUMAN RIGHTS

Human rights groups were generally able to operate freely, even though the authorities were at times hostile or non-cooperative. The Albanian Human Rights Group was active in documenting and reporting serious violations, including police violence, interference with media freedoms, and abuses in the government's anti-terrorist campaign. The Group's Complaint Center represented victims in legal actions, despite threats by perpetrators and stonewalling by judicial authorities. The Albanian Helsinki Committee directed significant resources at providing commentary on draft legislation, such as a police code of ethics and regulations on detention facilities. The committee also set up a network of correspondents in seven townships. The Albanian ombudsman made good progress toward the consolidation of that new institution, engaging various branches of government in human rights dialogue and focusing his activities on promoting freedom of information, privacy rights, and effective judicial remedies. However, a disturbing November 2001 decision of the Constitutional Court appeared to severely restrict his ability to initiate judicial review of legislation.

## THE ROLE OF THE INTERNATIONAL COMMUNITY

### United Nations

Since acceding to all major human rights treaties between 1992 and 1994, Albania had not submitted a single report, initial or periodic, on its compliance with treaty obligations. Fourteen reports were long overdue as of June 2002.

### Organization for Security and Cooperation in Europe

The Organization for Security and Cooperation in Europe (OSCE) called on Albania to implement its recommendations for electoral reform and offered assistance to the parliamentary committee established for this purpose. It also pushed the authorities to draft a comprehensive strategy for judicial reform and step up prosecution of traffickers and corrupt officials. However, human rights monitoring and reporting by the mission in Albania continued to suffer from political constraints, including pressures by senior Albanian government officials to downsize the mission and redefine its mandate.

### Council of Europe

The impact of the Council of Europe on Albania's human rights situation was generally disappointing. A delegation of the Committee for the Prevention of Torture (CPT) visited Albania in October 2001 to look into the treatment of detainees and follow up on its earlier recommendations regarding the Vlora psychiatric hospital. As of this writing, the government of Albania had not authorized the CPT to publish its findings, which made Albania one of only three countries that had not authorized publication of any CPT reports. A joint program of the Council of Europe and European Commission continued to support Albanian legal system reforms; activities under this heading included workshops on freedom of expression and privacy rights for judges and prosecutors. The impact of such trainings appeared to be limited, however. The European Court of Human Rights had yet to hear its first Albanian case.

## European Union

Political instability and concerns over the election of the new president delayed until October the opening of E.U.-Albania negotiations for a Stabilization and Association (SA) Agreement, the early precursor to the E.U.'s accession process. In April, the European Commission issued the first annual SA report, which laid out the challenges Albania faced to meet the SA requirements. The report's analysis of serious human rights problems, such as police abuse, media freedom violations, and the judiciary's failure to uphold fundamental rights, was disappointingly superficial. Following its most recent committee meeting with Albania in September, the European Parliament called on the commission to condition the conclusion of a SA agreement on an improved human rights record in law enforcement and a genuine commitment to free media. Italy, Greece, and Germany were slow to deliver on their pledges to support the operations of a new anti-trafficking center in Vlora.

## United States

The U.S. Department of State reports on human rights practices (March 2002) and trafficking in persons (June 2002) gave a largely accurate picture of the Albanian human rights situation. The U.S. administration failed, however, to exert pressure on the Albanian authorities to address key human rights concerns in areas such as police violence and press freedoms. The U.S. reportedly pressured the Albanian government to delay ratification of the Rome Statute of the International Criminal Court.

## RELEVANT HUMAN RIGHTS WATCH REPORTS:

*The NATO Summit and Arms Trade Controls in Central and Eastern Europe,* 11/02

*The Cost of Speech: Violations of Media Freedom in Albania,* 6/02

Back to Top

Table of Contents > Europe & Central Asia



© Copyright 2003, Human Rights Watch    350 Fifth Avenue, 34th Floor    New York, NY 10118-3299    USA

130